UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. MAGISTRATE JUDGE ERICA P. GROSJEAN

| | |
|---|---|
| DORIS RAY KNOX; JERRY WAYNE KNOX; JEREMY EDWARD MOORE, individually and as successor-in-interest to VERONICA LYNN CANTER, deceased,<br><br>        Plaintiffs,<br><br>  vs.<br><br>CITY OF FRESNO, a municipal corporation; EDWARD CHRISTOPHER LOUCHREN, individually and in his capacity as a police officer for the CITY OF FRESNO; DOUGLAS EDWARD COX, individually and in his capacity as a police officer for the CITY OF FRESNO,<br><br>        Defendants. | 1:14-cv-799 EPG<br><br>JURY TRIAL, DAY 2<br><br>Plaintiffs' Continued Direct Examination of Douglas Cox |

Fresno, California                    Wednesday, June 15, 2016

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiffs:  MORRISON & FOERSTER LLP
 425 Market Street
 San Francisco, CA 94105
 BY:  **ARTURO J. GONZALEZ**
  **SABRINA A. LARSON**
  **WESLEY E. OVERSON, JR.**
  **ROBERT J. ESPOSITO**


For the Defendants: FERGUSON PRAET & SHERMAN
 A Professional Corporation
 1631 E 18th Street
 Santa Ana, CA 92705-7101
 BY:  **BRUCE D. PRAET**

## INDEX

**PLAINTIFFS' WITNESSES**:

```
DOUGLAS COX                                                4
REDIRECT EXAMINATION BY MR. GONZALEZ                       4
FURTHER REDIRECT EXAMINATION BY MR. GONZALEZ              16
```

| | |
|---|---|
| 1 | Wednesday, June 15, 2016                    Fresno, California |
| 2 |       \*     \*     \*     \*     \* |

3                      **DOUGLAS COX**,
4 called as a witness on behalf of the Plaintiffs, having been
5 previously sworn, testified as follows:
6                  REDIRECT EXAMINATION
7 BY MR. GONZALEZ:
8 Q. Sir, how many times have you testified in a courtroom?
9 A. Several.
10 Q. Close to a hundred?
11 A. At least.
12 Q. Can we put up Exhibit 100, please. Sir, this is the
13 information that you received from dispatch that we went over
14 yesterday. I just want to note that right above the first
15 message from dispatch, it tells you the names of the 911
16 callers. Do you see that?
17 A. Yes.
18 Q. It says, "Veronica/Manager and Dag Lindbeck," and it even
19 has their phone numbers. Do you see that?
20 A. Yes.
21 Q. When you were responding to the call, as you mentioned
22 yesterday, you were responding Code 2, which meant that you
23 stopped at streetlights and stop signs, et cetera?
24 A. Yes.
25 Q. So you could have very easily have scrolled up to see who

1  the 911 callers were, correct?
2  A.  I could have, yes.
3  Q.  You could have seen that when you arrived or when you went
4  back to put up your sunglasses?
5  A.  I didn't bring up the call when I went back to my car.
6  Q.  But you could have?
7  A.  Yes.
8  Q.  And do you remember today whether or not you read the
9  information on the 911 callers?
10 A.  I believe I read the narrative, but I didn't put the two
11 together with the two RPs.
12 Q.  You mentioned yesterday that there were some stuff that
13 Veronica was breaking inside of the apartment; do you recall
14 that?
15 A.  I never saw her breaking anything, no.
16 Q.  The guitar, there may have been mention of a guitar.  The
17 guitar wasn't broken?
18 A.  No.  That was what Dag was worried about being broken.
19 Q.  Do you know of anything she actually broke?
20 A.  No, sir.
21 Q.  Can you and I agree that if Mr. Lindbeck was worried that
22 his guitar might be broken, that that's not a reason to go in
23 with deadly force?  Can we agree with that?
24 A.  We didn't go in with the intent of using deadly force.
25 Q.  Let me ask a different question.  Can we agree that even

