1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. MAGISTRATE JUDGE ERICA P. GROSJEAN


| | |
|---|---|
| DORIS RAY KNOX; JERRY WAYNE KNOX; JEREMY EDWARD MOORE, individually and as successor-in-interest to VERONICA LYNN CANTER, deceased, | 1:14-cv-799 EPG<br><br>JURY TRIAL, DAY 2<br><br>Direct Examination of Edward Louchren |
|         Plaintiffs, | |
|    vs. | |
| CITY OF FRESNO, a municipal corporation; EDWARD CHRISTOPHER LOUCHREN, individually and in his capacity as a police officer for the CITY OF FRESNO; DOUGLAS EDWARD COX, individually and in his capacity as a police officer for the CITY OF FRESNO, | |
|         Defendants. | |

Fresno, California                    Wednesday, June 15. 2016

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS




REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiffs:          MORRISON & FOERSTER LLP
                             425 Market Street
                             San Francisco, CA 94105
                             BY:  **ARTURO J. GONZALEZ**
                                  **SABRINA A. LARSON**
                                  **WESLEY E. OVERSON, JR.**
                                  **ROBERT J. ESPOSITO**


For the Defendants:          FERGUSON PRAET & SHERMAN
                             A Professional Corporation
                             1631 E 18th Street
                             Santa Ana, CA 92705-7101
                             BY:  **BRUCE D. PRAET**

3

**INDEX**

**PLAINTIFFS' WITNESSES**:

  **EDWARD LOUCHREN**                                      4
  DIRECT EXAMINATION BY MR. OVERSON:             4
  REDIRECT EXAMINATION BY MR. OVERSON         55

**EXHIBITS**

**PLAINTIFFS'**                                         Received

  104-E                                  18
  102-B                                  54

4

1   Wednesday, June 15, 2016                Fresno, California

2                   *       *       *       *       *

3           MR. OVERSON:  Plaintiffs call Officer Louchren.

4                       **EDWARD LOUCHREN**,

5   called as a witness on behalf of the Plaintiffs, having been

6   first duly sworn, testified as follows:

7           THE CLERK:  Please state your full name and spell

8   your last name.

9           THE WITNESS:  Edward Christopher Louchren,

10  L-o-u-c-h-r-e-n.

11          THE COURT:  Thank you.  Please be seated.

12          MR. OVERSON:  Your Honor, may I approach the witness

13  to provide him?

14          THE COURT:  You may.

15                      DIRECT EXAMINATION

16  BY MR. OVERSON:

17  Q.  These are the transcripts of the interviews and your

18  deposition.

19  A.  Yes.

20  Q.  Good morning, Officer Louchren.

21  A.  Good morning.

22  Q.  On March 7, 2014, you were on the day shift; is that

23  correct?

24  A.  Yeah, that's correct.

25  Q.  And that meant your shift would normally end at 4:30 p.m.,

1   true?

2   A.   True.

3   Q.   And you got a call that called you over to an apartment

4   complex to provide support to Officer Cox, true?

5   A.   Initially, I got a call somewhere else, but I preempted to

6   respond to Officer Cox.

7   Q.   And on that afternoon, you actually drove over to Officer

8   Cox's location at 1348 East San Bruno Avenue, here in Fresno,

9   true?

10   A.   That's true.

11   Q.   And you are aware that you receive event reports, and we

12   have seen them in the case; these are 911 summaries in your

13   vehicle, right?

14   A.   Correct.

15   Q.   And those reports tell you generally what the 911 caller

16   told the operator, true?

17   A.   It's a synopsis.

18   Q.   And you agree that it is a good idea to read those reports

19   when you have the opportunity to do so before you get to the

20   scene of the incident?

21   A.   Yeah, if we are able to, we try to read it.

22   Q.   Once you arrived at the scene at 1348 East San Bruno

23   Avenue, you saw there was no urgency there, true?

24   A.   No.   That's not exactly correct.

25   Q.   So you are saying that once you arrived on the scene at

EDWARD LOUCHREN

6

1   1348 San Bruno, you thought there was urgency there?

2   A.   No.   It's -- he had asked for emergency traffic.   And so

3   when I saw him there, I didn't see anything moving around a

4   lot.

5          So I asked him, "Is there any reason why we should

6   still have the air for emergency traffic?"   And then I told

7   him to "Cancel it, we don't need it," and he did.   That ties

8   up the radio traffic air.

9   Q.   And so the first thing you did when you got there is you

10   asked Officer Cox, "Do we have an emergency here or not?"

11   A.   Right.   "Do we still need to tie up the radio traffic?"

12   Q.   And he said no?

13   A.   He said no.

14   Q.   Okay.   So at that point, you had an opportunity,

15   certainly, to read the 911 reports, summarizing what the

16   callers had told the 911 operator, true?

17   A.   No.

18   Q.   You didn't have the opportunity to do that?

19   A.   No.

20   Q.   You had the time to do it, didn't you?

21   A.   No, not at the time, when I was going from the call that I

22   was leaving to him.

23   Q.   Okay.   Once you were there on the scene and you found out

24   there was not an emergency, you had the time, true?

25   A.   Well, I just talked to Doug.   I didn't look in my car.

1    Q.   So you are stating here today that you never read those

2    reports?

3    A.   No.  Not at the time of the call.

4    Q.   Do you recall that you were interviewed by Sergeant Sean

5    Biggs in January of 2015?

6    A.   I recall that.

7    Q.   And do you recall that when you discussed with Officer

8    Biggs, it was -- he wanted you to tell what happened as

9    truthfully as possible on March 7, 2014?

10   A.   Correct.

11   Q.   And do you recall telling Sergeant Biggs that you believe

12   that you in fact read those 911 reports, true?

13   A.   No.  I don't recall him telling me I had read those 911

14   reports at the time of the call.

15   Q.   Could you please turn to one of the interview transcripts

16   that actually says "Sean Bates" on the top, but it is the

17   interview with Sergeant Biggs; do you see that?

18   A.   Yes.

19   Q.   It is Exhibit 114-B.  And if you turn to page 4, there is

20   a clip 1 there.  Are you with me?

21   A.   I'm on 114-B.  What page?

22   Q.   Page 4.  Do you see where it says "Clip 1"?

23   A.   Yes.

24   Q.   Do you see where Sergeant Biggs said, "Did you read the

25   call where you were en route to fill with Cox?"  And the call,

1  he meant there the 911 report, true?

2  A.  Right, the one that comes across on the MDS.

3  Q.  The MDS, is that that little computer inside your vehicle?

4  A.  Yes, the mobile digital system.

5  Q.  And you responded -- he asked you, "Did you read the

6  call?"

7        And you said, "I want to say I believe I did."

8        True?

9  A.  That's in part, yes.

10  Q.  You go on to say you don't remember whether it popped

11  right up on your outfit, true?

12  A.  Yeah.  Again, that's in part.  I did say that.

13  Q.  So back in January 2015, you told the investigator that in

14  fact, you read that report, true?

15  A.  Can you say that again, please.

16  Q.  Back in January 2015, when you were asked during an

17  investigation by Sergeant Biggs, you said you believed you

18  read the 911 reports, true?

19  A.  No.  That isn't all I said.

20  Q.  It's part of what you said, isn't it?

21  A.  It is part of what I said.

22  Q.  So could I have PX 100, please.  It is in evidence.

23        Okay.  We have all seen this report, and I think we

24  are familiar with it now.  You know, Officer Louchren, that on

25  the report, it stated that Veronica, Ms. Canter, had mental

1    issues.  You know that's on this report, right?

2           If you could blow up, Tom, the second section of the

3    highlighting.  Do you see where it says, "Female has mental

4    issues."

5    A.   Right.  I don't believe I read that at the time when I was

6    en route to the call or arrived.

