1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                              --o0o--

4    JERRY WAYNE KNOX, et al.,      )  Case No. 1:14-cv-00799-EPG
                                    )
5                   Plaintiffs,     )  Fresno, California
                                    )  Tuesday, June 14, 2016
6         vs.                       )  1:48 P.M.
                                    )
7    CITY OF FRESNO, et al.,        )  Partial Jury Trial - Day One.
                                    )
8                   Defendants.     )  Testimony of Douglas Edward
     ┌──────────────────────────────┐  Cox.
9                         TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE ERICA P. GROSJEAN
                   UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For Plaintiffs:               ARTURO J. GONZALEZ
13                                 WESLEY E. OVERSON, JR.
                                   SABRINA A. LARSON
14                                 Morrison & Foerster, LLP
                                   425 Market Street
15                                 San Francisco, CA   94105
                                   (415) 268-7000
16
     For Defendants:               BRUCE DANIEL PRAET
17                                 Ferguson Praet and Sherman
                                   1631 E 18th Street
18                                 Santa Ana, CA   92705-7101
                                   (714) 953-5300
19
     Court Recorder:               OTILIA ROSALES/ESTHER VALDEZ
20                                 U.S. District Court
                                   2500 Tulare Street, Suite 1501
21                                 Fresno, CA   93721
                                   (559) 499-5928
22
     Transcription Service:        Petrilla Reporting &
23                                   Transcription
                                   5002 - 61st Street
24                                 Sacramento, CA   95820
                                   (916) 455-3887
25
     Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

Cox - Direct                                                    1


1        FRESNO, CALIFORNIA, TUESDAY, JUNE 14, 2016, 1:48 P.M.

2

3        (Partial transcript begins as follows:)

4             THE COURT:  Are you ready to call your first witness?

5             MR. GONZALEZ:  I am, Your Honor.

6             THE COURT:  Okay.

7             MR. GONZALEZ:  Douglas Cox.

8             THE COURT:  Thank you.  Can you approach the witness

9    stand, but don't sit down quite yet, and let's face Madam Clerk

10   here.

11            THE CLERK:  Please raise your right hand.

12        DOUGLAS EDWARD COX, PLAINTIFF'S WITNESS, SWORN

13            THE CLERK:  And please state your full name and spell

14   your last name for the record.

15            THE WITNESS:  Douglas Edward Cox, C-o-x.

16            THE COURT:  Thank you.  Please be seated, sir.

17                         DIRECT EXAMINATION

18   BY MR. GONZALEZ:

19   Q.   Sir, you are an officer with the Fresno Police Department?

20   A.   Yes, sir.

21   Q.   And you were the first officer who responded to the call

22   for help involving who you now know to be Veronica Canter; is

23   that right?

24   A.   Yes, sir.

25            MR. GONZALEZ:  Your Honor, we have stipulated that

Cox - Direct                                    2

1   Exhibit 100 can come into evidence.  That's the 911 calls.

2          THE COURT:  Okay.  Any objection?

3          MR. PRAET:  No, Your Honor.

4          THE COURT:  Okay.  Exhibit -- I'm sorry.  Say the

5   number again.

6          MR. GONZALEZ:  100.

7          THE COURT:  Okay.  Exhibit 100 will be admitted in

8   evidence.

9      (Plaintiff's Exhibit 100 is admitted.)

10          THE COURT:  Yes, you could publish it.  Something's

11  not turned on, what they were -- okay.  And also I think

12  there's exhibits that are before you.  You have a binder --

13          THE WITNESS:  Okay.

14  BY MR. GONZALEZ:

15  Q.   Sir, you can either look on the screen or you can look at

16  the binder in front of you, Exhibit 100.  When you responded to

17  the scene, you had received a couple of messages from dispatch

18  about what was going on at the scene; is that right?

19  A.   Yes.

20  Q.   And the first item that you see on the screen there, you

21  received information that there was a disturbance with a female

22  who was on drugs talking to herself and dancing around; is that

23  right?

24  A.   That is correct.

25  Q.   And then there's something in there about her threatening

1   a male resident.  Do you see that?

2   A.    Yes.

3   Q.    After you arrived at the scene, did you speak to anybody

4   about that threat?

5   A.    Yes.  I talked to Mr. Dag Lindbeck.

6   Q.    Did you speak to the reporting party?  This is a message

7   that acme from the apartment manager; is that right?

8   A.    That is correct.

9   Q.    So it's the apartment manager that's reporting that she

10  heard or observed some type of threat; is that right?

11  A.    That is correct.

12  Q.    Did you ever speak to her about that?

13  A.    About that particular statement?  No.

14  Q.    Did you ever speak to the apartment manager about what she

15  observed, the dancing around, the talking to herself?  Did you

16  ever ask her about that?

17  A.    Unfortunately, we did not have that chance to go back and

18  reinterview her or speak to her.

19  Q.    When you say you didn't have that chance, why not?

20  A.    Well, after the incident, I'm taken away from the scene

21  and so I don't have the ability to speak to her.

22  Q.    You're talking now about after the shooting, right?

23  A.    Yes, sir.

24  Q.    So let's talk about before the shooting.  You arrived.

25  You saw the apartment manager there, correct?

Cox - Direct                                                    4

1   A.   I do not recognize her to be the manager at that point

2   until she provided me a key to get into the apartment.

3   Q.   And once she gave you a key, you knew she was the

4   apartment manager, correct?

5   A.   I did not know for sure, but I suspected she was, yes.

6   Q.   All right.  Well, did you ask her are you the apartment

7   manager or how did you get this key?

8   A.   I asked her eventually before we made entry that I

9   confirmed that she was the manager and that Ms. Veronica Canter

10  was not one of the renters of the apartment.

11  Q.   All right.  So that before you kicked that door in -- or

12  your partner kicked the door in, you knew who the apartment

13  manager was, correct?

14  A.   Yes, sir.

15  Q.   And you had an opportunity before you kicked the door in

16  to speak to her, right?

17  A.   Yes, sir.

18  Q.   And you could have asked her what did you see, what did

19  you observed, tell me about what you saw.  You could have asked

20  that, right?

21  A.   Yes, sir.

22  Q.   But you didn't, did you?

23  A.   No, I did not.

24  Q.   If we can go to the second message that you received and,

25  Officer, you received these messages on the computer in your

1    police car; is that right?

2    A.    That is correct.

3              MR. GONZALEZ:  If we can go to 1, please.

4    BY MR. GONZALEZ:

5    Q.    You then received the second message -- and by the way,

6    you read both of these before you arrived at the scene; is that

7    right?

8    A.    Yes, sir.

9    Q.    The second message says disturbance with ex-girlfriend.

10   Is that what that means, GF?

11   A.    Yes, sir.

12   Q.    Okay.  Ex-girlfriend and it tells you her name, right?

13   Veronica Canter. so you know her name before you even arrive,

14   right?

15   A.    Yes.

16   Q.    And it says again dancing around, female has mental

17   issues.  And you clearly saw that, right?

18   A.    Yes.

19   Q.    And what do you understand that to mean?

20   A.    That she possibly has mental issues.

21   Q.    And then it says not DK or high.  That means that the

22   reporting party -- the ex-boyfriend is telling dispatch she's

23   not drunk and she's not on drugs, right?

24   A.    That's what -- that is what he is telling me, yeah --

25   dispatcher yes.

Cox - Direct                                                6

1          MR. GONZALEZ:  Could we put up -- we have a

2    stipulation on 104B which is a photo of him arriving -- the

3    camera.  Your Honor, we have a stipulation that 104B as in boy

4    can come into evidence.

5          MR. PRAET:  No problem, Your Honor.

6          THE COURT:  Okay.  104B will be admitted in evidence.

7       (Plaintiff's Exhibit 104B is admitted.)

8    BY MR. GONZALEZ:

9    Q.   Sir, that is you standing right outside the gate of the

10   apartment complex; is that right?

11   A.   Yes.

12         MR. GONZALEZ:  Can we blow up the time, please.  And

13   just for the record, Your Honor, we have blown up -- the time

14   is in the upper left-hand of the photo and unless your eyes are

15   a lot better than mine, it's hard to read.  So for the record,

16   it says 3:45 and I believe that's 30 seconds.

17   BY MR. GONZALEZ:

18   Q.   Does that sound like the approximate time?

19         MR. PRAET:  Your Honor -- objection, Your Honor.  I

20   have no problem, but the time is just lack of foundation

21   because I don't it coincides with the event log timing,  That's

22   my -- the first one, I have no problem with, but the blow up of

23   the time, I do object that there's no foundation that's the

24   correct time versus the event log.

