1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. MAGISTRATE JUDGE ERICA P. GROSJEAN


DORIS RAY KNOX; JERRY           )
WAYNE KNOX; JEREMY EDWARD       )    1:14-cv-799 EPG
MOORE, individually and as      )
successor-in-interest to        )    JURY TRIAL, DAY 2
VERONICA LYNN CANTER,           )
deceased,                       )    Testimony of Angelique
                                )    Conston and Veronica
          Plaintiffs,           )    Placentia
                                )
     vs.                        )
                                )
CITY OF FRESNO, a               )
municipal corporation;          )
EDWARD CHRISTOPHER              )
LOUCHREN, individually and      )
in his capacity as a            )
police officer for the          )
CITY OF FRESNO;                 )
DOUGLAS EDWARD COX,             )
individually and in his         )
capacity as a police            )
officer for the                 )
CITY OF FRESNO,                 )
                                )
          Defendants.           )
_____  )

Fresno, California                  Wednesday, June 15, 2016

         PARTIAL REPORTER'S TRANSCRIPT OF PROCEEDINGS




REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiffs:          MORRISON & FOERSTER LLP
                             425 Market Street
                             San Francisco, CA 94105
                             BY:  **ARTURO J. GONZALEZ**
                                  **SABRINA A. LARSON**
                                  **WESLEY E. OVERSON, JR.**
                                  **ROBERT J. ESPOSITO**


For the Defendants:          FERGUSON PRAET & SHERMAN
                             A Professional Corporation
                             1631 E 18th Street
                             Santa Ana, CA 92705-7101
                             BY:  **BRUCE D. PRAET**

3

**INDEX**

**PLAINTIFFS' WITNESSES**:

  **ANGELIQUE CONSTON**                          4
  DIRECT EXAMINATION BY MR. ESPOSITO            4
  CROSS-EXAMINATION BY MR. PRAET                8

  **VERONICA PLACENTIA**                         16
  DIRECT EXAMINATION BY MR. GONZALEZ            17
  CROSS-EXAMINATION BY MR. PRAET                23
  REDIRECT EXAMINATION  BY MR. GONZALEZ         33
  RECROSS-EXAMINATION BY MR. PRAET              34

**EXHIBITS**

**PLAINTIFFS'**                              Received

  104-F                                       5
  108                                         20

**DEFENDANT'S**

  211                                         10

4

1    Wednesday, June 15, 2016                    Fresno, California

2              *        *        *        *        *

3                          **ANGELIQUE CONSTON,**

4    called as a witness on behalf of the Plaintiffs, having been

5    first duly sworn, testified as follows:

6              THE WITNESS:  Angelique Conston, C-o-n-s-t-o-n.

7                          DIRECT EXAMINATION

8    BY MR. ESPOSITO:

9    Q.  Good morning, Ms. Conston.

10   A.  Good morning.

11   Q.  I'm going to ask you some questions about an incident that

12   happened on March 7, 2014.

13   A.  Okay.

14   Q.  First of all, ma'am, where do you live?

15   A.  1348 East San Bruno, Apartment 204.

16   Q.  How long have you lived there?

17   A.  For about four or five years.

18   Q.  Ma'am, are you familiar with a tenant who used to live at

19   your apartment complex named Dag Lindbeck?

20   A.  Yes.

21   Q.  Where was his apartment in relation to yours?

22   A.  Directly under mine.

23   Q.  Also, ma'am, do you have any children?

24   A.  One.

25   Q.  And how old is that child?

ANGELIQUE CONSTON - D

5

1    A.   13.

2    Q.   Ma'am, I would like to show you a clip that was taken from

3    a security camera in the front of your apartment complex on

4    March 7, 2014.

5    A.   Okay.

6    Q.   Before I do that, could you please turn to -- there is a

7    binder in front of you with exhibits.  Could you please turn

8    to 104-F.

9    A.   Okay.

10   Q.   Ma'am, is that you depicted in the image?

11   A.   Yes.

12   Q.   And are you walking with your son?

13   A.   Yes.

14        MR. ESPOSITO:  Your Honor, I would like to move to

15   admit Exhibit 104-F into evidence.

16        MR. PRAET:  No objection, your Honor.

17        THE COURT:  Exhibit 104-F will be admitted into

18   evidence.

19        (Plaintiffs' Exhibit 104-F was received.)

20        MR. ESPOSITO:  For the record, there is a time stamp

21   on the image, and it says 3:54 p.m. and 17 seconds.

22   BY MR. ESPOSITO:

23   Q.   As you walked up to the gate, did you see police officers

24   in front of the apartment?

25   A.   Yes.

1  Q.  As you approached the stairs coming up to your apartment,

2  did you see any officers?

