1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. MAGISTRATE JUDGE ERICA P. GROSJEAN


| | |
|---|---|
| DORIS RAY KNOX; JERRY ) | |
| WAYNE KNOX; JEREMY EDWARD ) | 1:14-cv-799 EPG |
| MOORE, individually and as ) | |
| successor-in-interest to ) | JURY TRIAL, DAY 3 |
| VERONICA LYNN CANTER, ) | |
| deceased, ) | Testimony of Mark Stevens |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| CITY OF FRESNO, a ) | |
| municipal corporation; ) | |
| EDWARD CHRISTOPHER ) | |
| LOUCHREN, individually and ) | |
| in his capacity as a ) | |
| police officer for the ) | |
| CITY OF FRESNO; ) | |
| DOUGLAS EDWARD COX, ) | |
| individually and in his ) | |
| capacity as a police ) | |
| officer for the ) | |
| CITY OF FRESNO, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

Fresno, California                    Thursday, June 16, 2016

REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

```
APPEARANCES OF COUNSEL:

For the Plaintiffs:          MORRISON & FOERSTER LLP
                             425 Market Street
                             San Francisco, CA 94105
                             BY:  ARTURO J. GONZALEZ
                                  SABRINA A. LARSON
                                  WESLEY E. OVERSON, JR.
                                  ROBERT J. ESPOSITO


For the Defendants:          FERGUSON PRAET & SHERMAN
                             A Professional Corporation
                             1631 E 18th Street
                             Santa Ana, CA 92705-7101
                             BY:  BRUCE D. PRAET
```

3

## INDEX

**PLAINTIFFS' WITNESSES:**

**MARK STEVENS**                                    4
DIRECT EXAMINATION BY MR. OVERSON              4
CROSS-EXAMINATION BY MR. PRAET                 19
REDIRECT EXAMINATION BY MR. OVERSON            30

4

Thursday, June 16, 2016                    Fresno, California

                *        *        *        *        *

                          **MARK STEVENS**,

called as a witness on behalf of the Plaintiffs, having been

first duly sworn, testified as follows:

        THE WITNESS:  Mark Michael Chadborn Stevens,

S-t-e-v-e-n-s.

                      DIRECT EXAMINATION

BY MR. OVERSON:

Q.  Good morning, Mr. Stevens.

A.  Good morning.

Q.  As of March 7, 2014, where were you employed?

A.  Turnkey Construction Properties.

Q.  Did that company provide any services to the apartments

that are at 1348 San Bruno Avenue?

A.  Yeah.  We did all maintenance there.

Q.  On the afternoon of March 7, 2014, where were you working?

A.  I was working in the Palms units, I think it was apartment

104, directly above the manager's unit.

Q.  And from that unit where you were working, could you see

the court yard down below?

A.  Yeah.  You could see the court yard and pretty much that

whole area in there.

Q.  On that afternoon, did you notice a woman walking around

there?

MARK STEVENS

5

1  A.  Yeah.  There was a lady dancing around and just walking
2  around.
3  Q.  Did you notice anything unusual about what she was doing?
4  A.  Just her actions were odd.  Nothing -- it was just the way
5  she was dancing around and just kind of looking goofy or
6  weird, like loopy or off.
7  Q.  And when she was dancing around, was there any music
8  playing?
9  A.  I don't remember any music.  We actually had probably
10  music in her unit as we were working.
11  Q.  What about down in the court yard?
12  A.  I don't really remember music being played.
13  Q.  And did you become aware that that woman was staying with
14  a man named Mr. Lindbeck, who was down in Apartment 101?
15  A.  Yeah.
16  Q.  And at some point, did she lock Mr. Lindbeck out of his
17  apartment?
18  A.  She did.
19  Q.  And did they call you in to see if they could get through
20  the locks?
21  A.  When the police -- when Mr. Cox got there?
22  Q.  Yes.
23  A.  Yes.  We tried to open the door with my master key and
24  Veronica's master key.  Veronica was the manager.
25  Q.  Veronica Placentia?

