1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. MAGISTRATE JUDGE ERICA P. GROSJEAN


| | |
|---|---|
| DORIS RAY KNOX; JERRY WAYNE KNOX; JEREMY EDWARD MOORE, individually and as successor-in-interest to VERONICA LYNN CANTER, deceased, | 1:14-cv-799 EPG<br><br>JURY TRIAL, DAY 3<br><br>Testimony of Dag Lindbeck |
|       Plaintiffs, | |
|   vs. | |
| CITY OF FRESNO, a municipal corporation; EDWARD CHRISTOPHER LOUCHREN, individually and in his capacity as a police officer for the CITY OF FRESNO; DOUGLAS EDWARD COX, individually and in his capacity as a police officer for the CITY OF FRESNO, | |
|       Defendants. | |

Fresno, California          Thursday, June 16, 2016

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS


REPORTED BY: PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiffs:          MORRISON & FOERSTER LLP
                             425 Market Street
                             San Francisco, CA 94105
                             BY:  **ARTURO J. GONZALEZ**
                                  **SABRINA A. LARSON**
                                  **WESLEY E. OVERSON, JR.**
                                  **ROBERT J. ESPOSITO**


For the Defendants:          FERGUSON PRAET & SHERMAN
                             A Professional Corporation
                             1631 E 18th Street
                             Santa Ana, CA 92705-7101
                             BY:  **BRUCE D. PRAET**

3

## INDEX

**DEFENDANTS' WITNESSES**:

**DAG LINDBECK**                                            4
DIRECT EXAMINATION BY MR. PRAET                            4
CROSS-EXAMINATION BY MR. GONZALEZ                         47
REDIRECT EXAMINATION BY MR. PRAET                         53
RECROSS-EXAMINATION  BY MR. GONZALEZ                      57

* * * * *

## EXHIBITS

**DEFENDANTS'**                                       Received

 201                                                  13

* * * * *

4

1    Thursday, June 16, 2016                    Fresno, California

2                  *       *       *       *       *

3         MR. PRAET:  Your Honor, the defense would call

4    Mr. Dag Lindbeck.

5                         **DAG LINDBECK**,

6    called as a witness on behalf of the Defendants, having been

7    first duly sworn, testified as follows:

8         THE COURT:  Good morning, Mr. Lindbeck.  Why don't

9    you approach, but stand close to this coffee pot, to take the

10   oath first.

11        THE CLERK:  Please state your full name and spell

12   your last name for the record.

13        THE WITNESS:  My name is Dag Anvil Lindbeck, D-a-g

14   A-n-v-i-like L-i-n-d-b-e-c-k.

15                    DIRECT EXAMINATION

16   BY MR. PRAET:

17   Q.  Good morning, sir.

18   A.  Good morning.

19   Q.  How long had you known Veronica Canter before March 7th,

20   2014?

21   A.  Probably a dozen years or so.

22   Q.  Had you even dated her for a period of time?

23   A.  Yes.

24   Q.  When did she first arrive at your apartment prior to this

25   incident on March 7, 2014?

DAG LINDBECK

5

1    A.   It was the night before, I believe.

2    Q.   Sure it wasn't a couple days prior?

3    A.   It might have been -- I think it was like the day before,

4    two days before that.

5    Q.   Well, how many nights did she spend with you at your

6    apartment?

7    A.   Two.

8    Q.   So it wasn't the day before?

9    A.   Right.

10   Q.   She spent two nights?

11   A.   Right, right.

12   Q.   Did you invite her or how did she show up?

13   A.   She just showed up.

14   Q.   Unannounced?

15   A.   Yes.

16   Q.   So this was on the 7th.  And she spent the night of the

17   6th and also the night of the 5th, right?

18   A.   Yes.

19   Q.   She arrived on March 5th?

20   A.   Yes.

21   Q.   She appeared pretty normal on the 5th and the 6th?

22   A.   Yes.

23   Q.   You spent two whole days and two whole nights with her.

24   She didn't show any signs of doing anything unusual?

25   A.   No.

6

1    Q.  Okay.  Even on the morning of the 7th, I think you went

2    off to take care of some personal business, right?

3    A.  I went to school, yes.

4    Q.  Okay.  When you left, what time did you leave on the 7th?

5    A.  Probably 8:30 in the morning or something.

6    Q.  She seem fine then?

7    A.  Yes.

8    Q.  Prior to March 7th, 2014, had you ever seen her act

9    strangely?

10   A.  Well, Valentine's Day, she had gotten upset and just took

11   off, kind of mad.

12   Q.  We will talk about that one in just a minute.

13          When you got home on the afternoon of March 7th, the

14   day of this incident, what is the first thing that appeared

15   out of the ordinary to you?

16   A.  My tomato plant was outside of my yard on the lawn,

17   outside of my little patio area.

18   Q.  Where had your tomato plant been before?

19   A.  Inside the patio.

20   Q.  That little fenced area we have seen?

21   A.  Right.

22   Q.  Okay.  Do you know how it got there?

23   A.  No.

24   Q.  Okay.  Other than your tomato plant being outside the

25   fence now, when you got home -- what time did you get home, by

1    the way?

2    A.   I don't know if it was like 2:00.

3    Q.   Okay.  Did she do anything unusual from the time you got

4    home at 2:00 o'clock?  Was there anything unusual?

5    A.   Yes.

6    Q.   What?

7    A.   Well, she was trying on different outfits and kind of just

8    acting strange, and putting on a bunch of makeup, and just

9    acting kind of strange.

10   Q.   Did you ask her about that?

11   A.   Yeah, yes.

12   Q.   What did she say?

13   A.   She didn't say anything, really.  She just kept acting

14   kind of loopy, so I just left her alone and started cooking

15   dinner.

16   Q.   Didn't she actually say, "I'm fine"?

17   A.   Yeah.

18   Q.   Yeah.  Then she said she is fine, and then you went and

19   made dinner, right?

20   A.   That's what I was -- yes.

21   Q.   So it didn't cause you any great concern because you just

22   went and made dinner?

23   A.   I was a little concerned because she was acting pretty

24   loopy, but I didn't know what was really going on.  So it

25   didn't seem too out of, you know, too out of line.  She wasn't

1   causing any -- causing any harm or anything.

2   Q.  Okay.  So you just let her go and you were going to do

3   your dinner thing?

4   A.  Yes.

5   Q.  Okay.  Then what did she do?

6   A.  Then she started behaving more and more, I guess you would

7   say crazy.

8   Q.  Why do you say that?

9   A.  Well, she was just doing strange things, like -- she had

10  like one foot on the tub and leaning over and trying to put

11  makeup on and trying on crazy outfits and dancing around and

12  stuff.

13  Q.  Did she go outside?

14  A.  Finally, yeah, she went outside and started like kind of

15  harassing the kids in the court yard there, and that's when I

16  had -- the manager told me, "She has got to go."

17  Q.  The manager told you, "She has got to go," right?

18  A.  Yes.

19  Q.  You've seen her so far trying on makeup, different

20  outfits.  Your term was she is acting a little "loopy"?

21  A.  Quite loopy.

22  Q.  And now the manager has told you she has got to go, right?

23  A.  Yes, because she was --

24  Q.  Did you at any point, in all you had seen so far, call

25  anybody to get her some help?

DAG LINDBECK

9

1   A.   No.

2   Q.   Had she done anything up to this point that caused you to

3   think you needed to call 911 or the police to help her?

4   A.   I didn't know what to do.   I mean that's all I could think

5   of.