1   if Mr. Lindbeck may have been concerned about his guitar, can
2   we agree that that's not a reason to set your policies aside?
3   A.  Of course.
4   Q.  And can we agree that you still have to be reasonably,
5   even though Mr. Lindbeck may be concerned about a guitar?
6   A.  Correct.
7   Q.  And can we agree that the fact that he may or may not have
8   been concerned about a guitar is not a reason to go in,
9   kicking in the door, and going in with a Taser, and with
10  deadly force as your backup?
11  A.  That's correct.
12  Q.  You understand that when someone is dancing around,
13  talking to themselves, that could be a sign of mental illness?
14  A.  Possibly.
15  Q.  You mentioned in the audio that was played for the jury at
16  some point -- and I think I got the words right -- you said,
17  "possibly high."  Do you recall that?
18  A.  Yes.
19  Q.  What was it that made you think when you sent out that
20  message, that she was possibly high?
21  A.  Just the way that she was behaving initially, yes.
22  Q.  Because what you observed was that she was behaving in a
23  way that was abnormal, correct?
24  A.  She was extremely angry, yes.
25  Q.  And when somebody is behaving in the way that you saw, she

1  could be high, right?
2  A.  Could have been, yes.
3  Q.  And she could also be mentally ill, correct?
4  A.  That is also possible, yes.
5  Q.  You mentioned yesterday that the manager told you to break
6  the door down.  Do you recall that?
7  A.  Yes.
8  Q.  I want to follow up on that just briefly.  You are not
9  saying that the reason why you broke the door down was because
10 the manager told you?  That's not what you are saying?
11 A.  No.
12 Q.  What happened was that you and Officer Louchren decided
13 that you were going to make an entry and you asked the
14 manager, "Would you rather have us break the sliding glass
15 door or break the front door," right?
16 A.  No.  Actually, we were discussing and deciding we were
17 going to make entry, figured out we could not make entry
18 because the dead bolt had been latched by Veronica, and
19 Mr. Lindbeck was in the back patio saying, "I can break a
20 window, I can break a window," and we told him, "No, we don't
21 want you to do that."
22         And that's when the manager spoke up, "I'm glad you
23 kicked the door.  It's cheaper."
24 Q.  So you are saying she is the first one that mentioned
25 kicking in the door?

1  A.  I don't recall who.  You know, we were discussing how we
2  were going to make entry since the key didn't work.  And we
3  decided that we were going to kick the door.  And that's when
4  I believe Dag started shouting that he would break the window.
5  And then that's when the manager spoke up.
6  Q.  All right.  Here's the only point I'm trying to make.  I
7  don't think this is in dispute, but I want the record to be
8  clear.
9        You and Officer Louchren decided that you were going
10 to kick the door in?
11 A.  Yes, sir.
12 Q.  And at some point after that, the manager said, well,
13 between the sliding glass door and the front door, the front
14 door would be cheaper to fix; is that right?
15 A.  That is what she said, yes.
16 Q.  You mentioned yesterday -- and I'm doing my best to quote
17 you, so if I don't get it exactly right, you can tell me --
18 but I think you said that when Officer Louchren entered, he
19 said something to Veronica along the lines of, "Come on back.
20 We just want to cite you."  Do you remember that?
21 A.  Something to that effect, yes.
22 Q.  You never said that to investigators, did you?
23 A.  I don't recall.
24 Q.  With respect to her closing the door when you approached
25 the door, when she closed it, do you recall telling the

1   investigators that it seemed like she shoved something against
2   the door?
3   A.  I believe what I told them was I wasn't sure if she
4   pressed her body weight up against the door or put something
5   up against the door.
6           MR. GONZALEZ:  Your Honor, I would like to play two
7   lines from Officer Cox's interview.
8           (Counsel conferred off the record.)
9           THE COURT:  Can you just identify, is there -- for
10  the record, identify where it is going to be from.
11          MR. GONZALEZ:  It is from page 2 of the transcript,
12  Exhibit 113.
13          THE COURT:  You may.  Thank you.
14          (The video was played as follows:)
15          "OFFICER COX:  I started opening up the door because
16              it was unlocked and she shoved it, and it seemed like
17              she shoved something up against it.  And so then, at
18              that point, I backed off."
19  BY MR. GONZALEZ:
20  Q.  Does that refresh your recollection that what you told the
21  investigators on the day of the shooting was that after she
22  closed the door, it seemed like she shoved something against
23  it?
24  A.  That's what I said that particular time, yes.
25  Q.  By the way, you told us in deposition -- I don't think