7    Q.   But you told Sergeant Biggs in January of 2015 that you

8    did, true?

9    A.   Well, I told him I don't remember, and I believe I might

10   have.

11          I had problems with the MDS at the time.  It wasn't

12   popping up, and I was leaving at call, so it was delayed.

13   Q.   You think you had problems with your vehicle computer such

14   that you couldn't read the 911 report; is that what you are

15   saying today?

16   A.   No.  I preempted from a call.  And they have to resend me

17   another one.  In the meantime, I'm driving Code 3, so I'm

18   driving, trying to get there with my lights and siren on, on

19   the 168 freeway, and doing that, I can't really look at the

20   call coming up.

21          But when I did look, it wasn't popped up yet, and I

22   was getting AMs from the dispatcher reminding me that I'm

23   going Code 3.  And I remember him saying something about he

24   was worried about Doug because of his voice or something like

25   that.

1      And I'm like, okay, and I'm still waiting for the

2  call.  And I couldn't get out over the air because it was so

3  busy so I can make sure the dispatcher knows to send me the

4  call, but I knew the direction of where he was at.  He was on

5  San Bruno, so I knew where to go.

6  Q.  You didn't tell that whole story to Sergeant Biggs, did

7  you?

8  A.  I wasn't asked.

9  Q.  Well, once you got there -- I understand you were on the

10  freeway.  And once you got there and you were parked and you

11  saw that you had time, in your view now, and what you are

12  saying to the jury, is you did not bother to read the 911

13  report, true?

14  A.  No.

15  Q.  You didn't read it?  Or you did?

16  A.  I didn't have it.  I don't believe I had the call until I

17  just arrived and it popped up and it was right there, so I

18  asked Doug what was going on.

19  Q.  You are saying the 911 report did pop up when you got

20  there?

21  A.  Probably.  I hit the arrive button.

22  Q.  It probably popped up?

23  A.  Well, because there is an arrive button on the screen that

24  you can hit if it doesn't go, and I just hit arrive, thinking

25  they will see my arrived on the prior call or, if it comes up,

1    it will hit there.  There was like a lag and delay.

2    Q.  After you hit the arrived button and it popped up on the

3    screen or probably popped up on the screen, in any event you

4    don't think you read it; is that what you are telling us?

5    A.  I hit it just as I exit my car so I can have arrival time

6    pop in there and go contact Doug.

7    Q.  You didn't take 30 seconds in your car after hitting the

8    arrival button to read the 911 report, true?

9    A.  No.  Doug was on ET, and I couldn't find Doug.  I couldn't

10   find Doug at first.

11   Q.  You didn't go back to read it; is that what you are

12   saying?

13   A.  No, I found Doug.  I just asked Doug.

14   Q.  You relied on Officer Cox to tell you what happened?

15   A.  Pretty much.

16   Q.  Let's talk about what happened after you got out of your

17   vehicle.  When you arrived, you saw Officer Cox standing there

18   in front of the apartment building, true?

19   A.  Yes.  He was in the quad.

20   Q.  And he was holding a Taser in his hand when you arrived,

21   true?

22   A.  Yes.

23   Q.  Let me show you a photo from the security camera, PX

24   104-C, which I believe is in evidence.  I will let you get

25   your water.

1    A.   Thank you.  I have allergies.  I get dry.  Sorry.

2    Q.   You ready?

3    A.   Yes, sir.

4    Q.   So looking at PX 104-C, that's the exhibit on the screen.

5    This is a photo from the security camera of the apartment

6    building.  And do you see yourself there walking in with

7    Officer Cox?

8    A.   Yes, I do.

9    Q.   And is that your vehicle over to the right?

10   A.   The one that's kind of at a canter?

11   Q.   Yes.

12   A.   I think that's my car.  I'm pretty sure that's my car.

13   Q.   Over to the right, do you see that red umbrella?

14   A.   Yes.

15   Q.   That's where he was when you arrived?

16   A.   Yes.

17   Q.   You see the time there, 3:51:02 that's on the security

18   camera?  Do you see that there?

19   A.   Yes, I see that.

20   Q.   That's the approximate time that you went through the

21   gate?

22   A.   The approximate time.

23   Q.   3:51:02, that's when you first went through the gate?

24   A.   That's the approximate time, yes.

25   Q.   Okay.  And so Mr. Lindbeck was inside the patio, and

1   Ms. Canter was inside the apartment locked in, true?

2   A.   Yes.

3   Q.   And you spoke with Officer Cox about what he had witnessed

4   before you got there, true?

5   A.   Yeah, I asked him what was going on.

6   Q.   And he told you that there was a disturbance, and the

7   woman had locked herself into the apartment, right?

8   A.   Yeah.  He said that she is inside and locked the guy

9   that's standing in the patio out of the apartment.  It's his

10  apartment.

11  Q.   And he told you that the woman had been out wandering in

12  the quad earlier, threatening people, true?

13  A.   No, I don't recall him telling me that.

14  Q.   Okay.  Could you turn to the transcript of your interview

15  with Sergeant Biggs and to page 9, please.  Again, this is

16  Exhibit 114-B.

17       Look at Clip 3 there.  Do you have that?

18  A.   Yes, sir.

19       THE COURT:  What page are you on, sir?

20       MR. OVERSON:  Page 9.

21       THE COURT:  Thank you.

22  BY MR. OVERSON:

23  Q.   Let me read for you a segment from that transcript.

24       "Sergeant Biggs:  And, basically, you are speaking to

25       Cox, and he is telling you a little about the

1          demeanor and what's happening up to that point?"

2          Then it says:  "Officer Louchren."  This is you

3     speaking now:

4          "He did mention she was out in the quad earlier.  I

5          think that's where I got my information.  She was out

6          wandering in the quad, threatening people, and went

7          into his apartment and locked herself in."

8          So reviewing that, does that refresh your

9     recollection --

10          MR. PRAET:  Could we have him read that again and put

11    all the words in.  "People earlier."  I think we left out

12    "earlier."

13          THE COURT:  Why don't we leave that --

14          Do you want to make the record clear?  It sounds like

15    you might have missed it earlier.

16          MR. OVERSON:  I'm happy to read again.  I'm sorry if

17    I missed a word.  I didn't do that intentionally.

18          Officer Louchren's response was:

19          "He did mention she was out in the quad earlier.  I

20          think that's where I got my information.  She was out

21          wandering in the quad, threatening people earlier,

22          and went into his apartment and locked herself in."

23    Q.  That's what you told Sergeant Biggs back in January 2015,

24    true?

25    A.  That's true.

1  Q.  So now does that refresh your recollection that Officer

2  Cox told you that she had been threatening people in the quad

3  earlier?

4  A.  Yeah.  I think I paraphrased that she was out in the quad,

5  and he said that she was making some threats or something

6  earlier and went back inside the apartment.

7  Q.  And by "quad," you meant that court yard?

8  A.  Outside the apartment in the court yard area.

9  Q.  Officer Cox, he also told you that she was getting

10 violent; isn't that true?

11 A.  That she was getting violent?

12 Q.  Yes.

13 A.  I don't remember.

14 Q.  Can you turn to the interview with Officer Ruiz, which is

15 Exhibit 114, and the page, there is page numbers on the

16 bottom, it is page 1349.

17       And there is a marking, "Clip 4," on the side that

18 should help you with finding that.  Do you see where I am?

19 A.  Yes, sir.

20 Q.  I'm sorry.  Could you turn to clip 10.  Sorry.  I mixed my

21 clips.  It's at page 1363.