25         MR. GONZALEZ:  Well, I'm about to ask --

Cox - Direct                                                           7

1          THE COURT:  Overruled.  Right now, he's just said

2     that this is saying the time of it is, but if you can lay more

3     foundation, that's always helpful.

4          MR. GONZALEZ:  Yes.

5     BY MR. GONZALEZ:

6     Q.    Is that the approximate time that you arrived on the scene

7     that day?

8     A.    Yes.

9     Q.    And when you arrived on the scene that day, I think the

10    jury can see that little red umbrella there.  That is the

11    sliding door to the apartment where Ms. Canter was inside?

12    A.    Yes.

13    Q.    And the ex-boyfriend, the tenant, Mr. Lindbeck, he was

14    standing on the balcony inside that fenced area; is that right?

15    A.    In front of the balcony.  It's a rear patio.

16    Q.    Patio.  I misspoke.

17    A.    But, yes, he was inside.

18    Q.    Yes.  I stand corrected.  He was standing in the patio

19    area where you see that red umbrella; is that right?

20    A.    Yes.

21    Q.    Now, when you first arrived and spoke to Mr. Lindbeck who

22    was standing on that patio, he told you that she was acting

23    crazy, right?

24    A.    Yes.

25    Q.    And -- by the way, after the shooting, you spoke to

1   investigators who were investigating the shooting, right?

2   A.    Yes.

3   Q.    And you knew that that was important, correct?

4   A.    Yes.

5   Q.    You knew that a woman had died and that it was very

6   important to be truthful in making your statement, true?

7   A.    Yes.

8   Q.    And that interview took place that very day, correct?

9   A.    Yes.

10  Q.    And then you were interviewed a second time many months

11  later in January of 2015, correct?

12  A.    No, I don't recall that.

13  Q.    You don't recall being interviewed a second time?

14  A.    No, sir.

15  Q.    Okay.  Well, let's stick to the first one then.  When you

16  spoke to investigators that very day and they asked you what

17  had happened, you told those investigators that when you first

18  went up to speak to Mr. Lindbeck, he told you that he had

19  knives, plural, true?

20  A.    To my recollection, I wasn't sure that he said that she

21  had knives, plural, but he did say that she had a knife

22  earlier.

23  Q.    Well, what you told investigators was knives, plural,

24  correct?

25  A.    I'd have to see what context that I was -- I made that

Cox - Direct                                                    9

1   statement in, yes.

2           MR. GONZALEZ:  Your Honor, may I approach the

3   witness?

4           THE COURT:  Yes.

5           MR. PRAET:  Can I see what we're approaching him

6   with?

7           MR. GONZALEZ:  It's his statement.

8           MR. PRAET:  Is there exhibit -- page reference?

9           MR. GONZALEZ:  Page 3.

10  BY MR. GONZALEZ:

11  Q.   Sir, I've handed you two documents.  The first one is

12  Plaintiff's Exhibit 113.  After you spoke to investigators,

13  they prepared a transcript of the questions and the answers.

14  Do you call that?

15  A.   Yes, I'm aware of it.

16  Q.   And do you recall that you had an opportunity to review

17  the transcript after it was prepared?

18  A.   Yes, sir.

19  Q.   And you never told the investigators that there was

20  anything in the transcript that was wrong or inaccurate in any

21  way, did you?

22  A.   I never saw it until it was given to me by the attorney.

23  I was never asked to review it and -- when I read it, I wasn't

24  asked to correct it.

25  Q.   When did you first see the transcript of your interview?

1    A.    When my attorney gave it to me.

2    Q.    After this lawsuit was filed?

3    A.    Yes, sir.

4    Q.    Okay.  Do you remember approximately when it was that you

5    saw it?

6    A.    No, sir.

7    Q.    How many months ago?

8    A.    Several months ago.

9    Q.    When you reviewed it, was there anything in there that you

10   thought was inaccurate?

11   A.    Not to my knowledge, no.

12   Q.    So if you'll turn, please, to page 3.  And do you see in

13   the margin on the left-hand side where I wrote down clip five?

14   Do you see that?

15   A.    Yes.

16   Q.    Does that refresh your recollection that what you told the

17   investigators was that when you first got there, Mr. Lindbeck

18   told you that she had knives, plural?

19   A.    That's what it says, yes.

20   Q.    Then if you'll turn to page 42, you'll see that the

21   document has numbers on the bottom right-hand side.  Do you see

22   that?  And if you look on the top of page 42, do you see where

23   I wrote down clip nine in the margin?

24   A.    Yes, sir.

25   Q.    And looking at that, does this refresh your recollection

1    that you told the investigator again that within the first

2    couple of minutes of arrival, you were told by Mr. Lindbeck

3    that she had knives, plural?

4    A.   Yes.  She told me that -- that he had -- that she had a

5    knife or knives, yes.

6    Q.   And you also told the investigators that during this

7    initial conversation, Mr. Lindbeck told you that she had

8    threatened to kill him.

9    A.   That is incorrect.

10   Q.   Mr. Lindbeck never said that to you?

11   A.   I don't believe he did, no.

12   Q.   If you'll look at the next page, which is 43, do you see

13   where it says clip ten?

14   A.   Yes, sir.

15   Q.   If you can please read that to yourself.  Does this

16   refresh your recollection that on the day of the incident, you

17   told investigators that she had threatened to harm him?  Do you

18   see that?

19   A.   Well, it says at that point I think -- I think that, but

20   that happened prior to, but, yeah, that she had threatened to

21   harm him as well.  But I wasn't sure of that.

22   Q.   And then the next question is how did he say or what did

23   he say.  Do you see that?

24   A.   Yes, sir.

25   Q.   And then you said I think -- and it says she -- may be a

1  typo.  I think she said she even threatened to kill me,

2  something like that.  Do you see that?

3  A.    Yes, sir.

4  Q.    Does that refresh your recollection that what you told the

5  investigators that day was that the ex-girlfriend had

6  threatened to kill Mr. Lindbeck?

7  A.    At that point in time, that is what I told the

8  investigators, yes.

9  Q.    And so when you are there early on, your state of mind,

10  what you are thinking is that there's a woman inside of this

11  apartment walking around with knives in both hands; isn't that

12  right?

13  A.    I wasn't aware of it -- I wasn't -- I did not confirm that

14  with any information I was provided, no.

15  Q.    I'm asking about your state of mind when you had this

16  conversation with Mr. Lindbeck that you reported to the

17  investigators on the date of the shooting, your state of mind

18  at the time that Mr. Lindbeck is saying these things to you,

19  you thought there was a woman inside the apartment walking

20  around with knives; isn't that right?

21  A.    That is what I thought and then I asked him to specify

22  what -- what had happened and I'd actually -- even actually

23  asked him had she ever threatened you and he told me no.

24  Q.    What I just read from your transcript is different than

25  that.

1    A.   Yes, sir.

2    Q.   What you told the investigator was that she had threatened

3    to kill him and that that's what he told you.  That's what you

4    said, right?

5    A.   That is what I told the investigators at the time, yes.

6    Q.   Now, was that true?

7    A.   At that time, it was the best of my recollection.  I had

8    been on a ten-hour shift and the interview is at the end of the

9    shift when this incident happened and the fact that the

10   interview happened about four or five hours after that and I

11   was -- quite honestly, I was kind of in shock.  So I'm not

12   exactly sure that my memory was intact.

13   Q.   So let me make sure I understand what you just said.

14   A.   Um-hmm.

15   Q.   When you spoke to the investigators about this woman being

16   killed, did you ever tell the investigators, you know what, I'm

17   kind of tired right now.  I don't know that this is a good time

18   to question because my memory's not too good because I'm tired.

19   Did you ever say anything like that?

20   A.   No, sir.

21   Q.   You knew this was important, didn't you?

22   A.   Of course.

23   Q.   So you told investigators that having been told by the

24   boyfriend that she had knives, plural, you were thinking at

25   that time that she was going back and forth to the kitchen or

1  wherever she was getting knives and picking up different knives

2  and walking around with them.  That's what you said, right?

3  A.    That is what I was thinking, yes.

4  Q.    Would you agree that if there's a woman walking around

5  inside of an apartment with knives, that's not normal?  Would

6  you agree with that?

7  A.    I never confirmed that that was -- that occurred.  That's

8  what my thought process at the time that I was talking to Dag

9  and I was clarifying whether or not she had actually ever

10  threatened him with a knife.

11  Q.    And he said yes according to your statement, right?

12  A.    My initial statement with IA, I did mention that -- I did

13  say that, but --

14  Q.    Okay.  So --

15  A.    -- in better recollection, when I was able to collect

16  myself, I thought about the incident and I remember asking Dag

17  if she had ever threatened him with a knife or came at him with

18  a knife and he said no.