3  A.  Yes.

4  Q.  How many officers did you see?

5  A.  Two.

6  Q.  And did these officers speak to you at all?

7  A.  No.

8  Q.  What did you observe the officers do next?

9  A.  Try to break down the door.

10  Q.  So the first thing you observed was one of the officers

11  trying to break down the door?

12  A.  Yes.

13  Q.  And how were they doing that?

14  A.  With their feet.

15  Q.  Where were you standing at that time?

16  A.  I was on my way up the stairs.

17  Q.  So you were on the stairs, and where were the officers in

18  relation to you?

19  A.  About 15 feet away, at the apartment door.

20  Q.  And about -- do you recall how many kicks it took to get

21  through the door?

22  A.  About four or five.  Maybe six.

23  Q.  Were there other people standing around as well?

24  A.  The entire complex.

25  Q.  So there were other people standing around --

1  A.  Yes.

2  Q.  -- observing as well?  What did you hear after the police

3  officers broke through the door?

4  A.  I just heard a lot of screaming.  They were telling her

5  different orders, but I wasn't really paying attention.  And

6  then I heard them Tase her and then I heard them shoot her.

7  Q.  Ma'am, how many shots did you hear?

8  A.  Five.

9  Q.  Ma'am, was there any delay in between those shots?

10  A.  No.

11  Q.  Now, in your deposition, you told us that the shots

12  happened very fast; is that right?

13  A.  Yes.

14  Q.  Can you please demonstrate for the jury how those shots

15  sounded to you.

16  A.  Like one, two, three, four, five.

17  Q.  Thank you, ma'am.  I just have a few more questions.  The

18  woman who was shot, Veronica Canter, had you had any

19  communications with her in the days leading up to the

20  shooting?

21  A.  Yes.

22  Q.  And can you tell the jury what happened?

23  A.  Well, she had apologized to me for making a disturbance,

24  but I never witnessed it.  I just said it was okay and brushed

25  it off because she seemed a little off.

8

1  Q.  You said she seemed a little off.  Did you think that her

2  comment was unusual?

3  A.  Yes, considering I never spoken to her before.  And she

4  just didn't seem quite right.

5  Q.  If the officers had spoken to you on the day of the

6  shooting, would you have told them what you just told the

7  jury?

8  A.  Oh, yeah.

9          MR. PRAET:  Objection.  Calls for speculation.

10         THE COURT:  Overruled.

11         THE WITNESS:  Yes, I would have.

12         MR. ESPOSITO:  Thank you, ma'am.  No further

13 questions.

14                     CROSS-EXAMINATION

15 BY MR. PRAET:

16 Q.  Good morning, Ms. Conston.

17 A.  Good morning.

18 Q.  My name is Bruce Praet.  You remember we met at your

19 deposition?

20 A.  Yes.

21 Q.  Thank you.  In relationship to Dag Lindbeck's apartment,

22 you said you lived right above him?

23 A.  Yes.

24 Q.  Had you heard anything unusual going on downstairs, either

25 that day or the day before?

1    A.   Not that day or the day before, but I had heard them like

2    have loud discussions before.

3    Q.   Like boyfriend-girlfriend arguments?

4    A.   I wouldn't know what they were talking about because they

5    were muffled through the floor, but I have heard them get loud

6    with each other.

7    Q.   This happened on March 7, 2014.  You said that Veronica

8    Canter came up to you when, the day before, two days before?

9    When was that?

10   A.   A day or two before.

11   Q.   So if this was March 7th, had she been there March 6th or

12   even prior to that?

13   A.   She had been there for a little while.  She was staying

14   with him on and off.

15   Q.   I think in your deposition, you told me a few days prior?

16   A.   Uh-huh.

17   Q.   She had been there more than one day?

18   A.   Oh, yeah.

19   Q.   And you are sure it wasn't just the day before that she

20   had gotten there?

21   A.   No.  She has been there for a little while.

22   Q.   When you say "a little while," you mean?

23   A.   A few days.

24   Q.   Okay.  Now, you saw these police officers at the door, and

25   you knew in your mind that this woman -- well, did you know

1   they were dealing with Veronica Canter inside?

2   A.   Yes.

3   Q.   How did you know that?

4   A.   Because on the way to the store, he was talking on the

5   phone, Dag was talking on the phone to the cops, and he said,

6   "Her name is Veronica."

7   Q.   You heard that?

8   A.   Yeah.  And I put two and two together.  And he was trying

9   to get her out.  So.

10  Q.   Did you ever hear Dag Lindbeck, when he was talking to the

11  cops, say, "This woman has mental health issues," or "She is

12  mentally ill"?