1   A.   Yes.

2   Q.   We have two Veronicas here, but the one you saw, her name

3   was Veronica Canter?

4   A.   Yeah.   It was Veronica, the manager.   I don't know her

5   last name.

6   Q.   Placentia?

7   A.   Placentia.

8   Q.   The woman who was dancing around, did you know her name?

9   A.   No, I didn't.

10  Q.   When Officer Cox arrived, I take it you spoke with him

11  about the key?

12  A.   Yeah.

13  Q.   And did you find him a key?

14  A.   I actually had my own master key, and then Ms. Placentia

15  had a master key as well.   So we tried my master key to unlock

16  the door, and the lock had been changed.   So we tried

17  Veronica's, and hers also did not work.

18  Q.   And when you were there with Officer Cox, did you tell him

19  anything about what you had seen her, Veronica Canter, the

20  woman who was in the court yard?   Did you say anything about

21  what she was doing?

22  A.   I told them she was dancing around and acting weird, and

23  that her and the occupant of the apartment were arguing a

24  little bit back and forth, passing.

25  Q.   Okay.   After you tried the keys and were unsuccessful, do

1    you recall that another officer arrived?

2    A.   Yes.

3    Q.   Okay.  And that's Officer Louchren here?

4    A.   Yes.

5    Q.   And at some point, do you recall that Officer Louchren

6    tried to kick in the door?

7    A.   Yeah.  We actually, before he tried to kick in the door,

8    we had a conversation about him not wanting to blow his knee

9    out.  Actually, that's when we tried the keys.

10   Q.   I see.

11   A.   And then the keys wouldn't work, and then he had to kick

12   the door in.

13   Q.   Where were you standing when he was attempting to kick in

14   the door?

15   A.   I was back about ten feet away diagonally from her door.

16   Q.   Okay.  And you saw him kick several times?

17   A.   Yeah.  He kicked forward twice, and then had to turn

18   around and kick from -- backwards.

19   Q.   And could you hear inside the apartment that Veronica

20   Canter, the woman who was inside the apartment, could you hear

21   her in there?

22   A.   She was yelling.  Once the police showed up, she started

23   yelling and getting a lot more agitated, so she was being more

24   loud, yes.

25   Q.   Could you understand what she was saying?

8

1    A.   Couldn't understand what she was saying.

2    Q.   And so you were standing ten feet back away when Officer

3    Louchren managed to kick the door open; is that true?

4    A.   Yes.

5    Q.   Okay.  And do you recall at some point whether Officer

6    Louchren took a firearm out?

7    A.   I think he was pulling his gun out when he was turning

8    around.  Officer Cox -- after the door popped open, Officer

9    Cox went into the left, into the living room area, behind the

10   door.  And the other officer turned around and took his

11   position right square to the doorway, and he was pulling his

12   weapon as he squared up at the doorway.

13   Q.   So Officer Louchren was eventually successful in kicking

14   in the door?

15   A.   Yes.

16   Q.   And then Officer Cox went in to the left?

17   A.   Uh-huh.

18   Q.   And then Officer Louchren came and squared into the

19   doorway?

20   A.   Yeah.  He stood basically right in the doorway.

21   Q.   And at that point, you recall that he took out a firearm?

22   A.   Yeah.  It was like one motion, turning around and setting

23   himself in the door.

24   Q.   So is it your recollection that very shortly after Officer

25   Louchren kicked open the door, he had his firearm out?

MARK STEVENS

9

1   A.   Yeah.

2   Q.   When the door swung open, could you see inside the

3   apartment?

4   A.   Yeah, he stepped into the doorway.  I stepped over

5   directly behind him, behind the doorway.  And at that point, I

6   was about eight feet or so behind him, looking directly over

7   his shoulder into the apartment.

8   Q.   So could you see Veronica Canter inside the apartment?

9   A.   At first, she was behind the kitchen.  As you walk in the

10  unit, there is a wall that separates the kitchen from the

11  living room area, and she stepped behind that.

12          And they were saying, "Come out with your hands up."

13  And she stepped back into view and I could see her then.

14  Q.   And after she came back into view, and came back towards

15  the living room, did you notice that she had any knives?