6   Q.   Well, actually, when the manager told you she has got to

7   go, what did you do?

8   A.   I ended up -- I got her stuff and took it out, and I was

9   taking it outside, saying, "Hey, you are going to have to

10  split."   I just grabbed her bags -- she only had a couple

11  bags -- and I took them out front, and that's when she locked

12  me out.

13  Q.   First thing you did, she is out in the court yard --

14  A.   Oh, I tried to get her back inside.

15  Q.   Did you escort her back inside?

16  A.   Yes.

17  Q.   Did you tell her, "Don't touch me"?

18  A.   Yes.

19  Q.   She had just spent the night before, so you took her back

20  inside, and now you've told her she has got to go?

21  A.   Yes.

22  Q.   And that's when you took her bags out to the front gate?

23  A.   Yes.

24  Q.   Did she say anything about it when you said, "You gotta

25  leave"?

1    A.   No.

2    Q.   Did she tell you -- she said she didn't want to leave?

3    A.   No.

4    Q.   Did she, when she closed the door, did she say anything

5    then?

6    A.   No.  I just, when I got back, I noticed it was locked.

7    Q.   Okay.  Did you have a key?

8    A.   No, not on me.

9    Q.   Okay.  One second here.  So up to now, did you feel that

10   you needed any help dealing with Veronica?

11   A.   No.

12   Q.   Had, up till now, when she has locked you out, had she

13   done anything or had you seen anything that would indicate she

14   had any intention to hurt herself?

15   A.   No.

16   Q.   Up to this point, had she threatened to hurt you or anyone

17   else?

18   A.   No.

19   Q.   At any time that day, did Veronica Canter threaten to hurt

20   you?

21   A.   No.

22   Q.   All right.  So she is now inside your apartment.  You know

23   the door is locked.  What did you do?

24   A.   I pounded on the door.  And then I went around to the back

25   and knocked on the window, tried to get her attention, see

1   what was going on.  I tried to get her to open the door.

2   Q.  Did you ask her, "Hey, Veronica, you gotta let me in.

3   Open the door"?

4   A.  Yes.

5   Q.  What did she say?

6   A.  She said no.  I can't remember what she said exactly, but

7   she was not cooperating at all.

8   Q.  Didn't she say, "Come and get me"?

9   A.  She probably did.  Yes, she did, I think.

10  Q.  Well, you remember I took your deposition last year?

11  A.  Yeah.

12  Q.  Right.  And you were under oath at that time?

13  A.  Sure.

14  Q.  And you told me, when you said --

15  A.  Yeah, she said, I guess now.

16  Q.  So she did say, "Come and get me"?

17  A.  Yes.

18  Q.  And what did you say to her?

19  A.  I said, "How can I come and get you?  It is locked.  You

20  got to unlock the door."

21  Q.  Did you say, "I don't want to break a window"?

22  A.  Right.

23  Q.  Right.  Was she doing anything with respect to your

24  personal belongings that you could see inside the apartment?

25  A.  Eventually, yeah, she started piling stuff up against the

1    door, and she threw one of my birds out, and --

2    Q.  Did she actually throw your guitar against the door?

3    A.  Yes, she did.

4    Q.  She didn't push it up against the door, she threw it up

5    against the door, right?

6    A.  Yes.

7    Q.  Were you worried about your guitar?

8    A.  Yes.

9    Q.  So now that she is starting to throw your guitar and wreck

10   your stuff, is that when you called the police?

11   A.  No, I actually tried to call a friend of mine to see if he

12   could come and pick the lock, but he couldn't get away.

13          And then, eventually, I think I finally called the

14   police, yeah.

15   Q.  Now, on March 7th, when you called the police, the 911,

16   did you tell the operator that your ex-girlfriend was acting,

17   quote, "crazy and stupid"?

18   A.  Yes.

19   Q.  Your words, "crazy and stupid," what did you mean by that?

20   A.  Geez, I don't recall saying "crazy and stupid," but what I

21   meant was she was just acting erratic.

22   Q.  Okay.  Can we pull up the 911.  Sir, just one second.

23          Your Honor, I think we previously stipulated the

24   court reporter could be relieved of transcribing the audio

25   tape of the 911 call.

1             THE COURT:  Yes, that's right.

2             MR. PRAET:  We are going to ask this be admitted into

3    evidence.  So is there any objection?

4             MR. GONZALEZ:  Is it the entire 911 conversation

5    between dispatch and this witness?

6             MR. PRAET:  Yes, between the operator and the

7    witness.

8             MR. GONZALEZ:  Right.  And nothing else?

9             MR. PRAET:  Nothing else.

10             THE CLERK:  What is the number?

11             MR. GONZALEZ:  I believe it is 201.

12             THE COURT:  201 will be admitted into evidence.

13             (Defendants' Exhibit 201 was received.)

14             THE COURT:  It can be played, and Ms. Crawford does

15    not have to take it down.

16             (Pause to coordinate the playing of the 911 call.)

17             MR. PRAET:  I appreciate that.  I'm not sure why ours

18    is not coming over the speakers, but we will see if theirs

19    will.

20             (The audio was played.)

21    BY MR. PRAET:

22    Q.  All right.  Sir, did you hear yourself say, "She is acting

23    all crazy and stupid"?

24    A.  Yes.

25    Q.  Okay.  And then the operator asked you if she had mental

1   health issues, and you said, "Yeah, apparently," right?

2   A.   Yes.

3   Q.   Did you at any time ask the operator to send someone to

4   help her because she had mental health issues?

5   A.   No.

6   Q.   Did you ever say, she has a mental health problem or is

7   mentally ill?

8   A.   No.

9   Q.   You said she is crazy and stupid and just acting all

10  looney tunes, right?

11  A.   Yes.

12  Q.   What you meant by that is that you just wanted them to get

13  this crazy and stupid ex-girlfriend out of your apartment,

14  isn't it?

15  A.   Well, because -- yes.  Because she was, you know, damaging

16  some of my stuff.  And the manager said she had to go.  I mean

17  I wasn't -- I'm not trained to evaluate anybody's mental

18  health.

19  Q.   But your concern was that she was breaking up your stuff?

20  A.   Well, that, and yeah, she -- you know, I was worried about

21  her too.

22  Q.   Did you ever say you were worried about her?

23  A.   I don't know.  I don't think so.

24  Q.   We can play the tape again.

25  A.   No, not on the tape, I guess.

1  Q.  And you never at any time asked, "Can you guys send

2  someone out to help her?"  You said you want to get her out of

3  your apartment because she is wrecking your stuff?

4  A.  Yes.

5  Q.  In fact, in your mind, she was just acting like any other

6  crazy girlfriend; that you in fact had dealt with other crazy

7  girlfriends, right?

8  A.  Yes.

9  Q.  Were those people mentally ill?

10  A.  Yes.

11  Q.  And you continued to date them after that?

12  A.  No.

13  Q.  Well, you told me about one incident where you actually

14  took a knife away from some previous crazy girlfriend?

15  A.  Yes.

16  Q.  Okay.  And then you continued to date that person, didn't

17  you?

18  A.  Well, yeah, for a little while.

19  Q.  Okay.  The only mention of mental illness was from the

20  operator, right?

21  A.  Yes.  Well, beside me.  I told the cops she was acting

22  crazy.

23  Q.  Right.  Just like you said, "She is acting crazy and

24  stupid, breaking up my stuff," right?

25  A.  One of the things, I suppose.

1  Q.  Okay.  The 911 operator asked you, "What is she wearing,"

2  right?