1  this is disputed -- that there was no urgency in kicking the
2  door in at the time that you kicked it in?
3  A.  That is correct.
4  Q.  And I have just a few more questions, Officer, about the
5  actual shooting.  I want a clarification on where Veronica was
6  when that first shot was fired.  I think you said she was
7  stepping over the arm of the couch; is that right?
8  A.  I believe that at the time that Officer Louchren fired the
9  first volleys that she was stepping over towards me.
10 Q.  Do you remember which leg she stepped up with?
11 A.  I believe her right.
12 Q.  So that her right leg would have been in the air and her
13 left leg is on the ground.  Is the right leg over the arm of
14 the couch?
15 A.  It seemed like she was stepping over the couch.  Whether
16 she had placed her foot onto the cushion or onto the floor, I
17 do not recall that.
18 Q.  Okay.  So when the shots are first fired, her right leg is
19 up over the arm of the couch.  You are not sure exactly where
20 it lands when she is first fired.  That's okay.
21      Then what exactly happened?  Because you said there
22 were two shots fired.  And then what did she do?
23 A.  She basically stopped, and she might have took a step
24 back.  That's what I told the investigators.  And then she
25 came at me again.

1  Q.  Okay.  So that when she took a step back, now she is
2  standing like to the left of the couch?
3  A.  She was just -- I'm not exactly sure where she was, but at
4  some point, when she started coming towards me, she had
5  stepped over.
6       At what point Officer Louchren fired his weapon the
7  first time, I do not know what exactly position that she was
8  actually in the process of stepping over.  I remember her
9  stepping over and coming towards me, and Officer Louchren
10 shot.
11      To be specific, I'm not exactly sure exactly what
12 side of the couch she was on when the first shots were fired.
13 Q.  What you told the investigators was that she was stepping
14 over the couch when the first shots were fired, correct?
15 A.  I would have to look at it to confirm that.
16 Q.  Do you recall telling them that she then took a step back,
17 like you just said, after two shots?
18 A.  I believe I said she might have taken a step back.
19 Q.  Did she or did she not take a step back after the first
20 two shots?  You just said earlier that she did.
21 A.  I think she might have, yes.
22 Q.  At that point, she is no longer on the couch, right?
23 A.  I'm not exactly sure where her feet are.  She is in a
24 standing position, but which side of the couch she is on, I'm
25 not exactly sure.

1  Q.  Well, you are standing right in front of the couch, right?
2  A.  Yes, sir.
3  Q.  So when you say she takes a step back, that means she is
4  no longer on the couch, right?
5  A.  I'm not exactly sure if she had already stepped all the
6  way over.  You know, and like I said, I'm not sure if she took
7  a step back.  She stopped, and she could have just wavered
8  back and then come back, and then she came at me again.
9  Q.  And it is your testimony that there were two shots, she
10 goes back, and then she comes at you again?
11 A.  Yes, sir.
12 Q.  When she comes at you again, is it your testimony she is
13 standing on top of the couch with both foot?
14 A.  I don't remember if she was on the top of the couch.  I
15 just remember her coming at me with the knives, like this.
16 After she was shot the first time, she started coming at me
17 again like this (gesturing).  Whether she was actually on the
18 couch or stepping on the couch, I don't recall that.
19 Q.  You remember this delay very clearly, don't you?
20 A.  Yes, sir.
21 Q.  Now, that's not what you told the investigators, is it?
22 A.  I don't know.  I would have to take a look.
23 Q.  You never said anything to the investigators about any
24 delay at all, did you?
25 A.  I don't remember.  I would have to take a look at the

1  transcript.
2  Q.  Do you recall that what you told the investigator was that
3  you heard the shots and she went flying back?
4  A.  Yeah.  I would have to take a look.
5          MR. PRAET:  Vague as to which shots, your Honor.
6          THE COURT:  Can you confirm which shots?
7  BY MR. GONZALEZ:
8  Q.  Do you recall that you didn't say anything to the
9  investigators about two rounds of shots?
10 A.  Which day are you referring to?  Which interview?
11 Q.  The very first interview on the day of the shooting.
12 A.  Okay.  I may not have.  I would have to take a look at the
13 transcript to confirm that.
14         MR. GONZALEZ:  Your Honor, I would like to play --
15 BY MR. GONZALEZ:
16 Q.  Well, sitting here today, do you remember ever saying to
17 the investigators, either in the first interview on the day of
18 the shooting or even in January, did you ever say that there
19 were two shots and then there was a delay, and then there were
20 three more shots?  Did you ever say that?
21 A.  I would have to look at the transcripts to confirm whether
22 I did or not.
23         MR. GONZALEZ:  Your Honor, I would like to play a
24 short clip from page Bates stamp 35 of Exhibit 113, which is
25 the first interview on the day of the shooting.