22 A.  What page again, sir?

23 Q.  It's page 1363, Clip 10.

24 A.  Okay.  Clip 10.

25 Q.  Are you there?

1    A.   Yeah.  I'm on the page.

2    Q.   Okay.  And do you see there, and in talking with Officer

3    Ruiz on the day of the incident, you said:

4             "He told me," he talking about Officer Cox, "yeah, she

5                 is in there, and, you know, she is getting violent

6                 and stuff.  And I said, 'Okay.'  And, um, we just

7                 tried to keep it low key."

8             Do you see that?

9    A.   Yeah, I'm reading it.

10   Q.   Okay.  And does that refresh your recollection that on the

11   day of the incident, you told investigators that Officer Cox

12   told you she was getting violent.  True?

13   A.   I can't remember if I'm answering that in relation to Cox

14   or for Dag.

15   Q.   Okay.

16   A.   Because we are talking about the incident where she is

17   looking out and I'm trying to respond back what she was doing.

18   Q.   Somebody told you on March 7, 2014, before you decided to

19   kick in the door, that Veronica was getting violent, true?

20   A.   Right.  I used that word, but I don't think I was

21   referring to like combative violent.  She was getting more

22   angry.

23   Q.   But Officer Cox had told you before you decided to kick in

24   the door, that she was being highly combative, true?

25   A.   Well, in that previous statement that you refer to where

1   that's made, I read that.  And what I recollect is that her

2   demeanor was becoming more aggressive.  I might have used the

3   word "more violent."

4   Q.   Okay.  And it's true, is it not, that on March 7, 2014,

5   the same day as this incident, and when you were talking to

6   investigators, you said, "Officer Cox told me she is being

7   highly combative," right?

8   A.   Yeah.  I think I believe I said that.

9   Q.   So when you told the jury a minute ago it wasn't like she

10  was being combative, that was wrong?

11  A.   Well, yes.  She is not combative.  She is not physically

12  fighting, but, you know, she is verbally upset.  And I

13  probably misspoke when I said that, but that's what she was

14  at, she was throwing a tantrum.

15  Q.   In your view, on March 7, 2014, Veronica Canter was

16  throwing a tantrum; is that what you are saying?

17  A.   I'm trying to use that as an expression that she was

18  venting a lot.  She was yelling and screaming a lot.  Angrily.

19  Q.   Okay.  I would like to show you -- before I move on, let

20  me just sum up.

21       You talked to Officer Cox there after you got out of

22  your car, and that whole conversation took about a minute,

23  right?

24  A.   Probably a couple of minutes.

25  Q.   So you think you took a couple minutes talking with

1  Officer Cox?

2  A.  Maybe.  I would probably have to take a look at the whole

3  call, but at least a few minutes there talking to Cox, because

4  we were all right there communicating to each other during the

5  time while Dag is telling us all kinds of information.

6  Q.  Okay.  So let me clarify.  When you were just talking with

7  Officer Cox, before you talked with Dag, you talked with him

8  for only about a minute, right?

9  A.  About a minute or two minutes, yeah.

10  Q.  Okay.  Let's --

11        Actually, Mr. Praet, can we get a stipulation to PX

12  104-E, which is another picture of the security camera?

13        MR. PRAET:  Yes.  No objection.

14        MR. OVERSON:  Your Honor, we offer Exhibit 104-E into

15  evidence.

16        THE COURT:  104-E is accepted into evidence.

17        (Plaintiffs' Exhibit 104-E was received.)

18  BY MR. OVERSON:

19  Q.  Okay.  Now, we have 104-E up on the screen.  And this is

20  another security camera picture, and do you see that you are

21  standing over to the left, over against the fence there?

22  A.  Yes.

23  Q.  And you were talking -- as of this time, you are talking

24  with Mr. Lindbeck, true?

25  A.  I'm not sure if I was talking to him or listening to him

1    or watching Ms. Canter at the time, because she kept popping

2    out.

3    Q.  Okay.  Can we have the time on that blown up, please.  Do

4    you see that the time says "3:51:37"?

5    A.  Yes.

6    Q.  And you saw earlier that when you walked through the gate,

7    it was 3:51:02; it is over on the page over to your left?

8    A.  Correct.

9    Q.  So within 35 seconds, you weren't talking with Officer Cox

10   anymore, you were over there talking to Mr. Lindbeck, true?

11   A.  No, because he is telling me stuff.  I'm telling him I'm

12   listening, or I'm multi-tasking and I'm watching her pop out

13   at that time, yelling at Dag.  I'm pretty sure that's about

14   the time I saw her yelling at Dax [sic].

15   Q.  Dax, you mean Mr. Lindbeck?

16   A.  Yeah, Mr. Lindbeck, I'm sorry.

17   Q.  And so when you were over there talking with Mr. Lindbeck,

18   and as we see, it is at 3:51:37.  And you will agree with me

19   that is just the math; it is 35 seconds after you walk through

20   the gate, right?

21   A.  Yeah, approximately.

22   Q.  Okay.  And you told him when you walked over there, you

23   said, quote, "What do you want done with the girl in the

24   house," end quote, true?

25   A.  I'm not sure if it is at that time, but probably soon

1   after.

2   Q.  You said that to him?

3   A.  I said, "What do you want to do with the girl in the

4   house?  Do you want to press charges or not press charges?"

5   Q.  And you told him that the charges he could press was

6   misdemeanor trespassing, true?

7   A.  Yeah, I think I told him that we have a trespass.  It is a

8   misdemeanor.  So he would have to press the charges on it.

9   Q.  And in response, Mr. Lindbeck hemmed and hawed about

10  pressing charged, right?

11  A.  Yes, he hemmed and hawed about making decisions, because I

12  asked him what he wanted to do, and he kept arguing about his

13  stuff and her and him being upset.

14  Q.  As you were talking with him, you could see in through the

15  mesh of the fence and you could see Ms. Canter in the

16  apartment, true?

17  A.  I can see him through the mesh and I could see her when

18  she came up to the patio door.

19  Q.  Could you hear her screaming?

20  A.  I hear her yelling.

21  Q.  And isn't it true that you couldn't understand most

22  everything she was saying?

23  A.  Right, because sometimes she would get out of my hearing

24  where I couldn't make out what she was saying.

25  Q.  And she was pounding the glass door with her fist, right?

1   A.   Yes.  She would come up to the door and then slap the

2   patio thing and look at Dag and say, "You mother fucker," and

3   start cussing him out, really fast, talking fast, and then she

4   would go back inside.

5   Q.   So she was yelling and screaming things really fast and

6   then going away?

7   A.   Well, she was, you know, if someone talks fast or is

8   yelling at you really fast, that's what she was doing.  And

9   then she would walk back into the apartment, and I couldn't

10  see her.

11  Q.   And she could see you; is that true?  I mean you could

12  tell by her demeanor and her -- by the way she was looking

13  that she noticed you were there?

14  A.   Yeah, because I remember this one time when she was doing

15  that, she was yelling at Dag, and her eyes turned towards me,

16  and I'm like looking at her, and then she looked back at Dag

17  and then went back inside.

18  Q.   And she, as she came up to the window, she said, quote --

19  this is your recollection -- she said, quote, "Mother fucker,

20  you guys want this," end quote, true?

21  A.   Something to that effect, yes.

22  Q.   And she was looking at you when she said that, true?

23  A.   She was looking at Dag.  I think that's one of the moments

24  when she was yelling at Dag.  She looked at us and Dag and was

25  saying that.

EDWARD LABOUCHREN 08

22

1  Q.  So "You guys want this," that's not just talking to Dag,

2  is it?

3  A.  I perceived that she was talking to Dag because she was

4  more focused on him when she was saying it than us.

5  Q.  So you thought when she said "guys," plural, to Dag, she

6  meant just Dag?

7  A.  Yeah.

8  Q.  Did you notice that she had peculiar clothing on?

9  A.  No.

10  Q.  Did you notice that she had a red, white and blue

11  basketball net on over her dress?