19  Q.    When did you come to that realization that what you told

20  investigators was wrong?

21  A.    I don't recall.

22  Q.    Well, did you ever go back to these investigators and say,

23  you know what, what I said about the knife, you forget the

24  whole thing, I was wrong?

25  A.    Again, I don't remember ever seeing that until the

1    transcript was given to me.

2    Q.   Well, did you ever go back at any point to the police

3    investigators and say that what I said about the knives was

4    just -- was wrong?

5    A.   Quite honestly, sir -- and like I said, I was pretty much

6    in shock and I don't really remember exactly what I said to

7    each answer.  So I wasn't -- I didn't realize that I was

8    incorrect making that statement at that time.

9    Q.   Regardless of what you said about what Mr. Lindbeck told

10   you, what you thought at the time that you were speaking to

11   Mr. Lindbeck is that there was a woman inside wandering around

12   with knives?

13   A.   He never said that, no.

14   Q.   I didn't ask if you said that.  I'm asking about your

15   state of mind and what you communicated to investigators.  You

16   told the investigators that you were thinking at that time when

17   you were talking to Mr. Lindbeck that you had a woman inside

18   the apartment wandering around with knives.  That's what you

19   told them, right?

20   A.   That is what I told them, yes, sir.

21   Q.   Now, back to my question.  Would you agree, sir, that if

22   there is a woman wandering around with knives in an apartment,

23   that's not normal?  Can we agree to that?

24   A.   No.  It depends on what the circumstances are.

25   Q.   Well, did you think there was any circumstance in that

1    situation where it would be normal for her to be wandering

2    around with knives?

3    A.   Again, I never confirmed that that was actually occurring.

4    That was just a thought that went in my head.

5    Q.   All right.  So you get a message from dispatch saying

6    woman with mental health issues, and then you're thinking about

7    a woman wandering around with knives.  If you put those two

8    things together, wouldn't you agree that it's at least possible

9    that this woman has mental issues?  Would you agree with that?

10   A.   It is possible, yes.

11   Q.   Sir, if you would turn to Exhibit 108.

12        MR. GONZALEZ:  I'm waiting for a stipulation, Your

13   Honor, and I won't display them until I get it.

14        MR. PRAET:  That's fine.

15        MR. GONZALEZ:  Move 108 into evidence, Your Honor.

16        THE COURT:  108 will be admitted into evidence.

17     (Plaintiff's Exhibit 108 is admitted.)

18        MR. GONZALEZ:  Can you please put up the first page

19   of 108.  All right.

20   BY MR. GONZALEZ:

21   Q.   Do you recognize this as the area that's outside of the

22   apartment, sir?

23   A.   Yes, sir.

24   Q.   And the door that's open there on the first page of

25   Exhibit 108 is the door that actually was kicked in that day?

Cox - Direct                                    17

1    A.   Yeah, Apartment 101.

2         MR. GONZALEZ:  Next page, please.

3    BY MR. GONZALEZ:

4    Q.   And this is the -- I call it the patio area in the middle

5    of this apartment complex; is that right?

6    A.   It's the courtyard, yes.

7    Q.   And many years ago, it was a swimming pool and they

8    cemented it in?

9    A.   It appears to be, yes.

10   Q.   And this is the area where Ms. Canter was apparently

11   dancing around?

12   A.   According to the call, yes.

13   Q.   But you don't know for sure because you never asked either

14   Dag or the apartment manager where exactly was she dancing

15   around, did you?

16   A.   No.

17   Q.   Or how was she dancing or what was she doing, you never

18   asked that.

19   A.   No.

20        MR. GONZALEZ:  Next photo, please.

21   BY MR. GONZALEZ:

22   Q.   And this is the patio area and the front door?

23   A.   Yes.

24   Q.   And you could see through the fence, as you can tell, I

25   think, from this picture, which is page 3 of Exhibit 108 -- you

1    could see through the fence and look into the apartment from

2    where you were standing when you arrived, correct?

3    A.   I couldn't see -- actually see into the apartment, but

4    when she came up to the sliding glass, I could see her, but

5    when she left, I could not actually see what she was doing

6    inside the apartment.

7    Q.   Fair enough.  To clarify, when she walked up to the

8    sliding glass door, because the curtain was open, you could see

9    her at that point, correct?

10   A.   Yes, sir.

11        MR. GONZALEZ:  Next photo, please.

12   BY MR. GONZALEZ:

13   Q.   This is the last page of Exhibit 108 and this is just

14   another angle showing that the apartment is near the street,

15   correct?

16   A.   Yes, sir.

17   Q.   When you were speaking to Mr. Lindbeck, the boyfriend,

18   Ms. Canter came up to the sliding door at least two or three

19   times such that you could see her, correct?

20   A.   Yes.

21   Q.   And she was yelling and screaming things that you couldn't

22   quite understand, right?

23   A.   She was looking at Dag and yelling at him, yes.

24        MR. GONZALEZ:  Well, Your Honor, I move to strike the

25   yelling at him.  That's a conclusion as to who she was yelling

1    at.

2              MR. PRAET:  Answered the question, what did he hear.

3              THE COURT:  Overruled.

4              MR. GONZALEZ:  All right.

5    BY MR. GONZALEZ:

6    Q.    What was she yelling?

7    A.    I don't recall.

8    Q.    Do you recall anything at all that she was yelling?

9    A.    A lot of cuss words.

10   Q.    And you said she was very irate, right?

11   A.    Yes.  She was very angry at Dag.

12   Q.    Did you at any point ask Mr. Lindbeck why is she so upset?

13   A.    I would assume I did and she said that she didn't want to

14   be out of his apartment.

15   Q.    You assume.  Do you have a recollection of having asked

16   him that question?

17   A.    No, but I'm sure I would have.

18   Q.    Well, when you were questioned after the shooting, you

19   never told anybody that you asked why she was angry, did you?

20   A.    No, sir.

21   Q.    So before this moment, right now in this courtroom --

22   A.    Um-hmm.

23   Q.    -- before this moment, had you ever told any investigator

24   that you asked why she was angry and that Mr. Lindbeck said

25   whatever you just said?

1    A.    No.

2    Q.    Now, you said just a moment ago that you assumed you would

3    have asked.  Sitting here today, do you have a specific

4    recollection of having asked Mr. Lindbeck why is she so upset?

5    A.    No.

6          MR. GONZALEZ:  Your Honor, we have a stipulation and

7    I move into evidence Exhibit 101.

8          THE COURT:  101 will be admitted into evidence.

9        (Plaintiff's Exhibit 101 is admitted.)

10   BY MR. GONZALEZ:

11   Q.    Sir, you would agree that as an officer of the Fresno

12   Police Department you have an obligation to be familiar with

13   the policies of the department; is that fair?

14   A.    Yes.

15   Q.    And the practices and procedures of the department, true?

16   A.    Yes.

17   Q.    And you're familiar with the document that's up on the

18   screen which is called Mental Illness Procedure 418.  You're

19   familiar with that document, correct?

20   A.    Yes, sir.

21   Q.    Now, I've blown up part of the first page because I want

22   to ask just a few questions about a few of these items.  First

23   of all, it says that an officer who's handling a call involving

24   a suspected or actual mentally disabled individual should

25   consider the following.  Now before I get into what the

1   following is, what does it mean suspected?

2   A.   If you have information to believe that she may be

3   mentally ill.

4   Q.   Such as a note from dispatch saying mental illness,

5   correct?

6   A.   Well, that's just a guideline.  That's information that

7   you take into a call and you verify that information when you

8   get to the call.

9   Q.   And then when you got to the call, you concluded that you

10  had a woman wandering around with knives and that that could be

11  a sign of mental illness, right?

12  A.   No.  That was a thought that went through my head.  That

13  was never confirmed.

14  Q.   Did you take this policy into consideration at all that

15  day?

16  A.   Yes.

17  Q.   You thought about it.

18  A.   Yes.  I thought it -- I thought, you know, it -- I thought

19  about whether or not she had mental issues.  In fact, I even

20  asked Dag if she had any mental health issues and he turned

21  around and told me no.

22  Q.   And you have a clear recollection of that.

23  A.   Yes, sir.

24  Q.   That you asked Mr. Lindbeck did she have any mental issues

25  and you have a clear recollection that he said no.

1   A.   Yes.

2   Q.   Did you tell the investigators that?

3   A.   I wasn't asked.

4   Q.   You weren't asked.

5        MR. GONZALEZ:  Your Honor, I would like to play the

6   audio because all I have is the audio of one question and one

7   answer from the second interview of Officer Cox.