13  A.   No.

14  Q.   When you were going up the stairs and you saw the police

15  getting ready to make entry, did you ever say, "Hey, Officers,

16  she has got mental problems"?

17  A.   No.

18  Q.   When you were coming up the stairs, you said you had your

19  son.  How old was your son at that time?

20  A.   He was 11 at the time.  12 -- he was ten or 11.

21       MR. PRAET:  Your Honor, I would offer Defendant's

22  211.  I think we have a stipulation.

23       THE COURT:  Exhibit 211 will be admitted into

24  evidence.

25       (Defendants' Exhibit 211 was received.)

ANGELIQUE CONSTON - X

11

BY MR. PRAET:

Q.  Does this depict the stairway that you and your son were going up when you saw the officers standing there, ready to make entry?

A.  Yes.

Q.  And can you tell us about how far up the stairs you and your son were when you saw the officers standing there, getting ready to make entry?

A.  We were about halfway up when they were kicking in the door, and we kept walking.

Q.  Did you ever make it to the top or did you stand there and kind of watch?

A.  I didn't watch.

Q.  Did your son?

A.  Yes.

Q.  Where did he stay?

A.  He stayed crouched down on the stairs, about a little bit from the top, but he could still see.

Q.  Were you at all concerned that your son was standing on those stairs, with the police kicking the door?

A.  At the time, it was more just we were just walking up the stairs and there was so much excitement going on, we didn't expect everything to go so badly so fast.  We just expected them to get in and get her and that was it.

        We didn't expect such a tragedy.

1  Q.   Okay.  So based on everything you knew about Veronica

2  Canter from the few days prior, based on what you had heard

3  downstairs from your apartment, based on what you had heard

4  Dag Lindbeck telling the officers or the dispatch operator,

5  the 911, were you expecting anything other than what you just

6  said, that they were just going to go in, get her out, and it

7  would be done?

8  A.   I figured that would be it.

9  Q.   Were you expecting any sort of violent confrontation?

10 A.   No.

11 Q.   You had met this woman before, right?

12 A.   Yeah, but I never really spoken to her.  She apologized to

13 me one time.

14 Q.   When she apologized to you, she actually was apologetic,

15 right?

16 A.   Yeah, she was really nice.

17 Q.   Nothing at that time that indicated to you she was

18 mentally ill?

19 A.   She seemed off, but not like drugs off, just kind of like

20 in la la land off.

21 Q.   You never said anything about that to the officers, right?

22 A.   I'm pretty sure I did.

23 Q.   Before it happened?

24 A.   Not before it happened.  Whenever they questioned me.

25 Q.   Did you ever hear Mr. Lindbeck, the officers, anybody

ANGELIQUE CONSTON - X

13

1  before the officers made entry, did you ever hear anybody

2  mention knives or "She has got knives," or anything like that?

3  A.  No.

4  Q.  You mentioned you thought they were just going to go in

5  and bring her out; is that right?

6  A.  Yes.

7  Q.  When you -- so they made entry, and then you said you

8  heard the Taser?

9  A.  Yes.

10  Q.  How did you know it was a Taser?

11  A.  Because I watch cops a lot, and they are kind of easy to

12  tell what they sound like.

13  Q.  Kind of an electrical buzzing sound?

14  A.  Yeah.

15  Q.  All right.  And actually, I know you retrospectively felt

16  bad about what was said, but did you and any of the other

17  people out there say something about after she got Tased?

18  A.  Dag was yelling at the cops.  Everyone else was just

19  standing around like talking to each other about why it

20  shouldn't have happened.

21  Q.  I'm talking about before the shots.

22  A.  Before the shots?

23  Q.  Right.  Didn't you tell me in your deposition that you all

24  were kind of joking like, you know, she got what she deserved,

25  she didn't cooperate?

14

1    A.   No.

2    Q.   Not the shots.  The Tasing?

3    A.   No.  We were kind of like joking, like, oh, she is getting

4    Tased, but then around ten seconds later, she got shot, so it

5    wasn't very happy after that.  It wasn't funny.

6    Q.   I didn't mean to imply that.  That's why I said just the

7    Tasing.

8         When you and the other folks standing around heard

9    the Tasing, that's when you all were kind of joking like,

10   well, she got Tased, right?  Just for that few seconds before

11   the shots, right?

12   A.   For the few seconds.

13   Q.   Were you expecting to hear gunshots?

14   A.   No.

15   Q.   Okay.  So when you described the five rapid shots, had you

16   ever heard gunshots go off before?

17   A.   Yes.

18   Q.   In a situation where somebody is getting shot or like at a

19   range?