16  A.   She had, for sure, one knife, and I thought the other

17  thing was like a metal pipe or something.  And it looked like

18  she had pulled them out of her skirt.  She pulled them out,

19  like she slid them up her body.

20  Q.   Was she moving them around at all?

21  A.   Yeah, she started clacking them together, saying, "Come

22  on, Effers, come on," and she was clacking them together, kind

23  of like circling her hands, you know.

24  Q.   Can you stand up and show the jury what you are doing?

25  A.   She kept clacking the knives together and she was like

1   circling like this (Demonstrating.)

2   Q.   At one point, do you recall that a Taser was used on her?

3   A.   I remember the Taser going off.  I could hear it clicking,

4   but it did not seem to faze her.  I personally thought it

5   didn't hit her because she didn't react whatsoever.  She

6   didn't stop yelling.  She didn't stop moving.  She didn't

7   stutter, she didn't stumble.  And I could hear it, click,

8   click, click, click.

9   Q.   And you knew that was the sound of the Taser?

10  A.   Yeah.

11  Q.   When she was stuck with the Taser, was Officer Louchren

12  standing in front of her?

13  A.   She was just a little bit to his right.  She wasn't quite

14  directly in front of him yet.

15  Q.   And do you recall after she was struck with the Taser, did

16  she change her direction or her movements?

17  A.   No, she didn't.

18  Q.   At some point, did you see her step up onto the couch,

19  which would have been to her right?

20  A.   Yes.  She took -- I want to say she took two steps, and

21  then onto the arm of the couch.

22  Q.   So two steps on the ground and then --

23  A.   And then onto the arm of the couch.

24  Q.   -- and then stepping up onto the arm of the couch.

25       When she was putting one leg over the arm, what did

1   you hear?

2   A.   She got one leg on the couch and she was bringing her

3   second leg up over the arm of the couch, and I heard two

4   shots, pop-pop.

5   Q.   And what was her reaction to those two shots?

6   A.   She started to buckle down towards her leg that was

7   lifting, to her left.

8   Q.   Okay.  So is it your recollection that the first leg she

9   put on the couch was her right leg?

10  A.   Yes.

11  Q.   She was lifting her left --

12          THE REPORTER:  One at a time.

13          THE COURT:  You can reask a question or pick it up

14  there.

15          As you can see, there is a court reporter, so we take

16  turns so she has to write down one at a time.

17          Maybe start the question again.

18          MR. OVERSON:  Yes, your Honor.  Would it be

19  acceptable, your Honor, for Mr. Stevens to show what she was

20  doing with her legs?

21          THE COURT:  Yes.

22  BY MR. OVERSON:

23  Q.   Could you come here, Mr. Stevens?

24          THE COURT:  Just be careful.  Don't fall.

25          MR. OVERSON:  Is it okay if Mr. Stevens puts his foot

MARK STEVENS - D.

12

1   on the chair?

2          THE COURT:  In any way you need to demonstrate.

3   BY MR. OVERSON:

4   Q.  Can you show us, this is a chair and not a couch.  Can you

5   show the jury what she was doing?

6   A.  She stepped up, and as she was stepping up right like

7   that, this.

8   Q.  So you heard two shots as she was lifting her left leg up

9   towards the couch?

10  A.  Yes.

11  Q.  And when you heard those two shots, you saw her buckle

12  down?

13  A.  Start to buckle, yes.

14  Q.  And as she was buckling down -- you could take a seat.

15  Thank you.

16          As she was buckling down, what did you hear next?

17  A.  Three more shots.

18  Q.  And could you see those shots being made as they were

19  going in?

20  A.  No.  She was just falling.  It was -- she was going down,

21  and I couldn't -- I couldn't tell if she was being hit or not

22  on the way down.

23  Q.  But you heard --

24  A.  But I heard --

25  Q.  -- the last three shots as she was falling to the ground?

1  A.   Yes.

2  Q.   So after the first two shots, did you ever see the woman

3  in the apartment standing on the couch with two knives above

4  her head, pointed at an officer, in like a bull horns --

5  A.   No.  She had them in her hands, just right about chest

6  height, as she was stepping up.  She wasn't swinging or

7  stabbing or anything.