3  A.  Yes.

4  Q.  And all you said is a black dress, correct?

5  A.  Yes.

6  Q.  You never said, "Oh, yeah, she is wearing a basketball

7  net," did you?

8  A.  No.  At that point, I don't think she was.

9  Q.  Okay.  When did she put the basketball net on?

10  A.  Shortly after that at some point.

11  Q.  Do you know if she was wearing the basketball net when the

12  officers got there?

13  A.  Yes.

14  Q.  She was?

15  A.  Yes, I believe so.

16  Q.  Are you sure?

17  A.  No.

18  Q.  Okay.  You could see her because you were inside the patio

19  area, right?

20  A.  Yes.

21  Q.  You had a direct -- the only thing between you and her was

22  the sliding glass door?

23  A.  Yes.

24  Q.  The officers were on the outside of that kind of

25  translucent metal fence?

DAG LINDBECK - D

17

1    A.  Yes.

2    Q.  But you are not sure if she was wearing that --

3    A.  Oh, she was at that point, yeah.

4    Q.  But when the officers got there, you are not sure?

5    A.  No -- yes.  When they got there, she was.

6    Q.  Now you are sure?

7    A.  Yes.

8    Q.  By the way, have you talked to the attorneys from the

9    other side?

10   A.  Yes.

11   Q.  When?

12   A.  Yesterday and today.

13   Q.  They picked you up and gave you a ride?

14   A.  Yes.

15   Q.  We called you as our witness, and they gave you a ride?

16   A.  Yes.  They called me as their witness as well.

17   Q.  Actually, they didn't in their case.  They picked you up

18   today and talked to you today, and then you appeared as our

19   witness?

20   A.  Yes.

21   Q.  You knew that she had her foot on the tub, putting on all

22   this makeup, trying on all these outfits; you never told that

23   to the officers when they got there, did you?

24   A.  No.

25   Q.  You thought this was kind of "looney tunes" or "loopy," I

1    think you said, right?

2    A.   Yes.

3    Q.   The officers asked you why you called, right?

4    A.   Yes.

5    Q.   And you said, "Because she is angry, she has locked me

6    out, and she is wrecking my stuff," right?

7    A.   Yes.

8    Q.   And they asked you, "Does she have any mental problems,"

9    right?

10   A.   I said -- I don't recall exactly, but they said -- they

11   didn't say much, except for, "What do you want to do?"  I

12   said -- "Do you want to press charges or something?"

13            I said, "No.  I just need her to get out of there

14   because she is wrecking my stuff, and the manager wants her to

15   leave."

16   Q.   That was like ten minutes later, when the second officer

17   got there?

18   A.   Could have been.  It's couple of years.

19   Q.   But when the first officer got there, Officer Cox, he

20   asked you questions about what was going on, questions about

21   Veronica, right?

22   A.   Yes.

23   Q.   Now, you knew before he had gotten there, she was acting,

24   as you say, "loopy," putting on different outfits and makeup,

25   right?

1    A.   Yes.

2    Q.   Why didn't you tell the officer that?

3    A.   I did.

4    Q.   You did?

5    A.   I think so.  I might not have.  I'm not sure.  It's been a

6    while.

7    Q.   Yeah.  When I took your deposition back in September of

8    last year, I asked you under oath, okay --

9            MR. GONZALEZ:  What page?

10           MR. PRAET:  I'm sorry.  Page 39, lines 16 through

11   18 -- strike that as to the lines.  Lines 13 through 15.

12   BY MR. PRAET:

13   Q.   I asked you under oath, sir, at that time, "And you didn't

14   tell them that she had been trying on makeup and --"

15           You said "no."

16   A.   Maybe at the time, I didn't, no.

17   Q.   Well, why would you say today that you did?

18   A.   I don't know.  I think you are trying to confuse me or

19   something.  I don't understand.  I can't remember exactly what

20   happened and what chronological order.

21   Q.   Okay.  When I took your deposition back in September of

22   2015 --

23   A.   It was all pretty confusing at the time.  You know, I

24   wasn't prepared for anything like that to be happening.  I was

25   a little bit flustered.  And I can't recall exactly what

1  happened the whole time.  I wasn't taking notes.

2  Q.  And you hadn't ridden to court with the other attorneys,

3  had you?

4  A.  What's that got to do with it?

5  Q.  Well, when I took your deposition, I told you, "If at any

6  time you don't understand one of my questions, I need you to

7  tell me," right?

8  A.  Oh, yep.

9  Q.  Okay.  I said, "And you did not tell them that she had

10  been trying on make up?"

11       You said, "No."  You didn't say, "I'm confused" --

12  A.  Well, at that time, I probably was recalling a little

13  better.  I may not have.

14  Q.  So what you just said in court, that you did tell the

15  officers about her trying on makeup, is not correct?

16  A.  That could be a mistake, yes.

17  Q.  Okay.  What you told me when I took your deposition under

18  oath is correct, that you did not tell the officers she was

19  trying on makeup, right?

20  A.  Okay.

21  Q.  Do you understand you are still under oath?

22  A.  Yes, yes.

23  Q.  Okay.  Now, when the police arrived -- okay, well, back

24  up.

25       When the 911 operator asked you, "Are there any

21

1    weapons," and your words were, "Not that I know of," right?

2    A.  Yes.

3    Q.  At any time prior to the officers getting there, had you

4    seen Veronica Canter arm herself with a knife or knives?

5    A.  No.

6    Q.  Okay.  When Officer Cox got there, did you tell him -- did

7    he ask you the same question the operator said, "Are there any

8    weapons?"

9    A.  Yes.

10   Q.  Did you tell him, "Yeah, she armed herself with two

11   knives?"

12   A.  No.

13   Q.  Did you ever mention to Officer Cox or Officer Louchren

14   that you had seen Veronica Canter with knives prior to the

15   time they made entry?

16   A.  No.

17   Q.  Okay.  In fact, you were interviewed after this incident

18   by detectives, and they even grilled you pretty hard on

19   whether or not you mentioned knives, right?

20   A.  Yes.  I might have mentioned it.  They asked me if she had

21   any weapons, and I said the only thing I could think of was

22   kitchen knives or something.

23   Q.  Yes.  Knives in the kitchen, like anybody would?

24   A.  Right.

25   Q.  That's the only mention you may have made about knives?

1   A.  Right.

2   Q.  And you are sure about that one, right?

3   A.  I'm pretty sure, yes.

4   Q.  Well, they asked you six times in your interview.  Is that

5   the only thing you said about knives, "There may be knives in

6   the kitchen"?

7   A.  Yes.

8   Q.  You never said anything about, "She armed herself with

9   knives," you saw her --

10  A.  No.

11  Q.  -- with knives or anything, right?

12  A.  No.

13  Q.  "No," that's correct?

14  A.  No, that's correct.

15  Q.  Okay.  You previously told us just today that she never

16  threatened you, and you said the same thing to Officer Cox,

17  right, "She hasn't threatened me"?

18  A.  Right.

19  Q.  Because she had not threatened you, correct?

20  A.  Correct.

21  Q.  Now, we have heard some mention about her placing some

22  sort of electrical cord around her neck.  Did that happen

23  before the officers got there?

24  A.  Yes.

25  Q.  Okay.  Was that before you called -- you were in the

1  little patio area and she was inside the apartment?

2  A.  Yes, I guess so.  I don't know.

3  Q.  I don't want you to guess.

4  A.  I can't recall exactly, but I did see her do that at some

5  point.