1          MR. PRAET:  I'm sorry.  Is this 113-A, B or C?
2          (Counsel conferred off the record.)
3          THE COURT:  Any objection?
4          MR. PRAET:  No, your Honor.
5          THE COURT:  Please proceed.  Thank you.
6          (The video was played as follows:)
7        "OFFICER COX:  I'm not that sure where I was in my
8         draw, but I cleared -- if I was -- if I had cleared
9         leather, I hadn't drawn down on her yet, and I was
10        getting ready to, and then that's when I heard the
11        shots, and I saw her fly back.  And once I saw her
12        fly back, there wasn't any need for me to deploy or
13        fire my weapon because the threat was no longer
14        there."
15   BY MR. GONZALEZ:
16   Q.  What you told the officers on the day of the shooting was
17   that you heard the shots and she went flying back.  That's
18   what you said, right?
19   A.  In that segment, yes.
20   Q.  And you know that the amount of force that an officer uses
21   has to be reasonable, you know that, right?
22   A.  Yes.
23   Q.  You know that even if there is a basis for firing your
24   weapon, you can only fire it enough times to stop the threat,
25   correct?

1  A.  You have to justify each and every shot.
2  Q.  Exactly.  And so if there was two shots and then a pause
3  and then three more shots, you know that would be an important
4  fact to these investigators, right?
5  A.  Yes.
6  Q.  But you never said that, did you?
7  A.  I never said it in this segment, no.
8  Q.  You never said it in the second segment either?
9  A.  I would have to take a look at the transcript.
10 Q.  But what you know now, what you know today in this trial,
11 is that Officer Louchren said that he fired twice, and then
12 there was a delay, and then he had to shoot three more times
13 because she came at you?  You know that now, don't you?
14 A.  I knew that then.
15 Q.  Then why didn't you tell the investigators that?
16 A.  I can't tell you why I didn't tell them that, but it did
17 happen.
18 Q.  Sir, if the jury finds that after two shots, she was no
19 longer charging, walking towards you, you would agree that the
20 last three shots would not have been necessary, correct?
21 A.  You mean if the threat had stopped?  Yes.
22          MR. GONZALEZ:  That's all I have, your Honor.  Thank
23 you.
24          THE COURT:  Thank you.
25              *         *         *         *         *

```
 1                FURTHER REDIRECT EXAMINATION
 2   BY MR. GONZALEZ:
 3   Q.  Sir, you just testified that when you said, "I heard the
 4   shots and saw her fly back," that you are talking here about
 5   the second volley of shots, right?
 6   A.  Yes.
 7   Q.  First time you ever said that was two minutes ago, in that
 8   chair, right?
 9   A.  I believe I told -- I told someone in one of the IAs.  I
10   don't remember when, but that's what happened.  That's what I
11   recall.
12   Q.  But on the day of the shooting itself, and even when you
13   had nine months to reflect, A, you never said anything about
14   this statement referring only to the second volley?  You
15   didn't say that, did you?
16   A.  Not in that segment, no.
17   Q.  And you never said, even in January, that you needed to
18   clarify something about what you said pertaining to the shots,
19   did you?
20   A.  I would have to take a look at the transcript.
21           MR. GONZALEZ:  That's all.
22           THE COURT:  Thank you.  Officer Cox.  You can step
23   down.  Thank you.
24                *        *        *        *        *
25
```

```
 1
 2
 3         I, PEGGY J. CRAWFORD, Official Reporter, do hereby
 4   certify the foregoing transcript as true and correct.
 5
 6   Dated:  16th of June, 2016        /s/ Peggy J. Crawford
                                       PEGGY J. CRAWFORD, RDR-CRR
 7
```