12  A.  No.

13  Q.  After the shooting was done, Ms. Canter was lying on the

14  floor of the apartment; do you recall that?

15  A.  Well, we had moved her to the floor.

16  Q.  And do you recall when she was lying there that she had

17  that basketball net around her?

18  A.  No.

19  Q.  I'm going to show -- before you put it up, I want to give

20  a warning here, that I'm going to show Exhibit 109.  It is a

21  photo that shows Ms. Canter's legs after the shooting.  And I

22  wanted to warn the people in the audience that they -- that

23  you can see a bullet shot wound through the legs.

24      But it shows something related to the basketball net,

25  so I'm afraid I have to show it to you.

1          Can I have 109, please, which is in evidence.

2          Do you see the red, white and blue basketball net

3    there beneath Ms. Canter's legs?

4    A.  Yeah, it is under her legs.

5    Q.  And does that refresh your recollection that she had that

6    on that day?

7    A.  If she had it on, I didn't see it.

8    Q.  You can take that down.

9          So as you are standing there outside of that patio,

10   looking in, and you are seeing her coming up to the window and

11   banging on it and yelling, your reaction was that her behavior

12   was, quote, "almost comical," end quote; isn't that true?

13   A.  Yes.

14   Q.  So after you told Mr. Lindbeck that you would be leaving

15   if he didn't press charges, he said, "Okay.  I need your help

16   to get her out.  I will press charges."  True?

17   A.  In part.  He told us, "Okay.  I will press charges on

18   her."

19          And I said, "Do you want to make the charge for

20   trespassing?"

21          I want to make sure he wanted to do it because he

22   wanted to do it.

23          And he says, "Yeah, I want her arrested for

24   trespassing."

25          And I said, "Okay.  We are going to cite her and

24

1 release her on that."

2 Q.  And as you are standing there, talking to Mr. Lindbeck

3 about the situation, you didn't even know Veronica Canter's

4 name, did you?

5 A.  No.  At the time, I didn't know her name.

6 Q.  You never asked him for her name?

7 A.  No.

8 Q.  Never asked Officer Cox about her name?

9 A.  No.

10 Q.  Do you know whether Officer Cox knew her name?

11 A.  I don't know.

12 Q.  You never asked Mr. Lindbeck why Ms. Canter was acting the

13 way she did, did you?

14 A.  I don't remember.

15 Q.  You never asked Mr. Lindbeck whether Veronica Canter had a

16 history of mentally ill, did you?

17 A.  No, I did not.

18 Q.  So you and Officer Cox decided to kick in the door and

19 arrest Ms. Canter.  And at the time you did that, you didn't

20 know her name or whether she had any history of mental

21 illness, and you had never read the 911 report summaries from

22 the dispatchers, true?

23 A.  No.  In regards to mental illness, she wasn't identified

24 as mentally ill at the time.

25 Q.  Well, the 911 report said "mental issues," but you didn't

1    read it, right?

2    A.    No.   Officer Cox clarified that at the scene.

3    Q.    Okay.   Officer Cox told you she doesn't have a mental

4    illness at the scene?

5    A.    She is fine.   There is no weapons.   I remember there is

6    nothing else to consider, just paraphrasing, and she is just a

7    angry girlfriend.   And I agreed with him.   She just looked

8    angry.

9    Q.    Nothing you saw as you saw her screaming and banging on

10   the door in the apartment and behaving the way she was,

11   nothing indicated to you or gave you any suspicion of mental

12   illness, is that true?

13   A.    Yeah.   I have been doing this a long time and I have seen

14   lots of angry people, and there was nothing different from her

15   from some of the multiple calls where I had where she was

16   extremely angry and venting at her boyfriend.

17   Q.    So you thought -- what you were seeing you thought was

18   venting at her boyfriend?

19   A.    Yeah.   I thought she was extremely pissed off at her

20   boyfriend.   I even said that to him, "She is pissed off at

21   you."

22   Q.    You left him standing there on the patio just on the other

23   side of the sliding glass door, true?

24   A.    That is correct.

25   Q.    So we have a sliding glass door, and then he is standing

1   there, and Veronica is on the inside, right on the other side

2   of that glass door, right?

3   A.   Correct.

4   Q.   And you know from your training, one thing you want to do

5   to deescalate a situation is to remove something that might be

6   triggering the person who is upset, right?

7   A.   Well, there is multiple factors in that, and when it comes

8   to him being in the little patio area, she was focused on

9   that, but she wasn't going to let him in, so he wasn't going

10  to cause any more triggers.

11      And I didn't have to worry about him jumping out and

12  doing something to us and him being upset about the situation

13  either.  So it was just viably safer to keep him where he was.

14  Q.   From your training, sir?

15  A.   That is from my training.

16  Q.   From your training, you know that if you have a dispute,

17  such as this, your goal is to deescalate the situation, true?

18  A.   Yeah, that's true.  And the plan was to keep him in there

19  because it keeps him deescalated.  If I have him on the other

20  side, she may get angrier and come out.

21  Q.   And your method of deescalating the situation was to kick

22  in the door and go in with a Taser and some backup on the

23  lethal side in your holster, true?

24  A.   No, not true.

25  Q.   Let's talk about deescalation.

1  A.  Okay.

2  Q.  It's true, is it not, that you ended up kicking in that

3  door within only a few minutes of your arrival, right?

4  A.  That's true.  I opened the door.  Yes.

5  Q.  And so is it your view that in those few minutes before

6  you kicked in the door, you deescalated the situation?

7  A.  Well, yeah.  I believe I was.

8  Q.  You think that you deescalated the situation prior to

9  kicking in the door or by kicking in the door?

10  A.  Well, we had to open the door, so I'm not attacking the

11  door to cause an explosive situation or anything like that.

12  I'm trying to open the door so I can talk and reason and

13  effect an arrest to Ms. Canter.

14  Q.  Well, in fact, you decided before you kicked in the door,

15  you thought, I could kick in the door and wait outside and

16  just talk with her; that was a consideration, wasn't it?

17  A.  It was.  Once I kicked open the door, she was right there.

18  Q.  Prior to kicking the door, sir, you considered whether you

19  should stay there at the door rather than rushing in through

20  the door, true?

21  A.  Well, no, not exactly.  Standing at the door is like a

22  fatal fall.  If you stay there and something does come at you,

23  you are stuck there; you have no way to move left or right off

24  the line.

25        It is better to get in a few feet.  And Doug was

EDWARD LOUCHREN - 8

28

1   behind me and he can protect me in case something happens.

2   Q.  You decided you should go straight in rather than stay at

3   the door because, in part, you were worried she would

4   barricade the door again after you kicked it in?

5   A.  No, I wasn't worried about her barricading the door.

6   Q.  Let's have you look at Exhibit 114-B, which is the Biggs

7   transcript, and if I could ask you to turn to page 22, and

8   there is a marking there for Clip 20.

9   A.  Which clip, sir?

10  Q.  Clip 20.  And this is part of your interview on January --

11  in January of 2015.

12  A.  Did you say page 22, Clip 20?

13  Q.  The page is 22, correct.

14  A.  I have a 28 and a 19 clip on my page 22.

15  Q.  Hopefully, I can help you with that.

16  A.  Yes, please.

17  Q.  I see.  Clip 28.  Thank you, sir.

18  A.  Okay.

19  Q.  Okay.  So there is a -- this is an interview with Sergeant

20  Biggs.  He is investigating this shooting, and he is talking

21  with you about whether you should breach the door, go in after

22  you kick the door, or stay at the threshold.

23       And do you see in your response, at the end there,

24  the last two lines:

25       "I said, why don't we just go in?  We will have the

1          door, so at least this way, she doesn't try to

2          barricade the door closed again.  We just go right in

3          and hold it."