8        THE COURT:  What's -- is there a page and line so

9   that Mr. Praet can see?

10        MR. PRAET:  We have a transcript that --

11        MR. GONZALEZ:  I will show him.  There are no line

12   numbers, Your Honor.

13        THE COURT:  Okay.  Any objection?

14        MR. PRAET:  Well, I haven't seen it.  I don't know

15   what he's going to refer to, but I'm assuming the transcript

16   would be easier than -- I have no problem with showing the

17   witness.  It's not prior sworn testimony.  If he wants to

18   refresh the witness's memory.

19        THE COURT:  Sounds like an admission.

20        MR. GONZALEZ:  It's a prior inconsistent statement,

21   Your Honor.

22        THE COURT:  Overruled.  It's up to counsel how they

23   want to display that evidence.

24        MR. GONZALEZ:  Clip 16, can you play clip 16?

25      (Audio recording played.)

1   BY MR. GONZALEZ:

2   Q.   Does that refresh your recollection that the investigator

3   specifically asked you did you ask Dag any questions in regards

4   to her being under the influence or possibly mentally ill?

5   A.   I heard the first part of the question and answered it.  I

6   don't remember hearing the second part of it, which is why I

7   didn't address it.

8   Q.   So you're telling us today that when you're being

9   questioned by this investigator about this woman's death, you

10  heard only part of that question?

11          MR. PRAET:  Misstates the evidence.  We can listen to

12  it again.  Counsel is --

13          MR. GONZALEZ:  I do want to listen to it again.  I

14  play it one more time.  Can I play it one more time?

15          THE COURT:  No.  What's the objection?

16          MR. PRAET:  Concerning mentally ill.  I heard was she

17  high or under the influence.

18          MR. GONZALEZ:  I'm sorry, but --

19          THE COURT:  Let me hear -- what's -- can you reask

20  your question.

21          MR. GONZALEZ:  I will.

22  BY MR. GONZALEZ:

23  Q.   Do you recall that the question that you were asked was

24  did you ask Dag any questions in regards to her being under the

25  influence or possibly mentally ill or anything?  Do you recall

1   being asked that question.

2   A.   I don't remember the second part of that.  I remember him

3   asking me about the first part.

4   Q.   Well, you just heard the question, right?

5   A.   Yes.

6   Q.   But you're not denying that you were specifically asked

7   whether you asked any questions of Mr. Lindbeck about whether

8   she was mentally ill.  You were asked that question by the

9   investigators, right?

10  A.   I was asked, but I didn't understand the second part of

11  that -- I didn't hear the second part of it, so I didn't answer

12  it.

13  Q.   You didn't hear it.

14  A.   I didn't -- it didn't register when he asked the question.

15  When he was asking the question, I heard the first part of it.

16  I didn't -- it didn't -- I didn't recall -- or didn't -- I

17  wasn't aware of the second part of the question and so I

18  answered the first part.  So that's why it's never addressed.

19  Q.   Sir, you may not remember, but if you look at the second

20  document that I gave you there, it is a transcript from an

21  interview that took place on January 6, 2015.  Just look at the

22  very first page.  Do you know someone named Sergeant Sean

23  Bates -- Biggs.  This is a typo.  Sergeant Biggs.  Do you know

24  Sergeant Biggs?

25  A.   Yes, sir.

1   Q.   He's the one that investigated this?

2   A.   He investigated a portion of it, I would imagine.

3   Q.   All right.  Do you remember talking to him in January some

4   months after the shooting?

5   A.   No, I don't.

6   Q.   Do you know some attorney named Marshall Hodgkins?

7   A.   Yes, sir.

8   Q.   You don't remember being with Marshall Hodgkins at this

9   interview?

10  A.   Yes, I do.

11  Q.   Because that refreshes your recollection.

12  A.   Yes, sir.

13  Q.   Okay.  Fine.  So now that you remember that you were

14  actually questioned twice, I want you to go to page 5 of this

15  transcript.

16           MR. PRAET:  Is there an exhibit number for this

17  transcript because there's no foundation for this transcript.

18           THE COURT:  For identification, what's the exhibit

19  number of the document in front of him?  Mr. Gonzalez?

20           MR. GONZALEZ:  It is --

21           THE COURT:  Just for identification.

22           MR. GONZALEZ:  It is 113B as in boy, Your Honor.

23           THE COURT:  Thank you.

24           MR. PRAET:  Is there a page number?

25           MR. GONZALEZ:  Page 5.

1  BY MR. GONZALEZ:

2  Q.   Do you see where I wrote clip 16, sir?

3  A.   Yes, sir.

4  Q.   And do you see that clip 16 is what I just played for the

5  jury to hear where you are asked about mental illness?  Do you

6  see that?

7  A.   Yes, I see it.

8  Q.   And that's where you say you just didn't hear the second

9  part of the question; is that right?

10 A.   That is correct.

11 Q.   Do you see that three lines down, you're asked again was

12 there -- did he make any reference to her being mentally ill or

13 crazy?  Do you see that?

14 A.   Yes.

15 Q.   And then you answer I think that's what he said.  I think

16 he said she is crazy, right?

17 A.   That's what it says, yes.

18 Q.   You did not say what you're telling us now which is that

19 Mr. Lindbeck said no mentally illness, no, she ain't got no

20 mental illness.  You didn't say that, did you?

21 A.   Not in this interview, no.

22 Q.   Did you say it at all in either interview?  You were

23 questioned twice in detail.  Did you ever say in either

24 interview --

25 A.   No, sir.

1    Q.   Now that I've refreshed your recollection in that you were

2    questioned in January a second time, fair to say that you

3    understood that was important?

4    A.   Of course, yes.

5    Q.   You understood you had to tell the truth?

6    A.   Yes.

7    Q.   You understood you had to get complete answers to

8    questions?

9    A.   To the best of my recollection, yes.

10   Q.   And you did that, didn't you?

11   A.   To the best of my recollection, yes.

12   Q.   Okay.

13            MR. GONZALEZ:  Could we go back to 101?

14   BY MR. GONZALEZ:

15   Q.   So let me come back to your policy that you say you

16   considered.  Dispatch tells you woman with mental illness.

17   Then you go and you talk to the boyfriend and he says she's

18   wandering around and she got knives.  You conclude in your head

19   she's wandering around inside.  Then you ask the boyfriend does

20   she have mental illness and he says she's crazy.  If you put

21   all of that together, wouldn't you agree that it was suspected

22   that she might have mental illness?

23   A.   Well, his actual term was she's acting crazy not that she

24   is.

25   Q.   She's acting crazy.

Cox - Direct                                              28

1    A.    Yes, sir.

2    Q.    So if you put together the message from dispatch, your

3    belief that she's wandering around with knives, the boyfriend's

4    statement that she's acting crazy, don't you think you ought to

5    apply procedure 418 in that situation?

6    A.    At no time did I see her armed and when she was yelling at

7    Dag, she wasn't making any statements or making any maneuvers

8    that led me to believe that she had mental health issues.

9    Q.    Was she making any sense?

10   A.    She was yelling at Dag and cursing him out.

11   Q.    Do you recall --

12   A.    She wasn't -- she wasn't making any outlandish statements

13   that would lead me to believe that she had mental health

14   issues.

15   Q.    Your policy says that you should collect any available

16   information.  Did you do that?

17   A.    I didn't suspect her to be mentally ill.

18   Q.    Did you collect any available information before making

19   the decision to kick in that door?

20   A.    Other than talking to Dag and briefly the manager, no.

21   Q.    When you say briefly to the manager, tell us as best you

22   can recall every thing that was said in your discussion with

23   the manager.

24   A.    The only thing I clarified with the manager is whether

25   Veronica had a right to be in the apartment or not, whether she

1    was on the lease.

2    Q.    And nothing more.

3    A.    At the time, no.

4    Q.    And by the way, there were a lot of residents mingling

5    around watching the police action, right?

6    A.    There were a few, yes.

7    Q.    And you didn't talk to any of them either about what they

8    had seen, did you?

9    A.    No.

10   Q.    It says conflict resolution and deescalation.  What is

11   deescalation?

12   A.    Try to calm things down.

13   Q.    Did you do that?

14   A.    I tried going up to the door and talking with her and

15   asking her if she would come out.

16   Q.    And what happened?

17   A.    She slammed the door in my face.

18   Q.    Did you do anything else to try to deescalate?

19   A.    Not at that point.  I walked away and asked for fill?

20   Q.    Fill meaning backup?

21   A.    Yes, sir.

22   Q.    Code three?

23   A.    Yes, sir.

24   Q.    Lights and siren?

25   A.    Yes, sir.

1    Q.    Then it says community resources.  You understand that in

2    the Fresno Police Department there are people who are trained

3    to communicate with people who might have mental illness.  Do

4    you understand that?