20   A.   Like on a farm.

21   Q.   Okay.

22   A.   Shooting guns.

23   Q.   Like target practice?

24   A.   (Nods head affirmatively.)

25   Q.   Had you ever witnessed a situation where another person

15

1    was getting shot?

2    A.  No.

3    Q.  Was that pretty shocking to you?

4    A.  The worst thing I ever witnessed.

5    Q.  Were you thinking in your mind, "I'm going to pay close

6    attention to the order and the rapidity with which these shots

7    were fired," when they were happening?

8    A.  No, but it is kind of something that's a little hard to

9    forget.

10   Q.  Could there have been maybe a half second to a second

11   between any of the five shots?

12   A.  No.

13   Q.  And after the shots, did you hear Mr. Lindbeck say

14   anything to the officers?

15   A.  Yes.

16   Q.  What did he say?

17   A.  He said, "You didn't have to kill her, you pussies.  You

18   didn't have to kill her."

19   Q.  He called the cops "pussies"?

20   A.  Yes.

21   Q.  Did you hear anyone else say anything outside?

22   A.  Just the mumblings of they shouldn't have done it, like.

23   It was crazy.

24   Q.  Well, didn't you tell me in your deposition that people

25   were saying, "Guess the Tasing just wasn't enough?"  Aren't

1  those the words you used in your deposition?

2  A.  That's just what I said for myself.  I didn't say that

3  other people said it.

4  Q.  You said that, though, right?

5  A.  I said that, "I guess it wasn't enough," and but I didn't

6  see.  I just heard what happened.

7          MR. PRAET:  Nothing further.  Thank you, your Honor.

8          MR. ESPOSITO:  Nothing further.

9          THE COURT:  Thank you.  You may be excused.

10         Would we like to start the next witness or take an

11 early lunch?  Do you have a preference?

12         MR. GONZALEZ:  Well, I have a witness, your Honor,

13 that should be a short witness.

14         THE COURT:  Let's go ahead.

15         MR. GONZALEZ:  Maybe try it.

16         THE COURT:  Are plaintiffs ready to call their next

17 witness?

18         MR. GONZALEZ:  Yes, we call Veronica Placentia, the

19 manager.

20         THE COURT:  Thank you.

21         Good morning.  Come close here, but stand before you

22 come on, and face this lady here, who will swear you in.

23                    **VERONICA PLACENTIA**,

24 called as a witness on behalf of the Plaintiffs, having been

25 first duly sworn, testified as follows:

VERONICA PLACENTIA

17

1      THE CLERK:  Please state your full name and spell

2  your last name.

3      THE WITNESS:  Veronica Placentia, P-l-a-c-e-n-t-i-a.

4      THE COURT:  Thank you.  Please have a seat.

5                    DIRECT EXAMINATION

6  BY MR. GONZALEZ:

7  Q.   Ma'am, we served you with a subpoena to be here today?

8  A.   Correct.

9  Q.   You are the manager of the apartment complex where

10  Veronica Canter was shot, correct?

11  A.   Yes.

12  Q.   You live there as well?

13  A.   Yes.

14  Q.   I want to ask you about the facts that led you to call 911

15  that day.  First, before March 7, 2014, which is the day that

16  she was shot, did you know Veronica Canter?

17  A.   No.

18  Q.   How is it that she first came to your attention that day?

19  A.   My daughter and my nieces and nephews were playing

20  outside, and they came in and called me and told me there was

21  a lady acting strangely or "weird," is what they said.

22  Q.   Did you go out to investigate?

23  A.   I walked outside, and that's the first time that I

24  actually seen her.

25  Q.   And what did you see that was unusual?

1   A.  She was walking back and forth, kind of in a marching

2   position, and she was speaking to herself.  I couldn't

3   understand what she was saying.

4           And then she was walking toward the laundry room and

5   opening the door and slamming it and opening it and slamming

6   it.

7   Q.  Did you also see her change her clothes that day?

8   A.  I did.

9   Q.  Tell us just briefly what you observed about that.

10  A.  I didn't realize that until after the fact, when I seen

11  her in the window, but she had on, I believe it was black at

12  first.  And then she switched to something else.

13  Q.  You told us in deposition that she was acting really

14  strange or crazy.  Does that sound right?

15  A.  Yes.

16  Q.  What did you do after you saw Veronica acting this way?

17  A.  I actually walked to Dag's unit first, because the door

18  was open.  And I just assumed that maybe it might have been

19  his guest.  So I walked over and I spoke with him briefly.

20  Q.  What did you say to Dag?

21  A.  I asked him if that was his guest, and he said yes.

22  Q.  And what did you say then?

23  A.  I said, "You either need to bring her inside, get her

24  under control, or ask her to go."