8          She had them in her hands and was stepping over the

9  arm of the couch towards Officer Cox.

10  Q.   Could you stand up, please, and show where she was holding

11  the knives as she stepped up on the couch.

12  A.   Right about her chest height.

13  Q.   And the knives were relatively close to her chest?

14  A.   I would say they are probably about this far apart.  She

15  was about like this.

16  Q.   Her hands were maybe a foot apart, and -- is that right?

17  A.   Yeah, maybe.

18  Q.   And her, I think --

19  A.   Maybe six to eight inches away from her chest.

20  Q.   And they were how far from her chest?

21  A.   Six to eight inches away.

22  Q.   Okay.  And when you were just demonstrating for us, can

23  you tell us where your elbows were?

24  A.   Her elbows were kind of out like this (Demonstrating.)

25  Her position was kind of like this as she was stepping on the

MARK STEVENS    -

14

1   couch.

2   Q.  Her elbows --

3       THE COURT:  We are doing this, because the jury can

4   see you, but we have to make a record.  He is trying his best

5   to describe what you are doing just so that we can write it

6   down since we don't have a picture.  Let's take it slow and

7   let him describe just what you just did in a way that has

8   words.

9       Go ahead.

10  BY MR. OVERSON:

11  Q.  Just to describe where your elbows were when you were

12  making the demonstration for the jury, your elbows were at

13  basically the normal height of your relaxed elbows, right?

14  A.  Maybe a little bit higher.

15  Q.  Inch or two higher, is that fair?

16  A.  Approximately.

17  Q.  And the elbow was maybe six inches away from her ribs,

18  eight inches?

19  A.  Possibly, somewhere around that.

20  Q.  Six to eight inches, is that fair?

21  A.  Yes.

22  Q.  Did you ever see that Veronica Canter had a second foot on

23  the couch?

24  A.  She was -- it was crossing over the arm of the couch.  It

25  was never -- she never planted it on the couch.

1  Q.  So if someone were to tell the jury that they saw Veronica

2  Canter walking across the couch with her feet on the middle

3  cushion, what would you say?

4  A.  That would be incorrect.

5  Q.  Did you see her make any lunging motions with the knives

6  as she was going towards the couch?

7  A.  No.  As soon as she stepped on the couch, she was going

8  down.

9  Q.  And you say she was going down.  Is that because she was

10  shot --

11  A.  Yes.

12  Q.  She was shot immediately as she stepped towards, up onto

13  the couch?

14         MR. PRAET:  Objection.  Leading.  Calls for

15  speculation.  Lack of foundation.

16         THE COURT:  Overruled.  I think it is clarifying,

17  what he just said.

18         THE WITNESS:  Can you say that again, please.

19  BY MR. OVERSON:

20  Q.  Yes.  You said she was going down because she was shot

21  almost immediately as she stepped up to the couch; is that

22  right?

23  A.  She had one leg on the couch, and she was stepping

24  completely onto the couch.  She didn't put her leg -- the

25  second leg on the couch because she was shot and going down.

MARK STEVENS - D

16

1   She was going forward.

2   Q.  Did you ever see Veronica Canter, the woman in the

3   apartment, did you ever see her cutting her wrist?

4   A.  I saw her touch her wrist, but I thought it was more on a

5   flat with the knife, like she kept touching herself, clacking

6   the knives together.  And she was acting crazy.  It was --.

7   Q.  Did you ever see her do anything that looked to you, that

8   appeared to you to be an intentional cut of her wrist?

9   A.  No.  I didn't think she was cutting her wrist.

10  Q.  Okay.  Now, after the five shots were done, what happened

11  next?

12  A.  When she hit the ground, the larger officer holstered his

13  weapon and pushed the knives away from her, and they rolled

14  her over and cuffed her.

15        And at that point, I took off across the court yard

16  over where the manager was and the guy I was working with.