6  Q.  It was clearly before the officers got there?

7  A.  I'm not sure.  It might have been after they got there.

8  Q.  Okay.

9  A.  I wasn't taking notes.

10  Q.  Well, let's -- do you remember in your interview --

11  A.  I wasn't taking notes at that point either.

12  Q.  I'm not asking you if you were taking notes.  Do you

13  remember telling detectives that, clearly, she had removed the

14  cord before the officers got there?

15  A.  I don't recall that, but I suppose.

16  Q.  Okay.  Well, we need a little more definite answer.  You

17  saw her put the cord around her neck, right?

18  A.  Yes.

19  Q.  You were inside that little fenced area and she was inside

20  your apartment?

21  A.  Possibly at that point.  I'm not sure what

22  chronological -- I'm not sure when she put it around her neck.

23  She wasn't holding it up like this.  She had it around her

24  neck, and I'm not sure at exactly what point I saw her do

25  that.

24

1   Q.   Okay.  You never told the officers that she put a cord
2   around her neck, did you?
3   A.   I don't recall.
4   Q.   The officers were asking you questions about what's been
5   going on before we got here, right?
6   A.   I don't recall that either.  I don't think they were
7   asking very much, many questions about that.  They just wanted
8   to know, "How do you want us to handle this?  Do you want to
9   press charges?"
10  Q.   Okay.  Well, Officer Cox spent -- I believe we looked at
11  the thing -- about seven minutes asking you questions from the
12  time he arrived before Officer Louchren got there.
13          MR. GONZALEZ:  Objection, your Honor.  That's
14  leading.
15          THE COURT:  Sustained.
16          MR. PRAET:  Okay.
17  BY MR. PRAET:
18  Q.   How much time had Officer Cox been asking you questions
19  before the second officer got there?
20  A.   I don't know.  Not very long.
21  Q.   When you say "not very long," what's your estimate of not
22  very long?
23  A.   Maybe five minutes.
24  Q.   Okay.  But I mean I don't want to do it now, but if
25  everybody sat here for five minutes, during that entire time,

25

1   he is talking to you, right, finding out what's going on?

2   A.   Intermittently.

3   Q.   Okay.  Now, had she at any time while the officers were

4   there, said anything about hurting herself?

5   A.   No.

6   Q.   Okay.  But actually, before the officers got there, she

7   told you, when she had the cord wrapped around her neck,

8   "There is going to be a suicide"?

9   A.   No, she didn't.  I don't remember that.

10  Q.   All right.

11          Let me have just a moment, your Honor.

12          MR. PRAET:  Can I have just a moment, your Honor?

13          THE COURT:  Yes.  Let's take a moment to stand and

14  stretch.

15          (Pause in the proceedings.)

16          MR. GONZALEZ:  You can read it.

17          MR. PRAET:  I will, but unfortunately, the page

18  numbers have changed.

19          (Counsel conferred off the record.)

20  BY MR. PRAET:

21  Q.   Okay.  When you were interviewed by detectives --

22          And thank you, your Honor, for indulging.  We just

23  took the page numbers off the exhibits.

24          You were asked a question, okay.

25          "What was she doing at the time?"

1          And this is the time when just you are there waiting,

2    before you called the police, okay.

3          "Your answer:  She was, uh, making lewd gestures

4               through the window glass at me and telling to -- tell

5               me to go ahead and call the cops, and stacking stuff

6               against the door and just being crazy.

7          "Question:  She told you to do what now?

8          "Answer:  To go ahead and call the cops.  And then she

9               is -- oh, she is tying a cord around her neck,

10              talking about 'There is going to be a suicide,' or

11              something like that."

12         Does that refresh your memory, sir?

13   A.   Yes.

14   Q.   So before the officers got there, Veronica Canter told

15   you, "There is going to be a suicide," didn't she?

16   A.   I really don't recall that, but I guess that she might

17   have.

18   Q.   Well, you told that to the investigators at the time you

19   were interviewed, right?

20   A.   Right, apparently.

21   Q.   You didn't make that up, did you?

22   A.   No.

23   Q.   And that's before the officers got there, right?

24   A.   Yes.

25   Q.   Okay.  But when Officer Cox is spending five or more

1  whatever minutes asking you questions, you never told him,

2  "The woman on the other side of that glass told me there is

3  going to be a suicide," did you?

4  A.  No.

5  Q.  Okay.  Did you think that might be important?

6  A.  At the time, I didn't think of it.

7  Q.  It just happened a few minutes before, hadn't it?

8  A.  Several minutes before, along with other things.

9  Q.  Like her putting a cord around her neck?

10 A.  Like throwing my bird out the window and generally acting

11 crazy.

12 Q.  Didn't you think it might be helpful to the officers to

13 know that she had tied a cord around her neck --

14 A.  No.  Hindsight, I suppose.

15 Q.  And just for the benefit of the court reporter, and -- we

16 need to let one person stop talking.  And I will certainly try

17 to wait for you to finish, and you need to wait for me to

18 answer my question, because she can't take down two people at

19 a time.  Okay?

20 A.  Yes, sir.

21 Q.  Okay.  Did you, at any time that day, before the officers

22 went in, have any fear that Veronica Canter was going to hurt

23 anybody?

24 A.  No.

25 Q.  Now, this incident that occurred a few weeks prior that

1  you started to talk about, okay, what were the circumstances

2  that led to that?

3  A.  She was visiting, and a couple girlfriends of mine showed

4  up.  And I don't know what the argument started about or

5  anything, I was not in the room, and I heard her yelling.  And

6  yelling at the other girls.  And then she -- and I told her to

7  cool it, and she left.

8  Q.  And she pretty much stormed off; she was pretty upset,

9  wasn't she?

10 A.  Yes.

11 Q.  Did you do anything to check on her that night?

12 A.  No.

13 Q.  You just stayed with your other two girlfriends?

14 A.  Yes.

15 Q.  Now, when she came over to your apartment, I guess it is

16 now March 5th, two days before this incident, right?

17 A.  Yes.

18 Q.  She actually told you that that incident around

19 Valentine's Day a few weeks prior, that she had been taken to

20 a psychiatric ward, didn't she?

21 A.  Yes.

22 Q.  So before the officers arrived, Veronica Canter had said,

23 "When I left here all upset, because you kicked me out, I --

24 they took me to a psych ward," right?

25 A.  Well, I didn't kick her out at that point.  She left.

DAG LINDBECK - D

29

1   Q.  When she left upset, she told you on March 5th or 6th, or

2  certainly before this incident, she had been taken to a psych

3  ward, right?

4  A.  Yes.

5  Q.  When the officers got there and were asking you questions

6  about Veronica Canter and what was going on, you knew from

7  just within the last 24 to 48 hours, she had told you she had

8  been taken to a psych ward, right?

9  A.  Yes.

10  Q.  But you never told the officers that Veronica Canter had

11  been taken to a psych ward before, did you?

12  A.  I don't recall.  I don't think so.

13  Q.  Okay.  That's because on March 7th, all you wanted was for

14  the officers to get her out of your apartment, right?

15  A.  Yes.

16  Q.  In fact, you previously testified you didn't care what

17  happened to Veronica Canter as long as they got her out of

18  your apartment, right?

19  A.  No.  Okay.  Maybe.  I don't know.  What's the -- I'm not

20  sure what you are trying to get at.

21  Q.  Well, that's not for you to decide.  I'm just asking you

22  what happened.