4          Do you see that?

5   A.  Yes, I do.

6   Q.  And you told Sergeant Biggs in January 2015, that you

7   decided to go in because you didn't want her to barricade the

8   door again, right?

9   A.  Well, I meant it like I was telling previously, when she

10  was having her body against the door, so I meant barricade,

11  like holding her body against the door.

12  Q.  So when she holds her body against the door, that's

13  barricading the door, correct?

14  A.  Well, it is putting her weight against it, and I don't

15  want her to get hurt.

16  Q.  In January 2015, you considered that barricading the door,

17  didn't you?

18  A.  No.

19  Q.  What did you mean when you told Sergeant Biggs you didn't

20  want her to barricade the door closed again?  What did you

21  mean by that?

22  A.  Well, I told him earlier when I went to check the door, I

23  felt the door pressed, like there was weight against it,

24  because I was about to kick the door and open it.

25          And when I felt it, I had to tell her to back away.

1  And sometimes she would come back and I would feel the door,

2  she would be leaning against it, and I didn't want to kick it

3  with her leaning against it.

4        So about the fourth kick or so, I decided I'm trying

5  to keep this thing from being demolished so they could repair

6  it easier, and when I told him about it, that's when I was

7  making reference I didn't want her to barricade or keep her

8  body against the door while I was kicking it, because I want

9  to make sure I got one good final kick so the door would open

10 and we could get in and she couldn't close it on us again.

11 Q.  I just want to be clear.  You used the term, in talking to

12 the investigator, that you didn't want her to barricade the

13 door again, true, sir?

14 A.  Right.  I wanted to clarify my term the way it was used.

15 I'm sorry.

16 Q.  Okay.  You agree that when you're trying to calm a

17 situation down and deescalate, it is helpful to talk to the

18 person who is upset, true?

19 A.  It's true to try to get compliance to speak to them, yes.

20 Q.  And here, you said to Veronica, "We are coming in to

21 arrest you," right?

22 A.  Well, yeah.  Told her that in a nice, calm voice.  "We are

23 going to come in.  We are going to have to arrest you if you

24 don't come out."  You know, "It's just a citation.  Come on

25 out."

31

1  Q.  And you told her, "Get away from the door," because you

2  are going to kick it, right?

3  A.  Yeah.  The first time when I felt the pressure there, I

4  said, "Veronica" -- not Veronica, but, "Hey lady," because I

5  didn't know her name, "can you please step away from the

6  door."

7          And I went and kicked the door, because she wasn't

8  opening the door.  She wasn't going to let us in.

9  Q.  Did you say, "Get away from the door.  I'm kicking it in"?

10  Did you say that in a nice, calm voice too?

11  A.  Yeah, I actually did.  I remember telling her, you know,

12  "I'm going to kick the door," and I think that's when I used

13  my statement, "I weigh like 300 pounds with gear.  I need you

14  to step away from the door because when I kick it open, I

15  don't want you to get hurt."

16  Q.  You yelled to her that you weighed 300 pounds with gear,

17  "Get away from the door," true?

18  A.  No, I didn't yell.  I said it to her.

19  Q.  And apart from what we just discussed, that was the total

20  of your communication with Veronica Canter before you kicked

21  in the door, true?

22  A.  No.

23  Q.  What else did you say to her?

24  A.  There was times earlier when I was knocking on the door,

25  and I think when Doug went to go put his sunglasses away, I'm

1  trying to say, "Can you open the door?  He wants you arrested

2  for trespassing.  We are going to come in.  It is just a

3  citation.  It is not a big deal.  Can you just please open the

4  door."

5  Q.  And she was inside throwing a tantrum, in your view,

6  right?

7  A.  Well, she was yelling and screaming at Mr. Lindbeck, and I

8  could hear things being moved around.

9  Q.  And you decided on your own that she was not going to calm

10 down, right?

11 A.  Well, not with Mr. Lindbeck.

12 Q.  Well, you left him there on the patio, right?  You could

13 have had him leave away from the patio, but you decided to

14 leave him there, right?

15 A.  It was safer to leave him there, right.

16 Q.  You decided within a few minutes of your arrival that it

17 was not going to do any good to try to calm her down, right?

18 A.  No.

19 Q.  And one of the reasons you did not think that she would

20 calm down is because, in your mind, quote, "Women get angry

21 and they can stay mad a long time," end quote, right?

22 A.  That's out of context.

23        MR. OVERSON:  I would like to play a segment of your

24 deposition.  It is page 62, lines 12 through 16.

25        THE WITNESS:  Page 12 of the depo?

1        MR. OVERSON:  Page 62 of the deposition, lines 12

2   through 16.

3        THE COURT:  Any objection, Mr. Praet?

4        MR. PRAET:  If I could have a moment, your Honor?  I

5   have no objection.

6        THE COURT:  You may proceed.

7        (The video was played as follows:)

8        "Question:  Did you consider waiting, giving it some

9           time, and letting everyone calm down?

10       "Answer:  I don't think she was going to calm down.

11          She was pretty pissed, you know.  Women get angry,

12          they can stay mad a long time," you know.

13       THE COURT:  Counsel, pause just for a minute.  Let's

14   stand up just for a second.  We will take a bigger break in 20

15   minutes or so, but give a little stretch.

16       All right.  Sit down and proceed.  Thank you.

17   BY MR. OVERSON:

18   Q.  Officer Louchren?

19   A.  Yes.

20   Q.  You never tried to place a telephone call into the

21   apartment, did you?

22   A.  No.

23   Q.  We talked about your communications with her.  Isn't it

24   true that you never heard Officer Cox say anything to Veronica

25   Canter?

EDWARD AGUCHREN 0

34

1   A.   You know, I don't remember if he did or didn't.

2   Q.   You -- sitting here today, you don't remember him saying

3   anything to her at all, true?

4   A.   Right.  I don't remember, prior to making entry into the

5   room, I don't remember him saying something to her directly.

6   Q.   Okay.  Prior to kicking the door in, you didn't use your

7   radio to call dispatch to find out any of Ms. Canter's prior

8   history or police contacts or a mental history, true?

9   A.   True.

10  Q.   So when you kicked in the door, you weren't aware that she

11  had had a prior, what they call a "5150" detention, where she

12  was unable to take care of herself?

13  A.   No, I did not know that.

14  Q.   And it never occurred to you to call mental health trained

15  people at the Fresno Police Department to come out and help

16  you?

17  A.   Mental health trained people at Fresno Police Department?

18  Q.   Yeah.  People who are trained to deal with -- let's step

19  back.

20       There are people at the Fresno Police Department who

21  are trained to deal with people who have mental health

22  problems, aren't there?

23  A.   Yeah.  There is a Crisis Intervention Team, CIT.

24  Q.   And there are other types of mental health people

25  available too, aren't there?  There is MH-I, MH-II we heard

1    about yesterday?

2    A.  Yes.  Those people work for the County.

3    Q.  And there is other community resources that officers can

4    draw on for mental health, true?

5    A.  Um, not aware of much more than that that can help you out

6    in the field.

7    Q.  But on that day, March 7, 2014, you didn't call any of

8    those resources, did you?

9    A.  I did not, no.

10   Q.  To your knowledge, Officer Cox didn't call either, right?

11   A.  To my knowledge, no.

12   Q.  You are not aware of anybody, just to be clear, nobody

13   called any mental health resources regarding Veronica Canter

14   on March 7, 2014?

15   A.  No.

16   Q.  Yes?  No one called?

17   A.  No one called.

18   Q.  Okay.  So you and Officer Cox decided on your own, without

19   consulting mental health, without consulting a supervisor,

20   without doing any checks on her history, you decided on your

21   own to kick the door in that day, true?