5    A.    Yes.

6    Q.    And you understand it's important to use those folks when

7    you encounter someone with mental illness because they react

8    differently than people who are not mentally ill, right?

9    A.    Yes.

10   Q.    And you understand that there are also resources in the

11   community available, physicians, psychiatrists, who are on-call

12   to help police officers if they ever encounter someone who

13   might be mentally ill, right?

14   A.    Well, they don't respond out to the scene.  We have a

15   mental health cadet that is sometimes available to us, yes.

16   Q.    And you didn't ask for any assistance in that area from

17   anybody, did you?

18   A.    Not that -- I didn't think that -- one, I didn't suspect

19   she was mentally ill.  Two, she was angry and she wasn't even

20   speaking to me.  She -- a mental health advisor would not be

21   able to speak with her at that point.  We'd have to get her to

22   a point to where she's able to talk to him.

23   Q.    The last bullet on the screen here under your procedure

24   418 says the officers shall attempt to obtain medical health

25   history and any previous law enforcement contacts.  When you're

1    at the apartment, you actually have a radio on your uniform,

2    correct?

3    A.    Yes, sir.

4    Q.    Do that you could just push the button and say dispatch,

5    got a woman here, Veronica Canter, what do we know about her.

6    You could have done that.

7    A.    Yes, sir.

8    Q.    And it takes you two seconds to do that, right?

9    A.    To broadcast it, yes.

10   Q.    You didn't do that either.

11   A.    No, sir.

12   Q.    And it says -- there's a reference there to 5150.  Do you

13   see that?  Do you see that?  It's kind of covered up by the

14   letter R, but do you see that, 5150 hold?

15   A.    Yes.

16   Q.    And it says WIC.  Is WIC Welfare and Institutions Code?

17   A.    That's correct.

18   Q.    The special statute in California for how you deal with

19   people that may be mentally ill?

20   A.    Well, it's a statute that says if they pose a danger to

21   themselves or others or are greatly disabled.

22   Q.    And because if you have somebody in that situation, you

23   don't arrest them.  You try to get them some help, correct?

24   A.    Yes.

25   Q.    And if you have somebody in that situation, instead of

1  taking them in a police car to jail, the procedure is to take

2  them in an ambulance to a hospital where they can get help,

3  correct?

4  A.   Yes, sir.

5  Q.   And you never checked to see whether or not this woman

6  whose name you knew had previously been held on a 5150, did

7  you?

8  A.   No, sir.

9  Q.   But you learned later that just 20 days earlier, she was

10 laying out in the street in Fresno, correct?

11 A.   Yes.

12 Q.   You didn't call the supervisor that day before deciding to

13 kick that door in, did you?

14 A.   No, sir.

15 Q.   Whose idea was it to kick in that door?

16 A.   I don't remember.

17 Q.   Sir, you knew when you arrived at that apartment that if

18 there's a possibility that somebody has mental issues you

19 should deescalate the situation, true?

20 A.   Yes.

21 Q.   In fact, deescalation is always the objective of a

22 reasonable police officer, true?

23 A.   Yes.

24 Q.   And with respect to deescalation, you knew that the way in

25 which you speak to someone with mental illness makes a

1  difference in how they react to you, correct?

2  A.   Yes.

3  Q.   In other words, you don't want to be screaming at somebody

4  with mental illness.  You want to speak gently and calmly and

5  try to get them to relax; is that right?

6  A.   Yes.

7  Q.   You knew that making threats such as we're going to arrest

8  you is not the way one should address somebody that may have

9  mental illness, correct?

10  A.   At that time, I did not believe that she had mental health

11  issues.

12  Q.   I'm not asking you that.  I'm asking, sir, you understood

13  that day that if you have someone who might have mental

14  illness, you should not be making threats that you're going to

15  arrest them because they don't react well to that, correct?

16  A.   Well, she was in violation of the law, so I was just

17  stating a fact, but had she -- if she chose not to come out,

18  she was going to be arrested.

19  Q.   Let me try this again for a third time.  When you arrived

20  at the scene, your knowledge as a police officer was that if

21  you make threats of arrest to people who have mental illness,

22  they may not react well to that.  You knew that, didn't you?

23  A.   Yes, sir.

24  Q.   Because if you make threats of arrest, somebody with

25  mental illness may react in a way that they think is in defense

1    of themselves, correct?

2    A.    That's possible, yes.

3    Q.    You understood that day that not only the words but the

4    mannerisms of the police officer are important in how the

5    person who may have mental illness is going to react, correct?

6    A.    Yes.

7    Q.    And you knew that if the person might have a mental

8    illness, a reasonable police officer should proceed slowly and

9    with caution, true?

10   A.    Yes.

11            MR. GONZALEZ:  Your Honor, I have a stipulation on

12   Exhibit 102 which are the training records for -- or I'm sorry.

13   Exhibit 102 is the course outline and 102A is the training

14   records.

15            MR. PRAET:  So just 102A, not 102.

16            MR. GONZALEZ:  I'm going to use them both.  102A is

17   the training records.  102 is the mental health policy.

18            Your Honor, it's Exhibit 102A and I move 102A into

19   evidence.  That's the training excerpts from Officer Cox.

20            THE COURT:  102A will be admitted into evidence.

21       (Plaintiff's Exhibit 102 is admitted.)

22   BY MR. GONZALEZ:

23   Q.    Sir, I've put 102A on the screen.  This is a log or

24   history of your training with the Fresno Police Department,

25   correct?

1    A.    That's correct.

2    Q.    If we could please turn to the bottom of page 3.  On

3    February 3rd of 2009, you took a two-hour class called Mental

4    Illness Awareness Update; do you see that?

5    A.    Yes, sir.

6    Q.    Now just remember that name, Mental Illness Awareness

7    Update.  If we could leave that on the screen, if you could

8    look in your binder, sir, do you see your binder there?

9    A.    Yes, sir.

10   Q.    If you could turn please to Exhibit 102, you see at the

11   bottom of Exhibit 102, it's dated 2009.  Do you see that?

12   A.    Yes, sir.

13   Q.    And do you see that the title is Mental Illness Awareness

14   Update?

15   A.    I see that.

16   Q.    Is this the outline for the class that you took in 2009?

17   A.    It appears to be, yes.

18          MR. GONZALEZ:  Your Honor, I move 102 into evidence.

19          MR. PRAET:  102A.

20          MR. GONZALEZ:  102, the outline.

21          MR. PRAET:  Wait.  What?  I'll object.  Lack of

22   foundation, Your Honor.

23          THE COURT:  I think he just laid the foundation.

24   Overruled.

25          MR. GONZALEZ:  If we could put up 102, please.

1    BY MR. GONZALEZ:

2    Q.   Sir, I want to ask you just a few questions about this

3    course that you took on mental illness awareness.  First of

4    all, the whole idea of the course was to teach officers how to

5    react in situations where you confront someone who might be

6    mentally ill, correct?

7    A.   That's correct.

8    Q.   And if you look to Item VI, Roman VI, do you see at the

9    bottom there, it says tactical assessment.  Do you see that?

10   A.   Yes, sir.

11   Q.   And then if we go to the next page, it says collect

12   information to assess and stabilize the scene.  Do you see

13   that?

14   A.   Yes.

15   Q.   What does stabilize the scene mean?

16   A.   It means so it's no longer volatile.

17   Q.   Calm things down?

18   A.   Yes, sir.

19   Q.   It doesn't mean break a door in and go in with a Taser,

20   does it?

21   A.   We were trying to regain control for Dag with his

22   apartment.  That's what he wished.

23   Q.   Let me follow up on that.

24   A.   Um-hmm.

25   Q.   Is it your job as the police officer to do what Dag wants

1    or is it to follow your policies and training?

2    A.    To a certain extent, he -- he is the renter of the

3    apartment.  She is not.  He wanted to press charges.  That's

4    the only reason why we made entry.  Had he not wanted to press

5    charges, we would have walked away.

6    Q.    Let me ask it again.  Is it your job as the police officer

7    to do what Dag wants or to follow your own policies and

8    procedures?

9    A.    Both.

10   Q.    Well, what if they conflict?

11   A.    It depends on the severity of the issue --

12   Q.    Right.  And how severe was this issue?

13   A.    Again, when I made that decision or we made that

14   decision --

15   Q.    Wait, wait, wait.  How severe was this issue?

16   A.    At the time, all we thought we had was a

17   boyfriend-girlfriend disturbance and she was angry at him.