25  Q.  Then what happened?

1  A.  He said, "I'm trying to get her under control and I will

2  get her inside."

3  Q.  Did you speak to her that day?

4  A.  Not -- I didn't necessarily speak to her, but she was

5  speaking.  So she had mentioned to me, which stood out to me,

6  because we had the same name, she had said, "Oh, your name is

7  Veronica.  My name is Veronica too."

8  Q.  When she said those words to you, did she seem like

9  something wasn't quite right?

10  A.  Uh-huh, yes.

11  Q.  So what happened next after you told Mr. Lindbeck that,

12  you know, he had to get his guest under control?  Then what

13  happened?

14  A.  As we were talking about the situation, she actually,

15  without us noticing, she actually went into his unit and

16  locked the front door.

17  Q.  Then at some point, did Mr. Lindbeck jump over the fence

18  to get onto his patio area?

19  A.  At some point, yes.

20  Q.  Did you call 911 before or after that?

21  A.  After that.  He actually walked around to his back window

22  first and said his window was open so he was going to try to

23  get in, but she had already locked the window.

24          So, you know, he ended up coming back around, and

25  that's when we both called.

VERONICA PLACENTIA

20

1  Q.  When she went into the apartment, could you hear her

2  screaming from inside the apartment?

3  A.  I could hear noises and I could hear her.  I believe she

4  was talking or screaming, I'm not too sure.

5  Q.  You couldn't quite make out what she was saying?

6  A.  She was pretty upset, so I couldn't understand what she

7  was saying, but there was a lot of noise going on.

8  Q.  Was there something you described as gibberish?

9  A.  I would say so.

10  Q.  So what happened next?  You called 911.  She is inside.

11  Saying things you don't quite understand.  What happens next?

12  A.  I got through to the operator, and I believe I said we

13  needed officers out because there was a lady acting weird.

14  And I believe I said she might have been on something and that

15  we needed officers out because she was locked inside of a unit

16  of one of my tenants and didn't want to let him in.

17          MR. GONZALEZ:  Your Honor, we move into evidence

18  Plaintiff's Exhibit 109.

19          MR. PRAET:  No problem.

20          MR. GONZALEZ:  Oh, Exhibit 108.  Could we put up the

21  next page, please.

22          THE COURT:  Exhibit 108 is admitted into evidence.

23          (Plaintiffs' Exhibit 108 was received.)

24          MR. GONZALEZ:  Thank you, your Honor.

25  ///

1   BY MR. GONZALEZ:

2   Q.  I'm not sure, but you recognize this as the patio area at

3   your complex?

4   A.  Yes.

5   Q.  The laundry room door that you say she was kind of opening

6   and slamming shut, do you see that in the picture?

7   A.  Yes.

8   Q.  Which door is that?

9   A.  It is actually on the right-hand side, so the one with the

10  light on.

11  Q.  Okay.  By the way, once she went inside and locked herself

12  in, you could see her a little bit through the sliding glass

13  door?

14  A.  She was actually standing on top of one of his chairs, so

15  I could see the top of her head through the sliding glass

16  door.

17  Q.  So she was inside, standing on top of a chair, right in

18  front of the sliding glass door?

19  A.  Yes.

20  Q.  How many officers responded to the call?

21  A.  I believe I seen two.  I'm not sure if they arrived at the

22  same time or not, but there was two that were there at the

23  time.

24  Q.  Now, I appreciate you may not recall the exact words, but

25  do you recall that Mr. Lindbeck spoke to the officers?

VERONICA PLACENCIA

22

1    A.   Yes.

2    Q.   And do you recall that he said something to them about

3    mental health issues?

4    A.   I believed I overheard that, but I wasn't too sure of

5    exactly what was said, so I didn't want to assume.

6    Q.   But your best recollection is that you heard him say

7    something about mental health issues?

8    A.   That she needed help because she was maybe dealing with

9    some issues along the lines of that, but I wasn't too sure of

10   exactly what he said.

11   Q.   Now, at some point, did the officers ask you for

12   permission to kick the door down?

13   A.   Yes.

14   Q.   Before they asked you for permission to kick the door

15   down, did either one of the officers ask you why you called

16   911?

17   A.   Not that I recall.

18   Q.   Or what you knew about the situation?

19   A.   Not that I recall.

20   Q.   And we just -- the woman that just walked out of the room

21   here, Ms. Conston, do you recognize her?

22   A.   Yes.  She is one of my tenants.

23   Q.   Before, or right at the moment that they were kicking the

24   door down, were there other tenants around as well?

25   A.   There was quite a few people outside, actually.

VERONICA PLACENTIA

23

1   Q.   Some were on the stairs and up along the stairwell

2   watching?