17  The larger officer then came out and said, "Somebody go

18  outside and direct the ambulance."

19  Q.  Okay.  And did you do that?

20  A.  Yes, I did.

21  Q.  I would like to play three seconds from Exhibit 104, which

22  is the surveillance camera, and it shows Mr. Stevens going

23  across the court yard.

24        MR. PRAET:  No objection.

25        THE COURT:  You may.

17

1           (The video was played.)

2    BY MR. OVERSON:

3    Q.  That went rather quickly.  Can we have it played again?

4    Is that you there going through the gate?

5    A.  Yes.  Yes, it is.

6    Q.  And can we have the time blown up, please.

7           We can't do that right now.

8           MR. PRAET:  What exhibit is that?

9           MR. OVERSON:  Exhibit 104.  It is the tape of the

10   surveillance camera.  We can provide you with a better showing

11   of the time.

12   BY MR. OVERSON:

13   Q.  Was this roughly how long after the shooting?

14   A.  Oh, I would say me walking out of that gate, within two

15   minutes, maybe less.  It was a very fast occurrence.

16   Q.  Then after you walked through the gate, I take it a lot of

17   officers arrived onto the scene, true?

18   A.  Yes.

19   Q.  And did you have a few-minute conversation with one of

20   those officers that day?

21   A.  Yeah.  Well after, like it was a detective, I think,

22   interviewed me.

23   Q.  And where did that occur?

24   A.  In the work truck I was driving.  Actually, it might have

25   been in my boss's truck.

MARK STEVENS

18

1    Q.  You were both sitting in the truck?

2    A.  Yeah, we were both sitting in the truck.

3    Q.  How long did he talk to you?

4    A.  Mmmmm, maybe five minutes or so.

5    Q.  Were you asked to later to go downtown or go down to the

6    station and talk to them?

7    A.  Yes.  They wanted me to go down that evening.  I was

8    trying to get out of there because I was pretty freaked out at

9    the moment, and the officer said I could come down the next

10   morning and give them a statement.

11          So the next day, I went down to the Fresno Police

12   Department and tried to give a statement.

13   Q.  You said tried to give a statement.

14   A.  Yes.

15   Q.  Were you able to give a statement?

16   A.  I was not.

17   Q.  You reported and said, "I'm here to give a statement"?

18   A.  Yeah.  We actually -- it was on a Saturday morning.  I

19   went down there, tried to find a way in, and then finally

20   someone came out and said, "What are you doing?"

21          And I told them what I was there for, and he said,

22   "Okay.  Why don't you come in."  And they had us sit in the

23   hallway, and someone else came out and asked who we were there

24   to talk to.  Told them.

25          Said, "All right.  We will be right back."  They then

1    came out and took us upstairs into an office break room area,

2    and said someone would be in shortly to talk to us.

3          About 15 or 20 minutes later, another officer came in

4    and sent us on our way.

5    Q.  So other than a few minutes in the truck on the day of the

6    incident, when you said --

7    A.  Uh-huh.

8    Q.  -- upset, no Fresno police officer has ever talked with

9    you about this incident; is that right?

10   A.  Not since that afternoon, no.

11   Q.  When you saw Veronica Canter going down, after that second

12   shot, did you see any threat that was continuing?

13   A.  No.  She was going down.

14         MR. OVERSON:  Thank you.  I have no further

15   questions.

16                        CROSS-EXAMINATION

17   BY MR. PRAET:

18   Q.  Good morning, Mr. Stevens.

19   A.  Good morning.

20   Q.  You gave a statement the day of the incident to a Fresno

21   investigator, right?

22   A.  Yes.

23   Q.  That was recorded, right?

24   A.  Yes.

25   Q.  In your truck?

1   A.   Yes.

2   Q.   Yes?

3   A.   Yes.

4   Q.   In that statement, you said you heard two shots, a pause,

5   and three more shots, right?

6   A.   Uh-huh.

7   Q.   Yes?

8   A.   In the statement that was recorded?

9   Q.   Yes.

10  A.   I don't think I did.  And actually, the next morning, I

11  was -- I told my wife, I think it was three shots that I heard

12  after the first two, because with all -- that situation really

13  freaked me out.