23  A.  Okay.  I'm not recalling everything that happened.  You

24  know, I certainly didn't want anything to happen to her.  I

25  didn't -- you know, I wasn't saying that I didn't care what

1    happened to her.  I never said that.  That was your inference,

2    I think.

3            MR. PRAET:  Page 31, lines -- let's go lines 13

4    through line 2, on page 32.

5            THE COURT:  Just a moment.  I'm sorry, 31, starting

6    where?

7            MR. PRAET:  Line 13 through line 2, on the following

8    page.

9            THE COURT:  Any objection?

10           MR. GONZALEZ:  No, your Honor.

11           THE COURT:  Okay.  Go ahead.

12           MR. PRAET:  (Reading as follows:)

13       "Question:  And what did you want them to do with her?

14       "Answer:  Just, I don't know.  Just make sure she was

15        out.  Tell her to leave.

16       "Question:  And then just be on her way?

17       "Answer:  Yes.

18       "Question:  So knowing what you knew on March 7th,

19        2014, what you saw with Veronica, as long as the

20        officers got her out of there and sent her on her

21        way, that was --

22       "Answer:  That would have been fine with me.

23       "Question:  You didn't think she needed any kind of

24        psychiatric help or anything?

25       "Answer:  I wasn't -- I don't know.

1          "Question:  You didn't ask them to get her some help

2           or anything?

3          "Answer:  No."

4     BY MR. PRAET:

5     Q.  Now, you stayed in that little fenced-in area the whole

6     time while this all happened, right?

7     A.  No.

8     Q.  When did you leave?

9     A.  But -- well, while the whole thing was happening, no.  I

10    mean I was around in the back, I was in the front.  It was

11    right before the officers kicked the door, I jumped over the

12    fence.

13    Q.  You are saying you came out of the fenced area?

14    A.  Yes.

15    Q.  Before the shooting occurred?

16    A.  I was -- I was out of the fence before the shooting

17    occurred, yes.

18    Q.  We will get to that in just a minute.

19    A.  I was wondering if I should go through the window.

20    Q.  All right.  When the shooting occurred, you were back

21    inside the fence, right?

22    A.  Yes.

23    Q.  Okay.  So is it your testimony at some point, you came out

24    of the fenced area and then went back into the fenced area

25    before the shooting occurred?

DAG LINDBECK - D-

32

1  A.  No.  I was out of the fenced area, and then I went into

2  the fenced area before the shooting occurred.

3  Q.  Okay.  Did you go into the fenced area before the officers

4  got there?

5  A.  I don't recall.  I'm not sure if I was there inside the

6  fence the whole time or what.  I can't remember.

7  Q.  Okay.  The officers were talking to you.  They were on the

8  outside of the fence, and you were on the inside of the fence,

9  right?

10  A.  Yes, I guess so.

11  Q.  I don't want you to guess.

12  A.  Well, that's as far as I can recall, yes.

13  Q.  Do you remember talking to the officer through the fence?

14  A.  Seems to me like I was talking to him when I was outside

15  the fence as well.

16  Q.  Okay.  While the officers were there, before they made

17  entry into the apartment, did you climb back to the outside of

18  the patio area?

19  A.  No, I was outside when they got there, I believe, and then

20  I climbed inside.

21  Q.  From the moment, whenever that is, you went inside, they

22  had not entered the apartment, correct?

23  A.  Right.

24  Q.  They talked to you while you were on the inside and they

25  were on the outside, right?

A.   Yes.

Q.   Okay.  From that time, whenever it is that you went in,
you never came in out of that fenced area until after the
shooting occurred, correct?

A.   Right.

Q.   Okay.  Were the police officers trying to coax Veronica
just to simply come out of the apartment?

A.   I don't remember.  I think they were just pounding on the
door, telling her to open the door.  And then they were
telling her that I was not going to press charges and stuff,
she just needed to come out.

        MR. PRAET:  Your Honor, page 21, lines 2 through 8.

        THE COURT:  Any objection?

        MR. GONZALEZ:  No, your Honor.

        THE COURT:  Okay.  Go ahead.

        MR. PRAET:  (Reading as follows:)

     "Question:  Right.  Did the police officers try to

         talk her" -- excuse me.

     "Did the police officers try to talk to her through

         the door?

     "Answer:  Yes.

     "Question:  And, like, what did they say?  Do you

         remember?

     "Answer:  They said something like, 'Just open the

         door.  Dag doesn't want to press charges or nothing.

1          We are not going to take you to jail.  Just need you

2          to come out.'"

3   Q.  Does that refresh your memory as to what they said?

4   A.  Yes.  Isn't that what I just said?

5   Q.  Okay.  They were pretty much using a calm voice to talk to

6   her?

7   A.  Yes.

8   Q.  Talking to her by name?

9   A.  Yes.

10  Q.  Did the officers ever tell you that, "We just can't do

11  anything?  If she is angry and inside your apartment, that's

12  it?  We can't do anything for you"?

13  A.  No, I don't think so.  I can't recall.

14  Q.  Well, didn't they then tell you that the only way they

15  could do anything is if you were willing to press charges for

16  trespass?

17  A.  No, I don't think so.

18  Q.  Did they ask you what you wanted to do?

19  A.  Yes.  I said, "Just get her out."

20  Q.  Right.  That's all you wanted, was to get her out?

21  A.  Well, yeah.

22  Q.  Okay.  In fact, do you remember them asking you if you

23  wanted to press charges for trespass?

24  A.  I don't recall.  I think so.  The whole thing is pretty

25  fuzzy.

35

1    Q.   Okay.  Well, let's see if we can refresh your memory.

2    A.   I don't ever remember telling them that I would press

3    charges, no.

4    Q.   We will get to that in just a minute.  The bottom line

5    is --

6         Well, you know what?  I will read it, your Honor.

7    Page 40, let's go lines 8 through, I guess, line 1 on page 41.

8              THE COURT:  Any objection?

9              MR. GONZALEZ:  No, your Honor.

10             THE COURT:  Okay, go ahead.

11             MR. PRAET:  Thank you.

12             "Question:  When the officers got there, did they ask

13             you, 'What's going on?  Why are we here?'  That kind

14             of stuff?  'What do you want us to do?'

15             "Answer:  Yes.

16             "Question:  And would it be fair to say you were

17             anxious to get her out of the apartment -- your

18             apartment?

19             "Answer:  Yes.

20             "Question:  Did you want them to hurry up so she

21             wouldn't smash your guitar and other stuff?

22             "Answer:  I suppose.  I don't know.

23             "Question:  I mean you kept saying you want to -- you

24             wanted to break the window, you wanted to do things?

25             "Answer:  Yes.  I wanted to get her out of there.

DAG LINDBECK Bo

36

1          "Question:  And you were telling them, 'Get her out of

2              there before she breaks up all my stuff,' right?

3          "Answer:  I may have said that.

4          "Question:  Would it be fair to say you were anxious

5              to get her out?

6          "Answer:  Yes."

7     Q.   Now, do you remember kind of hemming and hawing on whether

8     you wanted to press charges?

9     A.   No.

10    Q.   Do you remember telling the officers you would press

11    charges?

12    A.   No.

13          MR. PRAET:  Your Honor, page 23, lines 21 through 25

14    first.

15          MR. GONZALEZ:  No objection.

16          THE COURT:  Go ahead.

17          MR. PRAET:  Okay.

18          "Question:  Did you ever say that you were willing to

19              have her arrested for trespassing?