22   A.  I made a decision to open the door, yes.

23   Q.  Was that your decision?

24   A.  I brought it up to him, about the options of gaining entry

25   into the house.

1  Q.  You had only been there a few minutes, right?

2  A.  Yes.

3  Q.  Before you kicked that door in, it was your view that you

4  arrest people with mental illness who are committing a crime

5  the same as you arrest anybody else, right?

6  A.  No.  At the time we were kicking the door down, I was

7  going to arrest a person who was trespassing.  There was no

8  mental health issue in my mind at that time.

9  Q.  Okay.  But it is your view, though, and it was your view

10  on the day, that you arrest people with mental illness the

11  same as would someone who doesn't have mental illness, right?

12  A.  No.  That's incorrectly stated, sir.

13  Q.  Could I have deposition clip page 75, lines 2 through 6.

14        THE COURT:  Mr. Praet?

15        MR. PRAET:  I have no objection, your Honor.

16        THE COURT:  Okay.  Proceed.

17      (The video was played as follows:)

18      "Question:  So you arrest people with mental illness

19        the same as you would with someone who does not have

20        mental illness?

21      "Answer:  If they committed a crime, yeah, they get

22        arrested and charged with it, you know."

23  BY MR. OVERSON:

24  Q.  And you believed on that day that you arrest people with

25  mental illness, you arrest them, as we just heard, like anyone

1   else, and then the mental illness part is taken care of once

2   they get to court, true?

3   A.   No.  It is kind of confusing.  On that day, I was

4   arresting a person that was having a domestic dispute.

5        The way your question, as I'm understanding you, is

6   that you are saying that we arrest mental health people.

7   Q.   Let me ask you this.  Step back from whether you thought

8   she had mental illness or not.

9   A.   Okay.

10  Q.   It was your view on March 7, 2014, that when you arrest

11  someone, when they are committing a crime, whether they are

12  mentally ill or not, you just arrest them the same, whether

13  they are mentally ill or not, and then you let the court sort

14  out the whole mental illness part, true?

15  A.   I still don't understand your question, sir.  Are you

16  asking me for my duties?  If a mentally ill person, like in

17  the tape, you know, if they commit a crime, do we arrest them?

18  Yes.

19       But was it my thought that she is mentally ill at the

20  time we were going in there?  No.

21       I'm not sure how to answer your question, sir.

22  Q.   According to your training, the way you have been

23  trained --

24  A.   Okay.

25  Q.   -- if you confront someone who is mentally ill -- lets

1    step away for a minute from Veronica Canter and your view.

2         If you confront someone who is mentally ill, your

3    view is if they are committing a crime, such as trespassing,

4    you arrest them just like anybody else, right?  And you let

5    the mental illness part be sorted out by the courts.

6         That was your view at the time, wasn't it?

7    A.   No.   My view is that on that topic, as a matter of law, if

8    you have a person who is mentally ill, and they commit a

9    crime, whether they steal, rob, shoot, stab, or, you know,

10   petty theft, you would make the arrest for that charge, just

11   the same as you would with anybody else, and the courts would

12   go ahead and decide if the illness has an effect upon what

13   they knew or rightfully knew at the time.   That goes for

14   anybody at that time.

15        In this case here, I just thought it was an angry

16   person, not anybody mentally ill.

17        MR. OVERSON:   Your Honor, I would like to play

18   deposition segment page 74, lines 22 to 75, line 1.

19        THE COURT:   Any objection?

20        MR. PRAET:   One moment, please, your Honor.   No

21   objection, your Honor.

22        (The video was played as follows:)

23        "Question:   Do they have any training for how you

24        arrest someone who is committing a crime who has a

25        mental illness?

1          "Answer:  No.  You arrest people, and then the mental

2                illness is taken care of in court."

3    BY MR. OVERSON:

4    Q.  Officer Louchren, you began kicking that door after a few

5    minutes after your arrival, and when you were doing that, you

6    could hear Veronica Canter inside, and she was screaming, "You

7    are not coming in here," true?

8    A.  That was the -- I think right after I told her she needed

9    to step away from the door or just prior to, she made that

10   statement, "You aren't coming in here."

11   Q.  And she was yelling other things in there too, wasn't she?

12   A.  Yeah, I think she was yelling or talking.

13   Q.  And but you couldn't understand most of what she said; is

14   that right?

15   A.  Well, I couldn't hear most of what she said, so I couldn't

16   understand it, because she would come close to the door and

17   then go away.

18   Q.  By the way, she wasn't a very large woman, was she?

19   A.  From what I can remember, no.

20   Q.  She was about 5 foot 4 inches tall?

21   A.  Correct.

22   Q.  About 130 pounds?

23   A.  Correct.

24   Q.  And as she was yelling, "You are not coming in here," you

25   responded back to her, "Yeah, we are coming in.  We are going

1  to kick the door in, and I'm going to talk to you about

2  trespassing and arrest you if you don't leave," right?

3  A.  I'm trying to think, did I say all that:  "If you don't

4  leave, I will have to arrest you."

5       But in summary, yeah, pretty much what I told her.

6  Not in that tone, but I told her that.

7  Q.  And she was being combative with you about it, right?

8  A.  She was not combative, but she was still angry, and still

9  yelling at Dag through the window and then come back to the

10  door.

11  Q.  When she yelled, "You are not coming in here," do you

12  think she was talking to Dag, Mr. Lindbeck?  She was talking

13  to you, wasn't she?

14  A.  I addressed it as for me, but I'm not sure if she was

15  talking about me or him because he was standing out by the

16  sliding door.  And when I heard it, it wasn't like loud like

17  it was real close to the door, but I can hear her.  I took the

18  address as if it were me just to cover it.

19  Q.  You kicked the door, and if I understand correctly, she

20  was leaning up against the door, trying to stop you from

21  coming in, right?

22  A.  No.  I don't think she was leaning up as much.  It kind of

23  felt like she just put her back against it, like you are not

24  coming in.  Kind of like how a kid tells you, you are not

25  coming into your room, dad.  Just put her weight on it like

1    she was leaning back.  So when I told her to back away from

2    the door, she did.

3    Q.  It took you five kicks to get through the door, didn't it?

4    A.  Yeah.  I was trying to make sure I didn't tear up the

5    door.  I could have kicked the door harder, but I was trying

6    to prevent damage to the door because it was just an entry to

7    assist.

8    Q.  And part of the reasons it took you five kicks is because

9    she was putting all of her weight against the door, right?

10   A.  No, sir, that is not the reason.

11   Q.  And after you kicked and she said, "You are not coming

12   in," you knew she was talking to you, didn't you?

13   A.  No.

14   Q.  You thought she was still talking to Mr. Lindbeck?

15   A.  Well, I didn't know for sure, but I addressed it as if she

16   was, so she would get the message I am coming in.

17   Q.  And you knew that before you kicked in the door, there was

18   a risk of a violent confrontation with a woman that was in a

19   tantrum, in your words, right?

20   A.  Well, yes.  You know, maybe "tantrum" is a bad choice of

21   words, but, basically, how to express someone just overly

22   angry and yelling and screaming.  They have lost all control.

23   They are just yelling mad.  Is there a potential for that?

24   Always.

25          I mean she is already mad at Mr. Lindbeck, and there

1 is a potential where she can just turn and get mad at us and

2 coming yelling and swinging on me or run out and get

3 Mr. Lindbeck.

4 Q.  Or you anticipated that she might pick up something after

5 you got through the door and use it as a weapon, true?

6 A.  There is always that possibility.  I have to prepare for

7 that.

8 Q.  And so you were aware that was a possibility before you

9 kicked the door?

10 A.  Yeah.

11 Q.  As you kicked that door, you were aware that kicking the

12 door was upsetting her because she wanted to stay locked in

13 and be left alone, right?