18   Q.    Not very severe?

19   A.    No, sir.

20   Q.    In fact, the whole reason why you kicked in the door and

21   went in with a Taser and with lethal backup was for

22   trespassing; is that right?

23   A.    That's correct.

24   Q.    And the plan that you came up with, with your partner was

25   in fact to kick in the door, to go in.  You would have a Taser

1   in your hand and your partner here would be lethal backup.

2   That was the plan that you came up with, right?

3   A.   Yes, sir.

4   Q.   And what does lethal backup mean?

5   A.   He has access to his firearm and it's ready.

6   Q.   It's ready to shoot somebody if you need to, right?

7   A.   Yes.

8   Q.   For trespassing.

9   A.   Not for trespassing, no.

10  Q.   Okay.  But the plan was to go in with lethal backup.  Do

11  you think that's stabilizing the scene?

12  A.   We went in -- we made entry to make an arrest for

13  trespassing.  We did not go in with the intent to do her harm.

14  Q.   Hold on.

15        MR. GONZALEZ:  Your Honor, I move to strike.  He's

16  not being responsive.  I asked him whether it was stabilizing

17  the scene.

18        THE COURT:  Overruled, but ask again.

19  BY MR. GONZALEZ:

20  Q.   Okay.  Try this again.  In your view, going in with a

21  Taser and with lethal backup within two and half minutes of

22  Officer Louchren arriving at the scene, in your view, is that

23  stabilizing the scene?

24  A.   Yes.  It's an attempt to stabilize the scene, yes.

25  Q.   Then it says, again reading from your training outline,

1    Roman VII, tactical communication.  Do you see that?

2    A.    Yes, sir.

3    Q.    And it says strategies for verbal -- thank you --

4    intervention.  Oh, that's better.  And it says tone, demeanor,

5    approach.  What does that mean, tone, demeanor, approach?

6    A.    The tone of your voice and the way you speak to her.

7    Q.    It means don't yell at her, right?

8    A.    Not necessarily.

9    Q.    Well, what does it mean then?

10   A.    It means to try go calm her down, but then that's not the

11   only issue.

12   Q.    All right.  Well, you just said try to calm her down.

13   What your partner said to her after he arrived is if you don't

14   open the door, I'm going to kick it in and arrest you.  That's

15   what he said, right?

16   A.    I don't know if that was his exact words.

17   Q.    Well, tell us what you remember.

18   A.    I remember that he said that -- we identified ourselves

19   and then he told them that we -- if she doesn't come to the

20   door that we would have to come in and arrest her, yes.

21   Q.    He said you were going to kick the door in and arrest her,

22   right?

23   A.    He may have said that, yes.

24   Q.    And is that the way you calm someone down when they're in

25   mental distress?

Cox - Direct                                    40

1    A.    Again, at that point, we did not believe that she had any

2    mental health issues.

3    Q.    Is that the way you calm situations in general?

4    A.    It's what was needed to stabilize the situation.

5    Q.    Let's put mental illness aside for the moment.  Whether

6    there's mental illness or not, you understand that the job of a

7    reasonable officer is to calm any situation down, true?

8    A.    To a certain extent, yes.

9    Q.    And to deescalate any situation, true?

10   A.    But not to walk away from a crime.

11   Q.    I'm not asking you about walking away.  You understand

12   that as a police officer, it is your job -- whether there is

13   mental illness or not, it is it your job to deescalate whatever

14   situation you encounter, true?

15   A.    If and when we can, yes.

16   Q.    And you could that day, couldn't you?

17   A.    To the best of our ability, I thought we had.

18   Q.    You thought you had?

19   A.    We were taking steps to regain control of Dag's apartment.

20   That's what he wanted.  A crime was being -- taking place and

21   at that point, we did not believe that she had any mental

22   health issues which is why we -- you know, when he decided that

23   he wanted to press charges, that's the only reason why we went

24   in.

25              THE COURT:  Okay.  Hold on just a moment.  Pause for

1   just a second.  I just want to make sure everyone's focused.

2   Can the jurors please just stand up for a second and stretch.

3   This is important and I want to make sure everyone can pay

4   attention.  Just a little breath.  It's okay.

5       (Pause.)

6           THE COURT:  Okay.  Okay.  Have a seat.  We'll take a

7   bigger break in a little bit.  Okay.  Proceed, Mr. Gonzalez.

8           MR. GONZALEZ:  Thank you, Your Honor.

9   BY MR. GONZALEZ:

10  Q.    Officer, if you look please at 7B4.  It says time.  Using

11  time to your advantage.  Do you see those words?

12  A.    Yes.

13  Q.    What does that mean?

14  A.    If and went you can, you can -- you should take as much

15  time as you can to use it in your advantage.

16  Q.    Because basically, it's telling you, look, don't get

17  yourself into a confrontation if you don't have to.  Take time,

18  right?

19  A.    This is in regards to mental health.

20  Q.    Well, let's set mental health aside for the moment.  In

21  any situation that you encounter -- in any situation where

22  there's no need for imminent reaction, time is always your

23  ally.  Isn't that what you told us?

24  A.    It can be, yes.

25  Q.    So even if she didn't have mental illness, time is still

Cox - Direct                                    42

1    something you could use to your advantage; isn't that right?

2    A.    Yes.

3    Q.    How much time did you take between the time that Officer

4    Louchren arrived and the time that the two of you made the

5    decision to kick the door in, how much time passed?

6    A.    I don't know, maybe two, three minutes.

7    Q.    It was about two and a half minutes, wasn't it?

8    A.    Sounds about right.

9    Q.    And is there any reason -- any reason at all that you

10   couldn't have taken more than two and a half minutes before

11   making the decision to kick that door in and to go in with

12   lethal force for trespassing?

13   A.    At that time, again, all we believed we had was a

14   boyfriend-girlfriend disturbance, an ex-girlfriend that had

15   locked her boyfriend out, and all we wanted to do was go in and

16   arrest her for trespassing.

17   Q.    Okay.  Let's go to the next one, sir.  Alternative to

18   lethal force.  What does that mean, alternative to lethal

19   force?

20   A.    Something other than.

21   Q.    In other words, do what you can as a police officer to

22   avoid a situation where you have to use deadly force, correct?

23   A.    Yes.

24   Q.    And it says principles and number three is use continuous

25   verbal communication.  Do you see that?

1   A.   Yes, sir.

2   Q.   Why is that important?

3   A.   Because you want to try to get -- deescalate the

4   situation.

5   Q.   So tell the jury how much verbal communication did you

6   attempt before making the decision to kick in that door and to

7   go in with lethal backup?

8   A.   She wasn't willing to talk to us.

9   Q.   What efforts did you make?

10  A.   I went to the front door, opened it, and she came up and

11  slammed it in my face.

12  Q.   What else?

13  A.   That's it.

14  Q.   Do you think that is continuous verbal communication?

15  A.   Again, at that point when we made entry, we did not

16  believe or suspect that she had mental issues.

17  Q.   All right.  Well, let's back off with the mental illness

18  thing for a second.  Even if you assumed she did not have

19  mental illness, continuous verbal communication is still what a

20  reasonable officer would do before breaking in the door and

21  going in with lethal force for trespassing.  Wouldn't you agree

22  with that?

23  A.   To a certain extent, yes.

24  Q.   The psychology of force, potential for escalation, do you

25  see that?

1    A.    Yes.

2    Q.    What that is telling you and teaching you is that if you

3    use force, there is a potential that that can escalate the

4    situation, right?

5    A.    Yes.

6    Q.    And therefore, you understood that a reasonable police

7    officer should not use force unless you have to, true?

8    A.    Yes, sir.

9    Q.    Sir, let me ask you just a few questions about MH1 and

10   MH2.  At the Fresno Police Department, there are people that

11   work with police officers that are referred to as MH1 and MH2;

12   is that right?

13   A.    That's correct.

14   Q.    And MH stands for mental health, correct.

15   A.    Yes, sir.

16   Q.    And these are people who are trained to help police

17   officers respond to situations where somebody might be

18   suffering some type of mental illness, correct?

19   A.    That is correct.

20   Q.    And you understand that even if it is a borderline case

21   where it's not clear whether the person may have mental issues,

22   you should ask these people for help, correct?

23   A.    Only if they're able to talk to them and individuals that

24   you suspect of having mental health issues.

25   Q.    Well, what you told us when we asked you questions under

Cox - Direct                                    45

1    oath is that if it's a borderline case, you should involve

2    these people to help you, correct?

3    A.    That is correct.

4    Q.    And you also told us that this kind of vague, on the

5    fence, we should use that resource, true?