3   A.   Correct.

4   Q.   Where were you standing when the officers were kicking in

5   the door?

6   A.   I was actually standing on my side of the -- my side,

7   where my unit is at, where my patio was at.

8   Q.   Did you hear the gunshots?

9   A.   Yes.

10  Q.   How many gunshots were there?

11  A.   I thought I heard four.  I was told there was five, and

12  I'm not sure if that is correct or not.

13  Q.   Did you hear any delay?  Was there any delay in between

14  the shots, whether it was four or five?

15  A.   Not that I recall.

16  Q.   You recall consecutive shots?

17  A.   Correct.

18  Q.   Boom, boom, boom, boom, boom?

19  A.   Yes.  That's what it sounded like to me.

20       MR. GONZALEZ:  Thank you.  That's all I have, your

21  Honor.

22                    CROSS-EXAMINATION

23  BY MR. PRAET:

24  Q.   Hi, Ms. Placentia.  I think we met at your deposition as

25  well a few months ago.

24

1   A.   Yes.

2   Q.   My name is Bruce Praet, and I represent the officers in

3   this case.

4           You said when you spoke to Veronica Canter out in the

5   court yard area, that was that day?

6   A.   I didn't necessarily speak with her, but she was speaking

7   to me.  That was the first day that I actually met her or seen

8   her.

9   Q.   And she said something like, "Oh, wow, your name is

10  Veronica too"?

11  A.   Yes.

12  Q.   You told her that?

13  A.   No.  Dag had called me by my name.

14  Q.   While in the presence of Ms. Canter?

15  A.   While we were talking.

16  Q.   And when she said, "Wow, your name is Veronica too," was

17  that kind of in a normal tone of voice?

18  A.   It wasn't necessarily normal, no.  She looked like she was

19  not a hundred percent coherent.

20  Q.   Well, you said she was slamming the laundry room door?

21  A.   Correct.

22  Q.   She looked like she was angry or pissed off?

23  A.   She looked like she just wasn't herself.  I don't know if

24  necessarily "anger" would be the right word, but she was

25  dealing with some things.

VERONICA PLACENTIA

25

1  Q.  You have seen people slam doors before, right?

2  A.  Correct.

3  Q.  You have seen people slam doors when they are angry at

4  someone else?

5  A.  Yes.

6  Q.  Is it pretty clear to you that she was angry at Dag?

7  A.  She might have been angry for a reason.  I'm not sure if

8  it was Dag or not.

9  Q.  He is the one she locked out of his apartment, right?

10  A.  Yes.

11  Q.  When you were standing there with Dag, was she yelling at

12  him?

13  A.  They were speaking to each other, but I'm not sure of the

14  conversation.

15  Q.  Did she raise her voice toward Dag?

16  A.  I believe she told him not to touch her, is what she said.

17  Q.  And this is while he is outside in that enclosed patio

18  area and she is inside?

19  A.  No, no, no.  This is before she even went in the unit.

20  Q.  Oh, okay, all right.  So she was expressing or wanting to

21  get distance from Dag; is that the impression?

22  A.  I think from everyone, because she was kind of referring

23  to both of us.  You know, "Don't touch me."

24  Q.  Did you ever try to touch her?

25  A.  No, no.

VERONICA PLASENCIA

26

1    Q.   But you told Dag, "You got to either control her or get

2    her out of here," right?

3    A.   Right.

4    Q.   Did he try to touch her and escort her out?

5    A.   That's what happened, and she said, "Don't touch me."

6    Q.   She wasn't referring to you?

7    A.   No.  Maybe not.

8    Q.   Okay.  You called the police, right?

9    A.   Correct.

10   Q.   Before you called the police, you said Dag indicated that

11   he was going to try to get back in his apartment through a

12   window?

13   A.   Correct.

14   Q.   Did he ever express any fear about, "I'm afraid of her,"

15   or "She is going to hurt me," or anything like that?

16   A.   No.

17   Q.   And did he ever say, "I gotta be careful.  She has got

18   knives"?

19   A.   No.

20   Q.   Did you ever hear any mention of knives before the cops

21   got there?

22   A.   No.

23   Q.   And when you told Dag, "You either have to get her under

24   control or get her out of here," okay, did you ever say, "This

25   woman needs help"?  You "need to get her some help"?

1        Or did you just say, "You need to control her and get

2   her out of here"?

3   A.  I didn't know what was going on, so all I said was, "You

4   need to control her or get her off of the property."  I wasn't

5   sure of what she needed at the time.

6   Q.  You weren't sure of what she needed, right?

7   A.  Right.

8   Q.  When you called 911, you said there was a woman who was

9   high on drugs?