14       I literally cried for two weeks for no reason, and

15  when I stopped crying, I gained 20 pounds.  It messed with my

16  head more than anything in my life.

17       That afternoon I was not in any state to be giving a

18  statement.  I went down to give my statement the next day.

19  Q.   As you sit here today, you very distinctly remember two

20  shots, a brief pause, three more shots?

21  A.   Yes.

22  Q.   Did you talk to the lawyers for the Canter family before

23  you came here today?

24  A.   Yeah, I have talked to them a couple times.

25  Q.   Because when you gave your statement in the pickup truck,

MARK STEVENS - X

1   you never said that she buckled down after the first two

2   shots, did you?

3   A.   I said she was going down.

4   Q.   What you said is you heard the shots and she went down;

5   that's your statement that you gave that day, right?

6   A.   Yeah.

7   Q.   That meant all five shots and she went down; isn't that

8   what you said?

9   A.   I don't remember exactly.

10  Q.   Okay.  She very clearly had both knives in her hands after

11  the first two shots, didn't she?

12  A.   She was still holding them, yes.  But she was going down.

13  Q.   You said she was moving forward onto the couch, correct,

14  after the first two shots?

15  A.   It was after the first two shots, she wasn't moving

16  forward.  She was going to the ground.

17  Q.   Did she end up on the floor?

18  A.   She did.

19  Q.   Did she end up on the couch?

20  A.   She did not.

21  Q.   Do you know how a knife got behind the couch, the back of

22  the couch?

23  A.   Yeah, because when she fell, she fell down to the ground

24  and back, with her head actually behind the couch, and the

25  officer pushed the weapons out of her reach.

MARK STEVENS XX

22

1   Q.   Okay.

2   A.   So the knife would have gone behind the couch between the

3   kitchen wall and the couch.

4   Q.   Did you tell that to investigators at the time?

5   A.   No.  Like I say, it was a five-minute interview, and he

6   knew I was freaked out.  I was --.

7   Q.   You -- I'm curious about these words, "buckled down,"

8   where that came from.  Because you never used that in your

9   statement.  Did you get that from the attorneys?

10  A.   No, I didn't.

11  Q.   You said that she was moving forward.  She had one foot on

12  the couch and she was bringing her left foot onto the couch,

13  correct?

14  A.   Yes, sir.

15  Q.   And you stood on the chair here?

16  A.   Yeah.

17  Q.   She fell forward, right?

18  A.   No, she fell backwards.

19  Q.   She fell backwards?

20  A.   Yeah.

21  Q.   After the last three shots?

22  A.   All in one motion.

23  Q.   Okay.  There is the first two shots.  There is a pause.

24  She is stepping up on the couch?

25  A.   The first two shots she starts to buckle.  Pop-pop,

1    pop-pop-pop.  It was the pause is not even time for her to hit

2    the ground.

3    Q.  Okay.  So you are saying she actually would have been

4    lower onto the floor at the last three shots; is that right?

5    A.  I don't think she was on the floor, but she was falling.

6    Q.  Okay.  But for the first two shots, you had her stepping

7    up onto the couch, right?

8    A.  Yes.

9    Q.  So at least part of her was elevated from if you were

10   standing on both feet, right?

11   A.  Yes.

12   Q.  And the way you now have her is for the last three shots,

13   she would have been at a lower height, her torso, right?

14   A.  She would have been falling, yes.

15   Q.  And towards the floor?

16   A.  Yes.

17   Q.  You ever seen anybody shot before?

18   A.  No.  First time.

19   Q.  Affected you pretty much emotionally, right?

20   A.  Yeah, it did.

21   Q.  How is it when you told the investigators, "I heard the

22   shots and she fell," but now you are able to tell us in great

23   detail, six to eight inches, with her arm from the body, every

24   single movement that she is making?  Is there some reason you

25   now have a memory other than, "I heard five shots and she

24

1    fell"?