20          "Answer:  I might have.  I don't recall.  I guess.  I

21              mean" --

22          MR. GONZALEZ:  Not correct.

23          MR. PRAET:  I'm sorry.  I will reread that.

24          "I might have.  I don't recall.  I don't think so, no,

25              because I told them I just wanted to press charges

1            just to get her out."

2        THE COURT:  I don't think that was right.

3        MR. PRAET:  Did I -- I apologize.  I will read it

4    again.  I'm not -- I didn't hear myself.

5        THE COURT:  Start again.

6        MR. PRAET:  One more time.  I will start with the

7    question.

8        MR. GONZALEZ:  I'm sorry.  Your Honor, just to be

9    technically correct, can we strike the prior two questions and

10   answers from the record because they were not read properly?

11       THE COURT:  That previous question and answer -- and

12   I'm following along -- I don't think was read properly.

13          Let's try to read this in again fresh.

14       MR. PRAET:  (Reading as follows:)

15       "Question:  Did you ever say that you were willing to

16          have her arrested for trespassing?

17       "Answer:  I might have.  I don't recall.  I mean I

18          don't think so, no, because I told them I didn't want

19          to press charges.  Just get her out."

20   BY MR. PRAET:

21   Q.  Now, you remember Veronica Placentia, the manager, being

22   there, right?

23   A.  Yes.

24   Q.  Now, if she testifies that you did say you wanted her

25   arrested for trespassing, would that refresh your memory?

1   A.  I think she would be mistaken.

2   Q.  Did the officers say they would go into her apartment and

3   get her out, like you asked?

4   A.  I don't remember.

5   Q.  Okay.  Was there some discussion of how they would get

6   into the apartment?

7   A.  Yes.

8   Q.  Okay.  Why were they going to go into the apartment?

9   A.  To get her out.

10  Q.  Okay.  Did they say they had some authority to get her

11  out?

12  A.  I don't remember them saying anything like that.

13  Q.  Did you tell them, "Go in and get her"?

14  A.  No.

15  Q.  Did you tell them, "It's okay to go in and get her"?

16  A.  I asked the manager, "What would be cheaper?  For me to go

17  through the window or for them to go through the door?"

18          She said, "The door."

19          They said, "Don't worry about it.  We will go through

20  the door."

21  Q.  You wanted to break the window to let the officers get her

22  out, right?

23  A.  I was going to get her out.

24  Q.  You had no fear that she was going to hurt anybody, right?

25  A.  Right.

39

1  Q.  But then is it the manager that said that it would be

2  cheaper to break the door than the window?

3  A.  Yes.

4  Q.  When the officers -- well, did you see them kick the door?

5  A.  Yes.

6  Q.  Okay.  And you were still in the little fenced area?

7  A.  Yes.

8  Q.  You could see around the corner?

9  A.  Well, no.  I couldn't see exactly.  I saw them getting

10  after the door.

11  Q.  I'm sorry, what?

12  A.  I saw them going towards the door and kicking it in.

13  Q.  Could you see them when they were outside the door?

14  A.  Yes, I could see them through the fence.

15  Q.  Okay.  And did you see if they had any guns out?

16  A.  I don't think they did.

17  Q.  Okay.  Did you see how the officer was positioned when he

18  kicked the door?

19  A.  Just in front of the door and kicking it (Demonstrating.)

20  Q.  Like kicking at the door --

21  A.  Yes.

22  Q.  He was definitely face-on to the door, right?

23  A.  Yes.

24  Q.  And you saw that?

25  A.  Yes.

1  Q.  Okay.  And then they didn't have any guns out?

2  A.  No.

3  Q.  "No," that's correct?

4  A.  That's correct.

5  Q.  Okay.  You saw the door open, right?

6  A.  Yes.

7  Q.  Did you see Veronica when the door opened?

8  A.  Yes.

9  Q.  And in order to see her, you were now looking through the

10  sliding glass door, right?

11  A.  Yes.

12  Q.  Is that a yes?

13  A.  Yes.

14  Q.  Did you see if she had anything in her hands?

15  A.  Yes, she did.

16  Q.  As soon as the door was opened?

17  A.  Yes.

18  Q.  Didn't you see her actually go into the kitchen and get

19  two knives?

20  A.  No.  I wasn't looking at her.  I mean I don't recall.  It

21  is possible.  What's your point?

22        MR. PRAET:  Your Honor, page 25, lines 14, let's go

23  through 22.

24        MR. GONZALEZ:  No objection.

25        THE COURT:  Go ahead.

1          MR. PRAET:  (Reading as follows:)

2          "Question:  Okay.  And did you see where Veronica was

3           when the door opened?

4          "Answer:  No, but then I noticed right after that,

5           noticed she came out of the kitchen.

6          "Question:  You saw the door fly open?

7          "Answer:  Yes.

8          "Question:  And the next time you saw Veronica was

9           when she was coming out of the kitchen?

10          "Answer:  Yes."

11     BY MR. PRAET:

12     Q.  First of all, you just told us you saw her when the door

13     opened, right?

14     A.  I suppose, yeah.  Well, actually, I'm not really sure if I

15     could see her or not.  I don't -- I'm not really sure if I

16     could see her at that moment or not.

17     Q.  Did you see her come out of the kitchen with two knives?

18     A.  Yes.

19     Q.  Okay.  When you saw her coming out of the kitchen, she

20     would walk right past those doors, wouldn't she, the glass

21     doors?

22     A.  Yes, but she didn't make it that far.  She didn't come

23     that far forward.

24     Q.  You saw -- you could, from the sliding door, you could see

25     into the kitchen, right?

DAG LINDBECK

42

1    A.   No.

2    Q.   You can't?

3    A.   Not from where I was.  There was blinds there.

4    Q.   Okay.  When did you first see her coming out of the

5    kitchen with knives?

6    A.   Right after they kicked the door in.

7    Q.   So it's your testimony that as soon as the door was

8    kicked, she was already in the kitchen?

9    A.   I guess so.

10   Q.   Well, don't guess.

11   A.   Well, I can't remember exactly.  I wasn't -- I didn't have

12   a timer.

13   Q.   Okay.  All I'm asking is what you visually saw.  I'm not

14   asking you to time it.

15   A.   I saw them kick the door in.  I was looking that way.

16   Then I saw her come out of the kitchen with knives.

17   Q.   Okay.  So she would be to your right or in front of you?

18   A.   Yes, she was to my right.

19   Q.   And the officers were to your left?

20   A.   Yes.

21   Q.   Did you yell at the officers, "She has got knives"?

22   A.   No.

23   Q.   Why not?

24   A.   They could see that themselves, I'm sure.

25   Q.   How do you know that?

1   A.   Because they both drew down on her, looking straight at

2   her, telling her to drop the knives.

3   Q.   You could see them?

4   A.   Yes.

5   Q.   You could see them.  Did they have their guns out before

6   she came around the corner?

7   A.   I could see one of them had his gun out.

8   Q.   When?

9   A.   Oh, as soon as they saw her with the knives.

10  Q.   Okay.  So as soon as they saw her with the knives, one of

11  them pulled his gun?

12  A.   I think they both did.

13  Q.   Neither officer had pulled a gun before she came out with

14  the knives, though, right?

15  A.   No, as far as I know.

16          MR. GONZALEZ:  Objection, leading.

17          THE COURT:  Sustained.

18          MR. PRAET:  Clearly, he is a hostile witness.

19          THE COURT:  Okay.  Are you asking permission to now

20  declare him a hostile witness and now you are going to be able

21  to ask leading questions?