14 A.  No.

15 Q.  You were aware that kicking the door was upsetting her,

16 right?

17 A.  No, I wasn't aware that it was upsetting her.

18 Q.  Could you turn to the interview with Sergeant Biggs.  It's

19 at page 14.  You see, there is a Clip 14 on there.  Do you see

20 that short clip there?  Are you with me, Officer Louchren?

21 A.  Yes.

22 Q.  And you said during your interview with Sergeant Biggs in

23 January of 2015, that, "While I was kicking the door, I think

24 that was upsetting her because she wanted to stay locked in."

25          You said that, didn't you?

1  A.  Yes, I did.

2  Q.  When you went through the door, you kick, I believe, I

3  think you said four or five times to get the door open; is

4  that right?

5  A.  Right.

6  Q.  So after you forced through the door, Officer Cox had his

7  Taser weapon up and ready, true?

8  A.  He had his Taser with him, but I didn't watch if he had it

9  up and ready when I went through the door.  He is behind me.

10  Q.  The plan was for him to have his Taser up and ready when

11  he went through the door, true?

12  A.  Well, the plan was to have it out and ready.

13  Q.  Well, I'm being pretty careful here because I think we

14  heard about the Taser being down at the side.  But the plan

15  actually was for him to have it up and ready; do you recall

16  that?

17  A.  It might have been the words I used, but that's what I

18  mean.  Up and ready means to have it out, have it up and ready

19  to have it go.

20  Q.  Can you look at the Biggs interview, page 16, please.

21  A.  Page 16.  Got it.  I'm on 16.

22  Q.  Do you see Clip 17 there?

23  A.  Yes, I do.

24  Q.  And do you see that Sergeant Biggs asked, "And the plan

25  was for him, that he had his Taser out?"

44

1       And you responded, "He had his Taser up and ready."

2       Did you say that?

3   A.  Yes, I did.

4   Q.  Okay.  After you came through the door, you were right --

5   you went straight through the door and a little to your right;

6   is that correct?

7   A.  Yeah, the door opened up, and I kind of veered to the

8   right and straight, yes.

9   Q.  When you came through the door, Veronica was standing

10  right in front of you; is that true?

11  A.  Yes, she was.

12  Q.  She had no weapons in her hands, right?

13  A.  No.  No weapons whatsoever.

14  Q.  But Officer Cox had a Taser up and ready, right?

15  A.  Well, what do you mean by that, sir?

16  Q.  He had his Taser out and ready to use.

17  A.  Yeah, I guess.

18  Q.  And after she saw the two of you come through the door,

19  she went into the kitchen, true?

20  A.  Yeah.  I think she just looked at me, though, because we

21  had eye contact.

22  Q.  After you kicked through the door and came in, she went

23  into the kitchen, true?

24  A.  No.  She paused first.  We looked at each other.  And then

25  she just slowly turned and then walked away towards the

1  kitchen.

2  Q.  She weighed about, I think we said, 130 pounds.  You are

3  about double her size, right?

4  A.  Yes.

5  Q.  When she came back from the kitchen, she was holding

6  knives; is that right?

7  A.  She was doing more than holding them.

8  Q.  All right.  And Officer Cox used his Taser on her; is that

9  true?

10  A.  Eventually, yes.

11  Q.  And after he used the Taser, she was still facing you; is

12  that right?

13  A.  After he deployed the Taser, she was facing me for about a

14  second or two.

15  Q.  And so she is facing right at you.  And you, at that

16  point, have a semiautomatic weapon pointing right at her,

17  right?

18  A.  Yeah.  I pulled my gun and I drew it, and I was -- had my

19  other hand on my mike to key it up, so I had probably one hand

20  out at the time.

21  Q.  And she turned away from you to her right to climb up onto

22  the couch, true?

23  A.  When?

24  Q.  After she had been Tased.

25  A.  Not immediately.

1  Q.  She paused there for a second or two, true?

2  A.  Yeah.  After she had the knives, when she approached me

3  and she was sharpening them against themselves, I tried to get

4  out over the air, and she is coming closer to me.  She is very

5  close.

6        And after I had unkeyed, I kept yelling out to Doug,

7  "Tase her, Tase her.  I don't want to shoot her," and Doug

8  Tased her.  And then she stopped for a second when she got

9  Tased.

10        And she said something like, "Is that all you got

11  mother fuckers?"  And then she cut her wrist, and she said

12  something else, and then she went towards the couch, towards

13  Doug.

14  Q.  I think we are going to see photos later in this trial

15  about her wrist.  There was no blood from her wrist, was

16  there?

17  A.  When I saw her cut, I saw it cut in the flesh of the left

18  one.  The right one, I'm not sure.  But I saw her take the

19  knife and go across like this, across her wrist.  It freaked

20  me out.

21  Q.  She did that before she stepped on the couch?

22  A.  Yes, before she went after Doug.

23  Q.  So you are standing right in front of her with your weapon

24  pointed at her, and she is across from you.  She has already

25  been Tased.  There is a pause.  And then she turns away from

1    you to the right to step up on the couch; is that right?

2    A.   No.  She does the cut first and then has the knives up,

3    and she steps towards the couch, going towards Doug.

4    Q.   So in your view, she had the knives up like this when she

5    was stepping on the couch?

6    A.   Right.  She had the knives up, and she stepped on the

7    couch over the arm and onto the first cushion.

8    Q.   And you shot her?

9    A.   Yes.

10   Q.   And you shot her again?

11   A.   Yeah, after a pause.

12   Q.   So is there a pause between the first two shots?

13   A.   I fired twice, paused, and fired three more.

14   Q.   The first two were right in a row, weren't they?

15   A.   Yeah, they were what we call like a double tap shot, boom,

16   boom.  And I remember I think one went across her legs and the

17   other was up higher.  I don't know where it went.

18   Q.   You can remember -- you saw them hit her, those bullets?

19   A.   I remember the first one.  The first one.  And I, you

20   know, just only because I saw the all the flesh on her legs.

21   But I don't know how badly she was hit.

22   Q.   And you say you saw all the flesh on her legs.  You can

23   see the wound from the bullet; is that what you are saying?

24   A.   No.  You know, kind of like -- she had a short dress on,

25   so, you know, I thought I saw some redness or something there.

1    It happened really fast.  So I thought I hit her in the leg.

2    Q.  And after the first two shots, you shot her again?

3    A.  It didn't stop her.

4    Q.  And again?  You shot her a third time?  Yes or no?

5    A.  No.  I shot two volleys.  I shot twice from my weapon.

6    Five rounds total.

7    Q.  You heard Officer Cox this morning say you have to justify

8    every pull of the trigger, don't you?

9    A.  Correct.

10   Q.  So you pulled the trigger once the first time and shot

11   her.  You think it hit her legs?

12   A.  Uh-huh.

13   Q.  You shot her a second time?

14   A.  Correct.

15   Q.  And in your view, you paused?

16   A.  Paused.

17   Q.  And then you shot her again a third time?

18   A.  When I paused, she continued to attack at Doug.  And I

19   thought she was going to kill him right there.  She was right

20   in his face, and then that's when I fired three more rounds,

21   because the first two rounds weren't effective, to make her

22   stop.

23   Q.  You shot her five times?  You pulled the trigger five

24   times?

25   A.  Yes, I did, sir.

1  Q.  And, sir, as she fell, after you shot her five times, you

2  recall that she was still holding a knife in her right hand,

3  true?

4  A.  Yes.  I remember that.

5  Q.  And you recall asking Officer Cox to take the knife out of

6  her left hand; is that true?

7  A.  Yeah.  She had already -- sorry.  She had already fell

8  back and slumped, and the knife in her right hand had fell

9  behind the couch and she was still holding onto the other

10  knife.  And I was worried because, you know, she was still

11  breathing, she was having difficulty, but she still had a grip

12  on that knife, and I didn't want her to attack us.