6    A.    Yes.

7    Q.    You never asked for assistance of either an MH1 or an MH2

8    that day, did you?

9    A.    No.  She wasn't able -- she wasn't willing to speak.

10   Q.    And Officer Louchren, by the way, he didn't suggest to

11   you, hey, why don't we call somebody to help us, an MH1 or MH2,

12   he didn't --

13   A.    No, sir.

14   Q.    And he didn't suggest, hey, you know what, why don't we

15   call the supervisor.  Before we break in the door and go in

16   with lethal force, maybe we ought to talk to a supervisor.  He

17   didn't recommend that either.

18   A.    No, sir.

19   Q.    And he didn't recommend, you know what, why don't we call

20   dispatch.  Takes three seconds.  Let's get some more

21   information about this woman, who is she, what do we know about

22   her.  He didn't raise that.

23   A.    No, sir.

24   Q.    And he didn't ask, you know what, why don't we check to

25   see if there's a 5150.  Maybe she's been arrested before on a

Cox - Direct                                                    46

1    5150 and if so, we ought to know that and we ought to look into

2    that.  He didn't suggest that.

3    A.    It's not considered an arrest, but no, he did not.

4    Q.    And -- thank you.  You actually corrected me.  He didn't

5    suggest that you see whether she had ever been detained on a

6    5150.

7    A.    That's correct.

8    Q.    And you didn't suggest it either.

9    A.    No, sir.

10   Q.    You also have people at the Fresno Police Department that

11   are trained negotiators, correct?

12   A.    That is correct.

13   Q.    And you didn't call them either.

14   A.    No, sir.

15   Q.    Whether to involve a negotiator, that's usually a decision

16   that's made by a supervisor, correct?

17   A.    Yes.

18   Q.    But you never called the supervisor to ask whether you

19   should get somebody like that involved, did you?

20   A.    No.

21   Q.    And you understand that if you encounter someone on the

22   job that's barricaded, you're supposed to contact your

23   supervisor, correct?

24   A.    We didn't consider her barricaded.

25   Q.    That's not what I asked you.  If you encounter someone who

1    is barricaded, you're supposed to call your supervisor, right?

2    A.   Yes, sir.

3    Q.   When you were at that apartment, you were familiar with

4    the Fresno Police Department's procedures and guidelines on a

5    forced entry, true?

6    A.   Yes.

7    Q.   And you understood that the policy at that time with

8    respect to forced entry is that you should slow the pace of the

9    call before forcing an entry, correct?

10   A.   Yes.  On a forced entry, yes.

11   Q.   And you understood that you're supposed to ask a

12   supervisor before you make a forced entry, correct?

13   A.   Yes.

14   Q.   And you're supposed to consider the seriousness of the

15   offense before you make a forced entry, true?

16   A.   Yes.

17   Q.   And you're supposed to consider the availability of mental

18   health advocates before you make a forced entry, correct?

19   A.   I'm not sure about that part in regard to a forced entry.

20   Q.   By the way, you just mentioned that at some point,

21   Veronica actually opened the door and then she slammed it when

22   you were there.  Do you remember that?

23   A.   Yes, sir.

24   Q.   And you told us that it seemed to you from what you could

25   hear that after she slammed the door, she shoved items up

Cox - Direct                                    48

1   against the door on the inside, right?

2   A.    I believe what I said was I wasn't sure after she slammed

3   it whether she put her weight up against it or something else.

4   Q.    Fair to say that you knew at that point that she didn't

5   want you in the apartment.

6   A.    That is correct.

7   Q.    Why did you ask for backup code three lights and siren if

8   this was just your typical not big deal, boyfriend-girlfriend

9   dispute?

10  A.    She displayed anger towards Dag and then she was being

11  uncooperative with me at the door and so I wanted to get my

12  fill there as quickly as possible just in case it escalated.

13  Q.    What you told the investigators was that you called code

14  three because she had knives.  Do you recall that?

15  A.    I don't recall that, no.

16  Q.    If you look at the transcript, the first one.

17        MR. PRAET:  Is there an exhibit number?  I don't know

18  what the first one means.

19        MR. GONZALEZ:  It's Exhibit 113.

20        MR. PRAET:  Is there a Bates stamp page number?

21        MR. GONZALEZ:  Second page.

22  BY MR. GONZALEZ:

23  Q.    Do you see where it says clip four on the side there?

24  A.    Yes, sir.

25  Q.    And just read that to yourself.  Does this refresh your

1  recollection that you told investigators that because she had

2  threatened him and because she had a knife, you decided to get

3  some help?

4  A.   That's what I told Dag, that I didn't want him going in

5  because I didn't want him getting hurt, yes.

6  Q.   And you told Mr. Lindbeck that the reason why you

7  thought -- or you told the investigators that the reason why

8  you thought he might get hurt is because she had threatened him

9  with knives, correct?

10 A.   That she might threaten -- or might harm him with knives,

11 yes.

12        MR. GONZALEZ:  Your Honor, we have a stipulation to

13 Exhibit 104C.

14        THE COURT:  104C is admitted into evidence.

15     (Plaintiff's Exhibit 104C is admitted.)

16 BY MR. GONZALEZ:

17 Q.   Sir, is that you and Officer Louchren?

18 A.   Yes.

19 Q.   And that's Officer Louchren's police vehicle right there

20 by the sidewalk?

21 A.   I would assume so, yes.

22 Q.   And if we can have the time.  According to this, this is

23 at 3:51:02.  Does that seem like approximately the time that he

24 arrived?

25 A.   Yes.

1    Q.    And when he arrived, you came out to meet him?

2    A.    Yes.

3    Q.    And you told Officer Louchren when he arrived that the

4    woman inside had been seen with knives, true?

5    A.    I told the investigators that I thought that I had told

6    him that.  I wasn't sure.

7    Q.    If you'll turn to page 42 of your first statement.  If you

8    look at the bottom, the investigator asked you whether you told

9    Officer Louchren about the knives and then you said I believe I

10   did, yeah, I should have.  And then later you say, oh, yeah, I

11   would have.  Do you see that?

12   A.    Yes.

13   Q.    That was your statement that day, correct?

14   A.    Yes, sir.

15   Q.    Then if you'll -- I want to call your attention to what

16   happened after Officer Louchren arrived.  Did you ever hear any

17   effort by Officer Louchren to communicate with Veronica?

18   A.    I believe he tried to speak with her when she came up to

19   the sliding glass door.

20   Q.    What did he say?

21   A.    I believe he was trying to get her to come out of the

22   apartment.

23   Q.    He yelled in a loud voice for her to come out, true?

24   A.    I don't know if it was a loud voice, but it was loud

25   enough so she could -- she would be able to hear it behind the

1   glass, yes.

2   Q.   Do you recall telling us when we asked you questions as

3   part of this litigation that Officer Louchren yelled in a loud

4   voice for her to come out and told her if she didn't come out,

5   she would be arrested?

6   A.   That sounds about right, yes.

7   Q.   And in response to Officer Louchren yelling at her to come

8   out or she's going to be arrested, you could hear her screaming

9   in response, but it was a bunch of gibberish that you couldn't

10  understand, true?

11  A.   She was yelling things I could not understand.

12          MR. GONZALEZ:  Your Honor, is this a convenient time?

13          THE COURT:  Yes.  Let's take a break.  It's just

14  slightly before 3:00.  Let's go to 3:15.  So you'll be ready to

15  come in first, Counsel, come in.  Okay.  Thank you.

16      (Recess.)

17          THE COURT:  Let me briefly address an issue before

18  the jury comes in.  I'm going to give some options in case

19  anyone needs to scramble to see resources and then we'll talk

20  about it after we close.

21          We have an ECRO court reporter.  They take an audio

22  and it is the official transcript, but you have to pay to get

23  it transcribed and it goes somewhere else to do that.

24          Plaintiff's counsel has indicated, or someone from

25  plaintiffs, that they would like to bring in a court reporter.

1        First, they can bring in a court reporter without any

2   permission at all if it's complete unofficial and it's their

3   own note taking.  They can also bring in, if they have a

4   certified court reporter and there's no objection from defense

5   counsel, we can -- we could make that an official record, but

6   it would have to be at counsel's cost, and I don't know if

7   they'd want to split, but at this point, it's plaintiffs who

8   are offering to do it, if they want to pay and it's certified

9   and no objection.

10       I have also inquired to see whether there are court

11  reporters available, recognizing this is a late request and our

12  procedure in this court is to have ECRO for these type of

13  cases.  Of course, if somebody is available, I will try to get

14  someone here, but I don't have any promises about that now.

15       MR. GONZALEZ:  So, Your Honor, I wasn't aware that we

16  had made a request to actually bring in a reporter.