10  A.  I said she was on something.  I assumed she was on

11  something, yes.

12  Q.  You didn't say, "I think there is a mentally ill woman out

13  here who needs mental help," or anything, did you?

14  A.  No.

15  Q.  You didn't say, "I think there is a mentally ill woman out

16  here," did you?

17  A.  No.

18  Q.  Now, you said that you overheard Dag say something --

19  actually, I think you said, "I assumed Dag said something to

20  the officers, that she might have issues or something"?

21  A.  I overheard him saying something along the lines of that,

22  but I wasn't exactly sure of what he said.

23  Q.  It is really important for us that we get your precise

24  memory, and I understand it happened a couple years ago, but

25  we certainly don't want you to assume things.

VERONICA PLAGENTIA

28

1        Do you know or specifically recall Dag Lindbeck

2   telling any police officers, "She has some issues and needs

3   help?"  Do you remember him saying those words?

4   A.   I don't want to assume, so no.

5   Q.   And nobody wants you to assume.

6        Now, the officers got there.  Were you there when

7   they talked to Dag?

8   A.   Yes.

9   Q.   Okay.  And did you ever hear Dag Lindbeck say anything to

10  the officers, "She has got some serious mental problems," or

11  "She is mentally ill"?

12  A.   All I remember him saying is, "She has got issues," or

13  "She has got problems."  It wasn't -- I didn't overhear any

14  specifics.

15  Q.   Did you hear him express concern about what she was doing

16  to his stuff inside?

17  A.   I think he was more concerned about getting her under

18  control and maybe out of the unit.

19  Q.   Why do you think that?

20  A.   I think that he didn't want to deal with it.

21  Q.   Didn't want to deal with what, her in his apartment?

22  A.   He couldn't control the situation.

23  Q.   He was ready to go in before the officers got there,

24  right?

25  A.   I think because he wanted to try to control it before it

29

1   got out of hand.

2   Q.   You said when you were standing outside that little fenced

3   court yard, she was standing up on a chair?

4   A.   Correct.

5   Q.   And you could see, I think, the top of her, her head?

6   A.   Right, yes.

7   Q.   How far down could you see?  To her neck?  To her chest?

8   A.   I remember just seeing her head through the blinds.  So

9   she was kind of moving the blinds around.  She was standing on

10  top of a chair, but I couldn't see all the way down because

11  our fence is maybe a five-foot fence or maybe four-foot, so

12  somewhere along the lines of that.  So I could just see the

13  top of her.

14  Q.   Could you see through the fence?

15  A.   You can, it is a mesh fence, but not very well if you are

16  far away.

17  Q.   I mean if you are three to four feet, can you kind of see

18  images or not really clearly?

19  A.   You could see images, but not clear.

20  Q.   So do you know what she was wearing when you could see her

21  from the neck up?

22  A.   I could not -- I couldn't tell when she was inside.

23  Q.   Okay.  But you saw her at the glass door, right?

24  A.   I saw her standing on a chair.  I couldn't really make out

25  what she was wearing.

VERONICA PLACENTIA

30

1   Q.   Was -- did you ever offer the officers a key to Dag's
2   apartment?
3   A.   Yes.
4   Q.   And did the officer try that key?
5   A.   I actually tried the key and it didn't work because Dag
6   had mentioned he had changed all the locks.
7   Q.   Okay.  When you went to try the key, were you prepared to
8   open the door?
9   A.   Yes.
10  Q.   Were you afraid of Veronica Canter if you opened that
11  door?
12  A.   No.
13  Q.   Had she done anything to indicate to you that you should
14  have any fear that she would attack you or be armed or was
15  dangerous?
16  A.   No.
17  Q.   You say that key didn't work?
18  A.   No, it did not.
19  Q.   Then did Dag -- well, did you hear Dag say something
20  about, "Okay.  I will press charges for trespass"?
21  A.   I believe he said kind of like, "Just arrest her for
22  trespassing."  Just, you know, it wasn't like, "Arrest her for
23  trespassing."  It was kind of like --
24  Q.   Get this over with, arrest her for trespass?
25  A.   Yes.

1  Q.  Kind of?  And did Dag offer to then break the window to

2  get in?

3  A.  No.  The officer actually asked me, "Is it okay if we

4  break the sliding glass window?"

5        And I said, "They are expensive.  I would rather you

6  guys figure out a way to get in the door."

7  Q.  The front door?

8  A.  Yes.

9  Q.  Did you say something about it was cheaper to kick the

10  front door?

11  A.  Yes.

12  Q.  Did you hear the officers say anything before they kicked

13  the door?