2    A.  Well, I can see it plain as day.

3    Q.  You said she was moving forward.  Do you know why she was

4    moving forward after the first two shots?

5    A.  I don't know why she was doing any of it.

6    Q.  Okay.  But I mean do you know whether she was, of her own

7    volition, whether she was causing herself to move forward

8    after the first two shots --

9          MR. OVERSON:  Objection.  He is assuming a fact not

10   in evidence.  It was never stated that she was continuing to

11   move forward after the two shots.  The testimony was that she

12   fell down after the two shots.  He is now building in that

13   fact --

14         THE COURT:  Sustained.

15   BY MR. PRAET:

16   Q.  Let me ask.  The way I heard it was you had her on the

17   couch.  She is stepping forward with her left foot, and the

18   first two shots, right?

19   A.  Yes.

20   Q.  Is it your testimony that her body continued to move

21   forward?

22   A.  No.  She started to buckle down to her left and back to

23   the ground.

24   Q.  Okay.  By the way, when you went out to try your master

25   key to open the door, did you have any fear of opening that

1  door?

2  A.  I wasn't going to open the door.  I was unlocking the door

3  for the officer to open it.

4  Q.  Had you ever heard anybody say anything about knives

5  before the door opened?

6  A.  No, I did not.

7  Q.  Did you ever hear -- and you know who Mr. Lindbeck is,

8  right?

9  A.  I see him.  I don't know him.

10  Q.  But you now know he is the guy inside the fenced patio

11  area?

12  A.  Yes.

13  Q.  Did you hear him talking to the officers?

14  A.  Yeah.

15  Q.  Did you ever hear him mention the words, "She is mentally

16  ill, she has got mental health problems"?

17  A.  I heard him say, "She is F'ing crazy.  I want her out of

18  my house."

19  Q.  Okay.  When you saw the officers standing at the door and

20  he said he didn't want to ruin his knee, did you have any

21  expectation there would be an armed encounter?

22  A.  No.

23  Q.  No officer had their gun out before they kicked the door,

24  did they?

25  A.  Not before they kicked the door.

MARK STEVENS - X

26

1    Q.   And you said that -- which officer went in first?

2    A.   Officer Cox.

3    Q.   Officer Cox went in first?

4    A.   Taller, older fellow.

5    Q.   How did you know his name?

6    A.   I have heard his name more than anybody's.

7    Q.   Okay.  And but it is your belief that he went in first?

8    A.   Yes.

9    Q.   And at some point, you saw Officer Louchren -- he is the

10   larger officer -- draw his gun?

11   A.   Yes.  As he was turning around into the door, he pulled

12   his weapon and squared up.

13   Q.   Turning around?

14   A.   He kicked the door from behind.

15   Q.   Oh, backwards?

16   A.   Yeah, he turned around and kicked the door like that

17   (Demonstrating.)

18   Q.   And then you say he pulled his gun?

19   A.   As -- yes.  As he kicked the door, he took a step forward,

20   and as he turned into the doorway, he pulled his gun.

21   Q.   Did you ever tell that to investigators that day?

22   A.   No, that day, I wasn't asked.

23   Q.   Isn't it true, sir, that he pulled his gun when Veronica

24   Canter came around the corner with the two knives?

25   A.   No.  I believe that he had his gun in his hand when he was

27

1   squared up with the door.

2   Q.   Did you hear him tell her, "Come on back.  We are just

3   going to give you a ticket or cite you for trespass"?

4   A.   No.  I don't remember that.  I remember them telling her

5   to drop the weapons and come out.

6   Q.   Okay.  So you do remember them saying, "Drop the weapons

7   and come out"?

8   A.   Yeah.  They said "drop the weapons" a few times.  Even

9   while they were Tasing, I believe that Louchren was saying,

10   "Drop the weapons, drop the weapons."

11   Q.   Okay.  And so how long after that -- strike that.

12          How long prior to that did he draw his gun before he

13   was saying, "Drop the weapons, drop the weapons"?