22          MR. PRAET:  Yes, your Honor.

23          THE COURT:  Okay.

24          MR. PRAET:  All right.

25  ///

1   BY MR. PRAET:

2   Q.   Sir, the first time you saw either or both officers draw

3   guns is after you saw her with the knives, correct?

4   A.   I think so.

5   Q.   Okay.  You never saw the officers have any guns out before

6   they made entry, right, you've already said that?

7   A.   Right.

8   Q.   You saw the officers when she is coming out with the

9   knives, right?

10  A.   Yes.

11  Q.   And you said you saw an officer draw, at least one officer

12  draw their gun, correct?

13  A.   I'm not sure if I saw them draw their guns, but I saw the

14  guns drawn.  They already had them out by the time I saw them.

15  Q.   And by the time you saw them, she is coming out with the

16  knives, right?

17  A.   Right.  It was pretty much simultaneously.

18  Q.   Simultaneously, she is coming out with the knives?  They

19  are bringing their guns out, right?

20  A.   Right.

21  Q.   You weren't expecting her to come out with knives, were

22  you?

23  A.   No.

24  Q.   You weren't expecting any kind of violent confrontation

25  between the officers and Veronica, were you?

45

1   A.   No.

2   Q.   Okay.  When she came out with these knives, and the

3   officers simultaneously, to use your words, "drew their guns,"

4   did you hear the officers say anything?

5   A.   They said, "Drop the knives."

6   Q.   Several times?

7   A.   Not -- maybe once or twice.

8   Q.   Okay.

9   A.   "Now."  They said, "Drop the knives now."

10  Q.   Did she drop the knives?

11  A.   I don't know.  At that point, I turned around because I

12  didn't even want to see what might happen.

13  Q.   Pretty much knew what was going to happen?

14  A.   I didn't know what was going to happen.  I was hoping

15  nothing like that would happen, but I didn't want to see it if

16  it did.

17  Q.   Did you hear a Taser?

18  A.   No.

19  Q.   Did you hear the shots?

20  A.   Yes.

21  Q.   How many shots did you hear?

22  A.   Five.

23  Q.   Can you, using pop-pop-pop or whatever, can you give us

24  the sequence of how you heard them?

25  A.   Bang-bang-bang-bang-bang.

1  Q.  Five shots, pretty fast?

2  A.  Yes.

3  Q.  Was she moving toward the officers with these knives?

4  A.  I don't know.  I wasn't looking.

5  Q.  How close did she get to the officer before you turned

6  away?

7  A.  Maybe eight feet, ten feet.  Actually, I think she might

8  have been backing off.  I'm not really sure.

9  Q.  Okay.  Well, we don't want you to guess.

10  A.  Okay.  Well, eight or ten feet.

11  Q.  The last time you saw her, what was she doing with the

12  knives?

13  A.  She was holding them like this (Demonstrating.)

14  Q.  Out in front of her?

15  A.  Yes.

16  Q.  And the person in front of her was a police officer?

17  A.  Yes.

18  Q.  And she was still moving forward, wasn't she?

19  A.  No.

20  Q.  Do you remember telling the officer or using the words to

21  the investigator, that "She was going to attack the officers"?

22  A.  No.

23  Q.  She was acting aggressively towards the officers?

24  A.  She was holding the knives in front of her.

25  Q.  Right.  And she was coming out of the kitchen, right?

DAG LINDBECK X

47

1    A.   Yes.

2    Q.   The direction that she was moving was towards the

3    officers, right?

4    A.   She had stopped.

5    Q.   I'm sorry?

6    A.   She had stopped.  She wasn't moving towards the officers.

7    Q.   She had stopped seven, eight feet in front of them?

8    A.   Probably eight or ten feet in front of them.

9    Q.   Now it is eight or ten feet?

10   A.   That's what I said earlier.

11   Q.   That's when you turned away?

12   A.   Yes.

13   Q.   You don't know what she did after that?

14   A.   No.

15            MR. PRAET:  Nothing further.

16                        CROSS-EXAMINATION

17   BY MR. GONZALEZ:

18   Q.   Good morning, Mr. Lindbeck.

19   A.   Good morning.

20   Q.   Sir, my law firm also served you with a subpoena to

21   testify today?

22   A.   Yes, sir.

23   Q.   Do you have a car?

24   A.   No.

25   Q.   Have you ever been in this courthouse before today?

DAG LINDBECK - X

48

1    A.   No.

2    Q.   You asked us if we could help you with transportation, and

3    we made arrangements to make sure you were here on time?

4    A.   Yes.

5    Q.   Sir, do you recall that when the officers came in, at that

6    moment, you are still standing out on your patio; is that

7    right?

8    A.   Yes.

9    Q.   Can we put up 209, please.  So I just want to clarify

10   something, Mr. Lindbeck, because there may be a little

11   confusion.  When you are standing on the patio -- you see the

12   word "patio"?

13   A.   Yes, sir.

14   Q.   And then your door is at a location where, if you are

15   standing in the patio, can you actually see the front door?

16   A.   No.  Well, from inside through the window.

17   Q.   Exactly.

18   A.   Yes.

19   Q.   That's what I'm trying to clarify.  You can see your door

20   from the patio from the inside, but not from the outside; is

21   that right?

22   A.   Yes.

23   Q.   So that when you saw the officers -- could you hear when

24   they were kicking the door?

25   A.   Yes.

1  Q.  And then when the door flies open, now you can see the

2  officers enter; is that right?

3  A.  Yes.

4  Q.  Is it fair to say that all of this happened pretty

5  quickly?

6  A.  Very quickly.

7  Q.  And when you saw the officers enter, do you recall that

8  immediately, they had weapons drawn?

9  A.  Yes.

10  Q.  When Veronica comes out with the knives, do you recall her

11  saying to the officers, "Back off"?

12  A.  Yes.

13  Q.  All right.  Now, let me back up just a little bit.

14       That morning, you attended classes at Fresno City

15  College?

16  A.  Yes, sir.

17  Q.  And there was a suggestion in opening statement here that

18  the day before, you had told her to leave.  That didn't

19  happen, did it?

20  A.  No.

21  Q.  There was one thing that happened the night before that

22  was somewhat unusual.  You woke up and saw her writing on your

23  door; do you remember that?

24  A.  That is -- yes.

25  Q.  Do you remember what she was writing?

1    A.   I don't recall.

2    Q.   You were asked whether you told officers a number of

3    different things that you had observed.  You were interviewed

4    after the shooting by police officers; is that right?

5    A.   Yes.

6    Q.   And they asked you lots of questions, didn't they?

7    A.   Yes, they did.

8    Q.   And some of the questions that they asked you dealt with

9    her mental health history, correct?

10   A.   Yes.

11   Q.   Do you recall that you told them about the 5150 arrest

12   that had occurred on or about Valentine's Day?

13   A.   Yes.

14   Q.   And you told them that before that, she had been

15   institutionalized?

16   A.   Yes.

17   Q.   And you told them that she was trying to get off a drug

18   called "Seroquel"?

19   A.   Yes.

20   Q.   Because they were asking you questions and you were

21   telling them these things?

22   A.   Right.

23   Q.   The two officers that showed up that day, they didn't ask

24   you if she had any mental health history, did they?

25   A.   No.

1  Q.  And if they had asked you, you would have told them the

2  same stuff that you told the officers after the shooting?

3  A.  Yes.

4  Q.  Sir, I don't want to play it again, I think the jury heard

5  it, but the 911 dispatch or operator, asked you, "Is she

6  having mental issues?"