13        So Doug had the free hands.  He was able to go ahead,

14  and we needed to handcuff her to make her safe and get her

15  away from the knives.

16  Q.  So Officer Cox took the knife out of her left hand, in

17  your view?

18  A.  While I covered her, yeah.

19  Q.  You covered her with the gun still?

20  A.  In case she attacked again, yeah.

21  Q.  And then you put her on the ground and cuffed her, right,

22  Officer Cox did?

23  A.  Well, Officer Cox cuffed her, and then we moved her away

24  from the weapons on the couch, because the weapon was right

25  there by the couch.  And I told him, "Okay, now that she is

1  away from the weapons, let's unhandcuff her and start
2  performing CPR and first aid."
3          MR. OVERSON:  This might be a good time for a break.
4          THE COURT:  Why don't we be ready to come back at
5  10:45.  15 minutes.  Thank you.  About 13 minutes.
6          (Recess)
7          (The following proceedings were had in the presence
8          of the jury, to wit:)
9          THE COURT:  Thank you.  Please proceed.
10         MR. OVERSON:  Thank you, your Honor.
11 BY MR. OVERSON:
12 Q.  Officer Louchren, I only have a few more questions.  We
13 were discussing earlier when you first shot Veronica Canter,
14 and I want to ask you to describe where exactly she was when
15 you first shot her.
16 A.  I don't know if I can give you exactly, but I can tell you
17 what I remember, is I think she had her -- I think she had
18 just stepped over the arm, and I think she was on the first
19 pillow of that couch, closest to the arm.
20 Q.  So you don't believe that she had made it to the second
21 pillow when you shot her the first time?
22 A.  That's the -- no.  I believe she made that on the second
23 volley.  That's when I fired on the second volley.
24 Q.  Okay.  I'm going to play a tape from your deposition.  It
25 is page 45, lines 2 through 7.

1          THE COURT:  Any objection?

2          MR. PRAET:  No.

3          (The video was played as follows:)

4          "Question:  Was she standing on the couch?

5          "Answer:  Yeah.  She was traversing the couch.  She

6              was going -- she got up there and started walking and

7              got to the middle pillow.

8          "Question:  Okay.

9          "Answer:  And that's when I shot her the first time.

10          "Question:  Okay."

11  BY MR. OVERSON:

12  Q.  After the first two shots, Officer Louchren, what exactly

13  did Veronica Canter do?

14  A.  She started swinging the knives and was about to lunge at

15  Doug after the first two shots.

16  Q.  You said earlier, you pulled the trigger again because he

17  was right in her face; is that right?  Let me step back.

18  A.  Okay.

19  Q.  When was she right in Officer Cox's face?

20  A.  She was close enough to his face on the second volley of

21  the shots I thought she could cut him in the face.

22  Q.  And on the first volley, she was further away?

23  A.  Yeah.  She was a little further away.

24  Q.  So after the first two shots, we heard you say she was

25  swinging knives.  Did she have any physical reaction to being

1  hit twice with these bullets?

2  A.  No.  I mean she had a physical reaction, but not -- it

3  didn't seem to slow her down.  It seemed like she was getting

4  more determined to stab Doug.

5  Q.  You didn't see her step back at all after she was hit the

6  first two times?

7  A.  No.  When I shot her the first two times, she stopped for

8  a second and then she started (gesturing), not even a full

9  second, she just like paused and went and was going to dive at

10  him, and that's when I fired.  Everything was very fast.

11  Q.  And in your weapon that day, you had hollow point bullets,

12  right?

13  A.  What they issue me, yes.

14  Q.  And those bullets expand once they hit the target?

15  A.  It is my understanding they do.

16  Q.  Where exactly was she standing when you pulled the trigger

17  for the third time?

18  A.  About the middle.

19  Q.  Okay.  So you think -- what was -- what were her hand

20  positions when you shot her the third time?

21  A.  I think they were still swinging.

22  Q.  Up above her head?

23  A.  When she was -- I don't know.  It was very fast.  I

24  remember she was swinging, fired.  It didn't have any effect,

25  she still swinging and probably like here, like bull horns,

1  she was going to dive out at him, and that's when I fired,

2  and --

3  Q.  Is that when you fired the third time, sir?

4  A.  Right.  And I fired rapidly, like one, two, three, boom,

5  boom, boom.

6  Q.  Three, four, five, were right in a row?

7  A.  Correct.

8  Q.  And what was her reaction when you hit her those times?

9  A.  She -- when she got hit, by the time I finished the third

10  round, I noticed she was just swinging a little bit and she

11  slumped back and her right hand went over the couch, and she

12  kind of was like in a lounge position on the couch, with the

13  knife in the left hand.

14        The other one, I heard it and saw it fall from her

15  hand.  I could see it was gone.  It went behind the couch.

16  Q.  Was her right hand over the couch toward the back?

17  A.  Over, on top, you know.  If he were cresting around it,

18  somewhere around the top, so I don't, you know, I don't know

19  if it -- it is kind of hard to recall.  We did things quickly,

20  but I remember seeing her hand there, and I remember the knife

21  falling from it.

22  Q.  Where exactly was her left hand after you shot her for the

23  fifth time?

24  A.  When she was like in a lounge position, it was near her --

25  it was in her hand, near her waist and leg area, because she

54

1  was in a lounge.  And it was -- I want to say her hand was

2  kind of partially on the couch because it was dangling there.

3  Q.  I'm going to move on to a different topic.  And so this

4  will be short.

5        Counsel, can I have a stipulation as to Officer

6  Louchren's individual training records, which is 102-B?

7        MR. PRAET:  Sure.

8        MR. OVERSON:  Your Honor, we offer plaintiff's

9  Exhibit 102-B into evidence.

10        THE COURT:  102-B would be admitted into evidence.

11        (Plaintiffs' Exhibit 102-B was received.)

12  BY MR. OVERSON:

13  Q.  Officer Louchren, you can see there on the screen, this is

14  a report of your training activity.  And I would like you to

15  turn to the third page or we will turn for you on the

16  screen --

17  A.  Okay.

18  Q.  -- to the third page, and you will see there is a 2009

19  entry there, and it says specifically it's for May 6, 2009.

20  And maybe we could have that blown up so we could see it all

21  on the screen.  Okay.  And so you see there, there is a Mental

22  Illness Awareness update.  Do you see that?

23  A.  Yes, I do.

24  Q.  And do you recall participating in that training?

25  A.  Yes.

1       MR. OVERSON:  No further questions, your Honor.

2                 *        *        *        *        *

3                       REDIRECT EXAMINATION

4    BY MR. OVERSON:

5    Q.  Officer Louchren, I wanted to just clarify.  When you were

6    standing outside of the patio and you were watching Veronica

7    Canter inside the apartment, you witnessed her pounding the

8    glass with her fists, true?

9    A.  No.  She pounded it with the flat of her hand.  She was

10   slapping it like this, the glass door (gesturing).

11       MR. OVERSON:  Could I please play page 18 of the

12   deposition, lines 23 to 25.

13       THE WITNESS:  What page?

14       MR. OVERSON:  Page 18 of the deposition, lines 23 to

15   25.

16       THE COURT:  You may.

17       THE WITNESS:  Okay.

18       (The video was played as follows:)

19      "Question:  Did she ever hit the glass?

20      "Answer:  Yeah, the patio door.  She pounded with her

21       fists."

22       MR. OVERSON:  No further questions.

23                 *        *        *        *        *

24

25

1          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

2    certify the foregoing transcript as true and correct.

3

4    Dated:  16th of June, 2016          /s/ Peggy J. Crawford
                                         PEGGY J. CRAWFORD, RDR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25