17       THE COURT:  Okay.

18       MR. GONZALEZ:  What I had asked is that our team do

19  whatever is necessary to get this thing on paper so that I

20  could read it, and I think what I was told is that we may have

21  to get a court reporting agency to listen to whatever the tape

22  is and to put it into a transcript.

23       I don't know if that's what the Court had in mind or

24  not, but I'd be more than happy to bring in a reporter to sit

25  here and take the transcript down.

Cox - Direct                                      53

1          THE COURT:  Why don't we bring in the jury.  We can

2     talk about it more after the jury.

3          MR. GONZALEZ:  Agreed.

4          THE COURT:  The only reason I did this now is in case

5     somebody's hustling to get an answer.  That's the information.

6     We'll bring it up after we bring the jury -- after we close for

7     the today.

8          MR. GONZALEZ:  Thank you.

9          THE COURT:  Okay.  Let's bring the jury in.  I think

10    you also know this, but when I had them stand up or take

11    breaks, it's because I fear that they're not paying attention.

12    It's not to interrupt you.

13         MR. GONZALEZ:  No.  I appreciate that, Your Honor.

14       (Jury present.)

15         THE COURT:  Okay.  Thank you.  So we'll be continuing

16    now with cross -- I'm sorry -- with direct examination of

17    Officer Cox.

18         MR. GONZALEZ:  Thank you, Your Honor.

19                    DIRECT EXAMINATION (RESUMED)

20    BY MR. GONZALEZ:

21    Q.   Officer Cox, I have just a few more questions and I want

22    to start off with the plan that you had for entering the

23    apartment.

24         The plan that you and Officer Louchren came up with

25    was that after Officer Louchren kicked in the door, the plan

1    was for him to bring out his gun, correct?

2    A.   Well, that's up to him whether -- at what point he

3    brings -- brings out his weapon.

4    Q.   Do you recall telling us in deposition in this case that

5    the plan was for Officer Louchren to bring out his gun right

6    after kicking in the door?

7    A.   Yes.

8    Q.   And you wouldn't have said that if it wasn't true.

9    A.   I don't know what he did once he went in, but the plan is

10   that he's supposed to be my lethal cover and --

11   Q.   And specific -- I'm sorry.  Please finish.

12   A.   So the plan that we made is that I was nonlethal and he's

13   supposed to be lethal just in case the situation escalated to

14   that point.

15   Q.   And to be even more specific, the plan was that he would

16   bring out his gun right after kicking in the door, correct?

17   A.   Again, that's what I stated, but then at what point he

18   pulls out his gun, that's on him, and I never witnessed when he

19   did that.

20   Q.   Okay.  I want to separate two things.  I want to separate

21   what you witnessed and put it over here on the side and only

22   ask about the plan.  What you told us in deposition was that

23   the plan that the two of you came up with was that he would

24   kick in the door and as soon as he kicked it in, he was going

25   to bring out his gun, right?

1  A.    That was the plan, yes.

2          MR. GONZALEZ:  Your Honor, we have a stipulation on

3  Exhibit 104D as in dog.

4          THE COURT:  Okay.  104D will be admitted into

5  evidence.

6      (Plaintiff's Exhibit 104D is admitted.)

7  BY MR. GONZALEZ:

8  Q.    Sir, if you look at Exhibit 104D, that is you walking

9  outside of the apartment complex, correct?

10 A.    Yes, sir.

11 Q.    And you'll notice that you're holding something in your

12 left hand.  Do you see that?

13 A.    Yes.

14 Q.    Those are your sunglasses?

15 A.    From this point of view, I don't -- I can't tell what it

16 is.

17 Q.    And the time is 3:53 and 44 seconds, just about two and  a

18 half minutes after Officer Louchren arrives, correct?

19 A.    Yes, sir.

20 Q.    And do you remember why you were going back to your police

21 car?

22 A.    Yes.  I was going to put my sunglasses away.

23 Q.    And that's because at that point you had already made the

24 decision that you were going to force entry and you didn't want

25 to break your sunglasses, right?

Cox - Direct                                    56

1   A.    I wanted to put them in a safe spot just in case there was

2   a physical altercation, yes.

3   Q.    By the way, when you went back to put away your

4   sunglasses, in the police car, you have a computer.  You can

5   use that computer to plug in a name to get information,

6   correct?

7   A.    Yes.

8   Q.    So that when you put away your sunglasses, you could have

9   plugged in the name Veronica Canter to see what information

10  would pop up, correct?

11  A.    I could have, but it would have left my fill unit alone.

12  Q.    How long would it take you to type into your computer

13  Veronica Canter, send?

14  A.    It would take probably two or three minutes for the

15  information to come back.

16  Q.    And you don't think that -- Officer Louchren, by the

17  way -- and I don't mean this to be offensive, but he's a

18  good-size man, true?

19  A.    Yes.

20  Q.    He had a gun, true?

21  A.    Yes.

22  Q.    He had a Taser?

23  A.    Yes.

24  Q.    He had a baton?

25  A.    Correct that.  I'm not sure if he had a Taser, but -- and

1    I don't know if he had a baton.

2    Q.    Okay.  Fair enough.  He had a gun.

3    A.    Yes.

4    Q.    Is there any reason why you thought somehow you couldn't

5    take two to three minutes to look up Veronica Canter while he's

6    standing out there with his gun?

7    A.    At the moment, I didn't think it was necessary.

8    Q.    Is there any reason why you couldn't have taken two to

9    three minutes?

10    A.    No.

11    Q.    After Veronica was shot, she ended up -- she was still

12    alive after the bullets were fired, correct?

13    A.    Yes.

14    Q.    And in fact, one of you handcuffed her after she had been

15    shot five times, correct?

16    A.    I did.

17    Q.    And then in fairness, efforts were made to apply first aid

18    with a red box, correct?

19    A.    Well, CPR was started first before the red box.

20    Q.    A few days after the shooting, you had a phone call with

21    Officer Louchren about what had happened, correct?

22    A.    Yes, sir.

23    Q.    And neither one of you felt that you should have done

24    anything differently, correct?

25    A.    That is correct.

1    Q.    So that if the same thing happened tomorrow, you'd handle

2    it the same way?

3    A.    Every situation is different.  We'd have to handle it --

4    we handle it call by call, incident by incident.

5    Q.    I get that, but if the exact same situation happened

6    tomorrow, you'd handle it the same way?

7    A.    Yes.

8    Q.    I want to clarify one point.  You had indicated earlier in

9    response to some questions that I asked you about your first

10   statement that -- and I forget the words that you used, that

11   you were nervous or whatever it was that you said, traumatized.

12   I forget your word.  But when you had your interview in

13   January, that was like nine months later, right?

14   A.    Sounds about right, yes.

15   Q.    Is it fair -- and you were accompanied with legal counsel,

16   correct?

17   A.    Yes.

18   Q.    And I don't want you to tell me what you said, but you

19   obviously had an opportunity to talk to legal counsel before

20   you went in there, correct?

21   A.    Yes, sir.

22   Q.    And you thought at that time you were in a sound state of

23   mind, correct?

24   A.    That is correct.

25   Q.    You knew it was important because you knew they were going

1    to ask you about the shooting death of a woman, correct?

2    A.    Yes.

3    Q.    And you never said to anybody, you know what, this is not

4    a good day for me because I'm not feeling well.

5    A.    No, sir.

6    Q.    You understood the questions and you answered them to the

7    best of your ability, correct?

8    A.    Yes, sir.

9    Q.    And you never went back ever to say that anything was

10   wrong or incomplete, did you?

11   A.    No.

12   Q.    The shooting happened at just a few minutes before

13   4:00 o'clock; is that right?

14   A.    Yes.

15   Q.    What time did you get off that day?

16   A.    After 10:00 o'clock.

17   Q.    What about Officer Louchren?

18   A.    I don't -- I don't remember what time he got off.

19   Q.    Let me ask a better question.  What time did your shift

20   end?

21   A.    4:30.

22   Q.    And Officer Louchren as well, right?

23   A.    Yes, sir.

24         MR. GONZALEZ:  Thank you.  That's all I have, Your

25   Honor.

60

1      (Whereupon the hearing in the above-entitled matter was

2  concluded at 3:29 p.m.)

3                          --o0o--

4                        CERTIFICATE

5      I certify that the foregoing is a correct transcript from

6  the electronic sound recording of the proceedings in the above-

7  entitled matter.

8

9  /s/ Mary C. Clark                    June 15, 2016

10 Mary C. Clark, Transcriber

11 AAERT CERT*D-00214

12

13

14

15

16

17

18

19

20

21

22

23

24

25