14  A.  I don't recall.

15  Q.  Did you ever hear them screaming or yelling, "Get away

16  from the door.  We are going to arrest you"?

17  A.  I don't recall.

18  Q.  Okay.  Did you ever hear the officers elevate their voice

19  or yell at Veronica Canter?

20  A.  I don't recall.

21  Q.  Do you think that's something you would recall?

22  A.  Well, because I walked away as they were going to kick in

23  the door, I walked away.  So I wasn't -- I mean I wasn't

24  paying attention.  At the time, I was walking away, so that's

25  the time when they actually went in.

1  Q.  Were you expecting any sort of violent confrontation

2  between Veronica and these officers?

3  A.  No.

4  Q.  I think you said you heard the Taser?

5  A.  Correct.

6  Q.  So you were still close enough to hear the Taser?

7  A.  As I was walking away, because I didn't know what it was,

8  so it stood out to me.

9  Q.  Why is it you now know it was a Taser?

10  A.  Well, because I think it was.  It was a clicking sound.

11  It wasn't a gunshot; it was a clicking sound.  And that stood

12  out to me, and I just assumed it was a Taser.

13  Q.  Did you hear the officers saying anything after the Taser?

14  A.  I don't want to assume, so no, not that I recall.

15  Q.  Did you hear their voices, but you just don't know what

16  they said?

17  A.  I don't recall.

18  Q.  Okay.  Were you expecting to hear gunshots?

19  A.  No.

20  Q.  From your memory, you thought it was only four gunshots,

21  right?

22  A.  Correct.

23  Q.  Okay.  Do you remember if it was four and then maybe one

24  more, or were you paying attention when you heard these shots

25  what the order was or the duration?

1  A.  No.  I mean I was walking away, like I said.  And the only

2  reason I turned back is because I heard the Taser, and I

3  thought it was done and over with.

4  Q.  Okay.  And then suddenly, you heard shots.  Did that

5  surprise you?

6  A.  Yes.

7  Q.  Were you anticipating hearing shots before you heard the

8  shots?

9  A.  No.

10         MR. PRAET:  Okay.  Nothing further.  Thank you, your

11 Honor.

12         MR. GONZALEZ:  Very briefly, your Honor.  Your Honor,

13 I would like to read one question and answer from

14 Ms. Placentia's deposition on September 24th of 2015.

15         MR. PRAET:  Page?

16         MR. GONZALEZ:  Page 29, lines 19 to 24.

17         MR. PRAET:  I don't know what the purpose.

18         THE COURT:  That's okay.  No objection.  Go ahead.

19                  REDIRECT EXAMINATION

20 BY MR. GONZALEZ:

21 Q.  Ma'am, I'm going to read you one question and answer, and

22 I will ask a followup question.

23         "Question:  Did anybody, while the police officer is

24         there, say, 'She has mental health problems,' or

25         anything?

1        "Answer:  I believe Dag had mentioned something like

2            that.  I don't recall exactly what he said, but I

3            think that he was mentioning something along those

4            lines to the officers."

5        Now, when you said you don't want to assume, is your

6 concern that two years later, you don't remember the exact

7 words that were communicated by Dag?

8 A.  I believe so.

9 Q.  So as you said to us in deposition in September, is it

10 fair to say that your best recollection is that there was

11 something said about mental health, but you don't remember

12 what it was?

13 A.  I would say so.

14        MR. GONZALEZ:  Thank you, your Honor.  That's all I

15 have.

16        MR. PRAET:  I have to ask you.

17                    RECROSS-EXAMINATION

18 BY MR. PRAET:

19 Q.  Mr. Gonzalez just added the words "mental health."  When I

20 asked you the questions, you said your memory was he said

21 something like, "She has issues," or "problems."

22 A.  Correct.

23 Q.  Did you ever hear the word "mental"?

24 A.  Not specifically.  I don't want to assume that was spoken,

25 but along those lines of having issues or some type of

1  problem.

2  Q.  She had some issues, some problems.

3       And the important thing is we don't want you to

4  accept the attorney's words.  We want your words.

5       And your memory is he said something like, "She has

6  issues," or "problems"?

7  A.  Correct.

8       MR. PRAET:  Thank you.

9       MR. GONZALEZ:  That's all.  Thank you.

10      THE COURT:  Thank you, Ms. Placentia.  You can be

11 excused.

12                *         *         *         *         *

13

14

15      I, PEGGY J. CRAWFORD, Official Reporter, do hereby

16 certify the foregoing transcript as true and correct.

17

18 Dated:  16th of June, 2016        /s/ Peggy J. Crawford
                                     PEGGY J. CRAWFORD, RDR-CRR
19

20

21

22

23

24

25