14   A.   As soon as he opened the door, he drew his weapon.

15   Q.   I want you to give me an estimate of time.  From the time

16   you hear him saying, "Drop the weapons," "Drop the knives,"

17   whatever he said, how many seconds or whatever prior to that,

18   did he draw his gun?

19   A.   Three seconds?

20   Q.   Three seconds?

21   A.   Yeah, about.  From the time the door opened to the time

22   she was on the ground was less than a minute.

23   Q.   Right.  Did you see her after the door opened?  She didn't

24   have anything in her hands, right?

25   A.   I didn't see anything in her hands.  And she stepped

MARK STEVENS - X

28

1   behind the wall of the kitchen, and as she came out, she

2   definitely had weapons in her hand.

3   Q.   How long did that take, from the time the door opened, she

4   had nothing in her hands, she went around the corner, and came

5   back with two knives?

6   A.   A couple seconds.  She stepped out of view and back into

7   view.

8   Q.   Okay.  So a couple seconds there, and then they try to

9   Tase her, right?

10  A.   Uh-huh.

11  Q.   And somewhere in there, now they are yelling, "Drop the

12  knives, drop the weapons"?

13  A.   Uh-huh.

14  Q.   And it's three seconds prior to the "drop the knives" that

15  you see him pull his gun, right?  That's what you just said?

16  A.   I -- I'm not quite following you.

17  Q.   Okay.  You just told us a minute ago, that I asked you

18  when he drew his gun in relation to when he is saying, "Drop

19  the knives, drop the knives," and you said about three seconds

20  prior, right?

21  A.   Yes.

22  Q.   Is that still your testimony?

23  A.   Yes.

24  Q.   Okay.  And that was after she went around the corner, took

25  a couple seconds, and came back with knives, right?

1    A.  I still don't follow what you are saying.  Sorry.  As soon
2    as she had the weapons in her hands, they were saying, "Drop
3    the weapons."
4    Q.  Right.  And just prior to saying, "Drop the weapons,"
5    three seconds, he drew his gun, right?
6    A.  Yes.
7    Q.  Right.  Prior to that, she went into the kitchen and got
8    the knives or at least came back with the knives, right?
9    A.  Prior to that, no.  They open the door.  He pulled his
10   weapon.  She went around the corner and came back with weapons
11   in her hand.
12   Q.  When did you talk to the attorneys for the other side?
13   A.  The first time was maybe a couple months ago.
14   Q.  When is the last time?
15   A.  Yesterday.
16   Q.  Okay.  You talked to me a couple months ago too, didn't
17   you?
18   A.  I don't really remember talking to you.
19   Q.  We talked on the phone?
20   A.  We talked on the phone.  I remember talking to you for a
21   second when I was at Shaver, and then my phone was cutting
22   out.  I got a letter from you.
23   Q.  Right.  You don't remember talking to me prior to me
24   sending the letter about trial?
25   A.  No, I don't.  Actually, I thought I had been talking to

30

1  them the whole time.

2      MR. PRAET:  Okay.  Nothing further.  Thank you.

3              REDIRECT EXAMINATION

4  BY MR. OVERSON:

5  Q.  So you and I spoke a couple months ago; is that right?

6  A.  Yes.

7  Q.  And we spoke again last night?

8  A.  Yes.

9  Q.  And you spoke with Mr. Praet last night as well?

10  A.  Yes.

11  Q.  Mr. Praet had sent you a subpoena to appear here today,

12  right?

13  A.  Yes, he did.

14  Q.  And you told Mr. Praet last night what you told the jury

15  today, didn't you?

16  A.  Yes.

17  Q.  And Mr. Praet told you, you didn't need to come today;

18  isn't that right?

19  A.  Yes.

20      MR. OVERSON:  No further questions.

21      MR. PRAET:  Nothing further, your Honor.

22      THE COURT:  Thank you, sir.  You can be excused.

23          *       *       *       *       *

24

25

1

2

3          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

4   certify the foregoing transcript as true and correct.

5

6   Dated:  16th of June, 2016          /s/ Peggy J. Crawford
                                        PEGGY J. CRAWFORD, RDR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25