7       And your answer was, "Yes, apparently."  Right?

8  A.  Yes.

9  Q.  And if these officers had asked you that question, you

10 would have told them the same thing?

11 A.  Yes.

12 Q.  Now, sir, just a couple of questions about this basketball

13 net.  You had a brand new basketball net in your apartment?

14 A.  Yes.

15 Q.  You were going to use it and put it on a hoop around the

16 neighborhood?

17 A.  Yes.

18 Q.  And she took that out of the packaging and slipped it on

19 like a skirt?

20 A.  Yes.

21 Q.  Did the police officers tell you, whether or not you said

22 arrest her for trespassing, did they tell you that their plan

23 was to go in with a Taser and have a gun as lethal backup?

24 A.  No.

25 Q.  If they had told you they were going to do that, would you

52

1  have just told them to leave?

2  A.  Yeah, or hold on, you know.  Don't need no weapons.  I

3  figured there is two of them, and she weighs like 120 pounds,

4  you know.

5  Q.  You also mentioned to the officers who did ask you

6  questions about her mental condition after the shooting, you

7  mentioned to them that she had been writing on your wall?

8  A.  Yes.

9  Q.  And you told them that Veronica was suffering from a

10  chemical imbalance?

11  A.  Yes.

12  Q.  And you told them at one point, you said to Veronica, "You

13  got to go see a doctor because there is something wrong with

14  your head"?

15  A.  Yes.

16  Q.  And you told them that Veronica had been changing clothes

17  and putting on sunglasses and bandannas and all that?

18  A.  Yes.

19        MR. PRAET:  Objection, relevancy.  This is all post

20  incident, things he disclosed.

21        THE COURT:  Overruled.

22  BY MR. GONZALEZ:

23  Q.  Had you been asked by these officers, "Have you noticed

24  anything unusual?  Has she done anything that makes you think

25  she might have mental illness," you would have told them the

53

1   same things; isn't that true?

2   A.  Yes.

3   Q.  Did you care about Veronica?

4   A.  Very much.

5       MR. GONZALEZ:  Thank you, your Honor.  That's all I

6   have.

7                 REDIRECT EXAMINATION

8   BY MR. PRAET:

9   Q.  Mr. Lindbeck, I talked to you on the phone last night,

10  right?

11  A.  Yes.

12  Q.  Told you I was going to need you down here at 9:00 o'clock

13  this morning?

14  A.  Yes.

15  Q.  Did you ever tell me you needed a ride?

16  A.  I had already spoken with Mr. -- with Arturo.

17  Q.  With Arturo?

18  A.  Yes.  And he told me he would give me a ride.

19  Q.  Did he tell you he was calling you as a witness or I was

20  calling you as a witness?

21  A.  He didn't say.

22  Q.  I told you, "I'm calling you as a witness tomorrow.  I

23  need you here at 9:00."  Did you mention to me that Arturo was

24  going to already get you a ride?

25  A.  No.

DAG LINDBECK, RN

54

1  Q.  Today, I just heard you tell Arturo that you heard

2  Veronica Canter tell these police officers to back off when

3  she is coming out of the kitchen with the knives; is that

4  right?

5  A.  Yes.

6  Q.  Okay.  You remember that today?

7  A.  Yes.

8  Q.  For some reason, you didn't tell detectives or anybody

9  that at the time you were interviewed?

10  A.  I -- I don't remember.  I do remember hearing her say

11  that.

12  Q.  You can remember that today?

13  A.  Yes.

14  Q.  Okay.  Can you think of any reason why you wouldn't have

15  said that in the three interviews you had with police?

16  A.  As far as I know, I did.  I mean I might not have, but it

17  was just, I don't recall.

18  Q.  You told Mr. Gonzalez that you would have told the cops

19  about her prior psychiatric detention, right?

20  A.  Yes.

21  Q.  Okay.  But you didn't, did you?

22  A.  No.

23  Q.  Okay.  Why was it important for you to tell detectives

24  after she had been shot that she had been in a psychiatric

25  facility prior?

1   A.   Because they were asking me.

2   Q.   Because they were asking you what?

3   A.   What was going on with her before this incident.

4   Q.   Same kind of questions, and I can read it from your

5   deposition again, that Officer Cox was asking you, "What's

6   going on?  What's happening?  What do we know about her?"

7   A.   Nothing in detail like they asked me after the fact.

8   Q.   You didn't tell the officer on the scene about her prior

9   psych, but you did tell detectives after you knew she had been

10  shot, right?

11  A.   Well, they didn't ask prior to her being shot.

12  Q.   Isn't it true that the only reason you didn't tell these

13  officers everything you knew about, there is going to be a

14  suicide and she has got prior history, and the makeup and the

15  cord around the neck, is because all you wanted -- and we read

16  it from your deposition -- was for them to get her out of your

17  apartment?

18  A.   No.  I think it was just because at the time, they weren't

19  asking questions like that.  They weren't concerned with that.

20  Q.   And nothing had happened at that point, right?

21  A.   Right.

22  Q.   Right.  It was just, "She has locked me out, she is

23  wrecking my stuff.  Get her out"?

24  A.   Right.

25  Q.   It wasn't important then, was it?

1  A.  No, it was important.

2  Q.  Why was it important?

3  A.  I mean apparently it was always important, but I didn't

4  think of telling them that.

5  Q.  It wasn't important at the time, was it, because she

6  hadn't been shot, right?

7  A.  Right.

8  Q.  It only became important after you knew she had been shot,

9  right?

10  A.  No.  It was important the whole time, but they didn't ask,

11  and I didn't think of telling them.

12  Q.  Well, if it was important, why didn't you tell them?

13  A.  Because I was -- I was, you know, kind of flustered at the

14  time.

15  Q.  Kind of like you are flustered now?

16  A.  Yeah.

17  Q.  By the way, you said you saw the officers both draw their

18  guns simultaneously when Veronica was coming out of the

19  kitchen with knives.  You sure one of them wasn't a Taser?

20  A.  Not that I recall.  I didn't see a Taser.

21  Q.  Do you know what a Taser looks like?

22  A.  Yeah, I think so.

23  Q.  Did one of the guns look like a bright yellow gun?

24  A.  No, I didn't see that.

25          MR. PRAET:  Nothing further.

1          MR. GONZALEZ:  Just briefly, your Honor.  I would

2  like to read from page 26, lines 5 and 6, from his deposition.

3          THE COURT:  Any objection?

4          MR. PRAET:  No objection, your Honor.

5          THE COURT:  Proceed.

6          MR. GONZALEZ:  I want to make sure I got the date,

7  your Honor.  I'm not sure I read the date.

8          MR. PRAET:  The date of the deposition?

9          MR. GONZALEZ:  Yes.  For the record, the deposition

10 was taken on September 24, 2015.

11          And you were asked, at page 26, line 5:

12          "Did you hear what she said?

13          "Answer:  Something like, back off."

14                    RECROSS-EXAMINATION

15 BY MR. GONZALEZ:

16 Q.  That's what you told us many months ago, right?

17 A.  Right.

18          MR. GONZALEZ:  Thank you.

19          MR. PRAET:  Nothing further.

20          THE COURT:  Okay.  Thank you, Mr. Lindbeck.  You may

21 be excused.

22                *         *         *         *         *

23

24

25

58

1        I, PEGGY J. CRAWFORD, Official Reporter, do hereby

2   certify the foregoing transcript as true and correct.

3

4   Dated:  16th of June, 2016        /s/ Peggy J. Crawford
                                      PEGGY J. CRAWFORD, RDR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25